UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| United States *ex rel*. Conyers,<br><br>Plaintiff/Relator,<br><br>v.<br><br>Halliburton Co., *et al*.,<br><br>Defendants. | **UNDER SEAL**<br>**FILE UNDER SEAL**<br><br>Case No.:   12-cv-04095 (SLD/JAG) |

### RELATOR'S FIRST AMENDED COMPLAINT

1. This is an action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*., regarding the Defendants' submission of false claims to the U.S. Army (the "Army"), Relator Bud Conyers' efforts to investigate and stop the Defendants' fraudulent conduct and his refusal to participate in it, and the Defendants resulting retaliation against Mr. Conyers.[1]

2. The Defendants received an Army contract to provide troop support in Iraq (the "LogCAP Contract, or "LogCAP"). Among other things, they are believed to have:

---

[1] This Amended Complaint is one of two being filed pursuant to the Court's October 14, 2013 Order. Relator Bud Conyers' original complaint in this action was filed on or about December 20, 2006. Under the October 14, 2013 Order, Relator is to file an amended complaint concerning his personal claims asserted in the original complaint; and the United States is to file a separate amended complaint concerning matters in the original complaint with respect to which the United States has intervened. Relator reserves all of his rights with respect to the intervened matters and the United States' amended complaint, including all of his rights under 31 U.S.C. § 3730.

1

- used morgue tracks that contained decayed human remains to store and transport ice to U.S. soldiers (ice which was used in refreshments);

- taken kickbacks from vehicle suppliers; and

- hired prostitutes as staff, and billed the expense to the Army.

3. Relator Bud Conyers was a civilian truck driver working under the LogCAP Contract. He developed knowledge of the information on which these allegations are based. Defendants' actions grossly violated the terms of the LogCAP Contract, and other applicable law. Their resulting claims for payment to the Army were false and fraudulent. The Relator complained to Defendants repeatedly about their failure to abide by health and safety standards, in particular regarding transporting, in morgue trucks, ice that was consumed by the troops. Conyers suffered in the terms and conditions of his employment as a result of his investigation of this fraud and refusal to participate in the fraud. The Defendants harassed him, stopped paying him, and then terminated his employment.

**PARTIES**

4. Relator Bud Conyers ("Conyers") is a citizen of the United States, now domiciled in Enid, Oklahoma. He served in the U.S. Army from 1987 to 1989, and then went to school on the G.I. Bill. He drove trucks from 1994 until 2005. Hoping to help the war effort in lraq, he joined Defendants in 2003 as a truck driver and convoy commander.

5. Defendant Halliburton Company ("Halliburton") is a publicly-traded company incorporated in Delaware. It wholly owns all business entities known as

2

Kellogg Brown and Root or KBR, and did so before, during and after their reorganization under Chapter 11. Halliburton's principal places of business are Suite 200, 1150 18th St., N.W., Washington, D.C. 20036 and 5 Houston Center, 1401 McKinney, Houston, Texas 77010.

6. Defendant Kellogg Brown & Root, Inc. ("KBR Inc.") and Defendant Kellogg, Brown & Root Services, Inc. ("KBR Services") are contractors under the LogCAP Contract, as explained further below. Their address is 5 Houston Center, 1401 McKinney, Houston, Texas 77010. KBR Inc. and KBR Services employ approximately 60% of Halliburton's total staff. Collectively, Halliburton, KBR Inc. and KBR Services are referred to as the Defendants. Together, KBR Inc. and KBR Services are referred to as KBR.

## JURISDICTION AND VENUE

7. This action arises under 31 U.S.C. §§ 3729 *et seq*. Therefore, this is a case or controversy arising under the laws of the United States. Hence the Court has jurisdiction under 28 U.S.C. § 1331 (2000). The Court has jurisdiction over Relator's state law claim under 28 U.S.C. § 1367.

8. This action may be brought in this judicial district under 31 U.S.C. § 3732(a) (2000) because, *inter alia,* one or more of the Defendants can be found or transacts business in this judicial district, and one or more of the acts prescribed by *id.* § 3729 occurred in this judicial district.

## ALLEGATIONS

9. In 2001, the U.S. Army Corps of Engineers awarded a 10-year contract to KBR under the U.S. Army's Logistics Civil Augmentation Program. This is the LogCAP Contract.

10. The U.S. Army Field Support Command ("FSC") administers the LogCAP Contract. FSC is headquartered in Rock Island, IL Arsenal, Rock Island, IL 61229-6000.

11. LogCAP is Contract No. DAAA09-02-D-0007. "DAAA09" is a prefix referring to the FSC office in Rock Island. LogCAP is a 10-year Task Order contract that calls for the contractor to provide a wide range of logistical services to the U.S. Army, including billeting, food, power, waste management, transport, and water and ice.

12. On information and belief, LogCAP was awarded to Kellogg Brown & Root Services, then an unincorporated division of Defendant KBR Inc., and later transferred to Defendant KBR Services.

13. Defendants KBR Inc. and KBR Services have submitted LogCAP claims to U.S. Government employees at FSC (and other locations) that FSC received within this judicial district. Defendant Halliburton caused such claims to be submitted. For the reasons stated above and below, these claims were false and fraudulent.

14. In 2003, Relator Bud Conyers went to work in Kuwait and Iraq for KBR, so that he could earn money for his family, and help his country in the war effort.

15. Conyers worked for KBR's Theater Transportation Mission, which provides transportation in support of the U.S. forces in Kuwait and Iraq. He worked as a truck driver and convoy commander. Despite exhaustive searches, Relator does not have

4

access to the LogCAP III Contract Task Orders that encompass the Theater Transportation Mission because they are in the exclusive possession and control of Defendants.

### I. Ice Consumed by U.S. Troops Delivered in Morgue Trailers

16. In March 2003, soldiers from the U.S. Army's 54th Quartermaster Company (the "54th"), of Fort Lee, VA, comprised the Army's only active duty Mortuary Affairs unit. That month, when the U.S. occupation of Iraq began, the 54th deployed to Kuwait, Iraq and Afghanistan.

17. When the 54th arrived in the combat theater, two teams branched off to support combat divisions heading toward Baghdad, Iraq. Both teams also established temporary internment cemeteries for deceased Iraqis.

18. After U.S. forces occupied Baghdad in April 2003, the teams from the 54th remained in the area. They assisted in the recovery of human remains from battle. The teams from the 54th employed refrigerated trailers to transport remains to burial sites. Refrigerated vehicles, whether for this purpose or for other purposes, were known as "reefers."

19. The proper disposal of human remains is a very serious matter, not only for cultural and religious reasons, but also for reasons of health and safety. According to the U.S. Army Center for Health Promotion and Preventive Medicine's Technical Guide:

> Contact with whole or part human remains carries potential risks associated with pathogenic microbiological organisms that may be present in human blood and tissue. Infectious conditions and pathogens in the recently deceased include-

> -bloodborne pathogens such as hepatitis B virus (HBV), hepatitis D virus (HDV), hepatitis E virus (HEV), and human immunodeficiency Virus (HIV);
> -tuberculosis;
> -group A streptococcal infection;
> -gastrointestinal organisms;
> -agents that cause transmissible spongiform encephalopathies such as Creutz Jakob disease; and
> -possibly meningitis and septicemia (especially meningococcal).
> ****
> The primary ways to protect personnel who handle human remains against infectious diseases are -
> -use of appropriate personal protective equipment,
> -observance of safety, industrial hygiene, and infection control practices described in this TG [Technical Guide].

"Guidelines for Protecting Mortuary Affairs Personnel from Potentially Infectious Material," TG 195 (October 2001).

20. The Army and the U.S. Department of Defense have promulgated numerous rules regarding health and safety. Many of these rules were incorporated in the LogCAP Contract, and were binding on the Defendants. Under these health and safety rules, the Defendants were not permitted to use mortuary trailers that had transported human remains to deliver supplies to U.S. troops. This included trailers that the teams from the 54th had employed.

21. Halliburton's "Code of Business Conduct: Health, Safety and Environment," - which the Board of Directors approved on May 21, 2003, and which explicitly applies to KBR - states:

> The Company will comply with all applicable Laws and relevant industry standards of practice concerning protection of health and safety of its Employees. . . . Protection of health [and] safety. . . is a primary goal of the Company and the management of the Company shall take such actions

6

as are reasonable and necessary to achieve such goal and carry out this Policy.

22. The Defendants disregarded applicable health and safety rules by hiring and using mortuary trailers to deliver supplies to U.S. troops, and submitting claims under the LogCAP Contract for the cost of such to the Army. As a result, those claims were false and fraudulent.

23. In addition, the Defendants followed none of the applicable rules regarding the protection of personnel exposed to human remains. Nor did KBR follow applicable rules governing the disinfection of vehicles or equipment containing such remains.

24. Conyers discovered the Defendants' misuse of mortuary trailers in a particularly unpleasant manner. On or about June 16, 2003, while working under the LogCAP Contract, he observed LogCAP convoy commander Wallace Wynia, David Milk and a half-dozen other LogCAP drivers working to repair the engine of a truck – "reefer" [refrigerated] Trailer R-89 - that had been inoperative for two weeks.

25. After about six hours of work, they got the engine running. They then wanted to check the trailer, to make sure the cooling unit worked. They opened the trailer door to a gruesome discovery. They found 15 dead Iraqis in various stages of decomposition. The bodies had been rotting in heat in excess of 120°, for approximately two weeks.

26. Since this vehicle was a morgue trailer, the Defendants were supposed to send it to an Army base in Kuwait, for continued use as such. Instead, the morgue trailer

went to a Public Warehousing Company ("PWC) facility, for use by the Defendants under the LogCAP Contract – specifically, to deliver ice to U.S. troops.

27. As noted above, under the LogCAP Contract, KBR delivered various supplies to Army bases and other U.S. facilities in Iraq. Among these supplies is ice made from drinking water. U.S. troops in Iraq consume such ice in large quantities, to cool beverages. KBR uses "reefer" vehicles to keep this ice frozen as it is delivered to U.S. facilities in Iraq. This is sometimes referred to as "potable ice" or "edible ice," although of course it is no longer potable or edible after being transported in a morgue trailer.

28. In the case of Trailer R-89, an Army mortuary team unloaded the Iraqi bodies at the PWC facility. A KBR foreman ordered Trailer R-89 to an "ice center," where it was loaded with "potable" ice. Trailer R-89 then delivered that ice for consumption by U.S. soldiers. After this run, KBR kept the contaminated trailer in circulation for various cargo, including more "potable" ice.

29. KBR's Project Manager and Deputy Project Manager covered up the Trailer R-89 incident. Earlier, two KBR employees had been injured while joy-riding a Blackhawk helicopter. Wynia and convoy commander Jeff Allen did not want those employees fined, and wanted KBR to pay the employees (at taxpayer expense) during their recovery. On information and belief, Wynia and Allen made a deal with two KBR supervisors, Ely and Ducksbury, and the drivers that they would not tell anyone about KBR's practice of transporting "potable" ice on morgue trucks if KBR would retain and pay those two injured employees during their recovery. Conyers overheard Ely and

8

Wynia discussing this deal when Conyers and other witnesses to the Trailer R-89 incident were called to Wynia's office.

30. The Trailer R-89 incident was far from isolated. Conyers tried to stop the Defendants and their suppliers from loading "potable" ice onto morgue trucks at least six times after the grisly June 2003 incident.

31. More than two months after the initial incident, as reported in Allen's August 31 mission log, Trailer R-89 was still being used to transport "potable" ice. Of the 5,000 pounds loaded onto the trailer, "approx. 1,800 pounds" of the "biocontaminated ice" was" used," according to a signed note written in a log.

32. Conyers repeatedly filed complaints with KBR's Internal Affairs Office, but the awful practice continued. Conyers and a colleague even took pictures to substantiate what was happening. Conyers' boss found out, got angry with Conyers, and confiscated the pictures (but not the negatives).

33. The claims that the Defendants submitted under the LogCAP contract for the transportation of items in refrigerated vehicle were false or fraudulent, because the Defendants certified compliance with applicable rules and contract provisions, but *(inter alia)* KBR did not comply with the rules forbidding the use of mortuary trucks to deliver other items, the rules governing the protection of persons exposed to human remains, and the rules governing cleaning and cleanliness of vehicles and equipment.

## II. Kickbacks on Trucks

34. Conyers discovered that one of Conyers' first bosses, Willie Dawson, took kickbacks from leasing companies for trucks, trailers and equipment. To add insult to injury, Dawson was taking the kickbacks regardless of whether these items worked.

35. For example, KBR had a fleet of around 200 "reefer" trailers to transport food and ice, but only around 50 ever worked. KBR submitted claims to the Army for all 200, however, so that Dawson and others could receive their kickbacks on all 200.

36. This resulted in false and fraudulent claims to the Government, for several reasons. *Inter alia, the* cost of the kickback was incorporated in the leasing company's bill to KBR, and KBR's bill to the Government. In addition, because of the billing for the inoperative vehicles, the leasing companies billed approximately four times as much as the bill would have been for operative vehicles, and this, in turn, increased KBR's bill to the Government. Moreover, this arrangement caused unnecessary repair bills to be submitted to the Government. Furthermore, the resulting inefficiency meant that the overall cost of the mission was increased.

37. Conyers complained to his immediate foreman and then to the local leasing company about these kickbacks. The local leasing company manager offered Conyers the same deal that Conyers' KBR supervisor was getting: "a kickback on all equipment that hits the ground, good or bad."

38. Conyers rejected the bribe.

39. Rob Nuble was another KBR employee taking kickbacks of this kind. At Camp Anaconda, Nuble took kickbacks from the supplier of flatbed trucks billed for use

there. Nuble came up with a new twist – he charged the Army for more trucks than were really delivered to Camp Anaconda, and took kickbacks on the phantom trucks. Nuble actually bragged about this to Conyers.

40. Conyers filed complaints about the kickbacks with KBR's Internal Affairs Office. Nothing changed.

### III. Prostitution Billed to the U.S. Government

41. Conyers initially was assigned to work for KBR in Kuwait. In Kuwait, Conyers observed that women from Bosnia and Kosovo who worked for KBR served as prostitutes for male KBR managers. Conyers learned that the managers had hired these women as LogCAP employees, billing their salaries to the Army under the LogCAP Contract. The women did little if any actual work under LogCAP, however. Their primary function was simply to service the KBR managers. KBR even paid for their hotel rooms. Conyers reported this to KBR's Internal Affairs Office, again to no effect.

42. Needless to say, providing prostitution services to KBR management is not authorized under the LogCAP Contract. The employment of prostitutes, at taxpayer expense, inflated the bills that the Defendants submitted under the LogCAP Contract to U.S. Government employees.

### IV. Retaliation

43. Despite threats from his supervisor, Conyers repeatedly filed complaints to KBR's Internal Affairs Office.

44. On October 24, 2003, Conyers told Jim Coin, KBR's Employee Relations manager for LogCAP, about yet another morgue trailer having a dead body in it (this one

11

at Cedar II). Conyers was relieved of his LogCAP duties the next day.

45. KBR stopped paying Conyers. In fact, he did not receive any of his salary after August 2003. When he complained to a supervisor, he was told that this is what happens when you are not a "team player."

46. KBR did not reimburse Conyers for the $4000 replacement prosthesis that Conyers had to buy when his artificial leg was broken on the job in Iraq. He also lost all of his personal belongings in Camp Anaconda, including, his clothes, his replacement artificial leg, and holiday presents for his family.

47. KBR fired him on December 28, 2003, ostensibly for "failure to remain at his post" in Safir al-Dana.

48. Conyers reported the incidents to the Army's Criminal Investigative Division in Kuwait.

### RELATOR'S FIRST PERSONAL CLAIM: RETALIATION (FCA § 3730(h))

49. All of the preceding allegations are incorporated herein.

50. Defendants controlled the terms, conditions and conduct of Conyers' employment.

51. KBR billed the Government under the LogCAP Contract each month. Each of these LogCAP claims relating to the shipping of edible ice in morgue trailers, taking kickbacks on trucks and billing for more working trucks than there were, and billing prostitutes as personnel, beginning no later than 2003 and continued during the pendency

of this lawsuit, is a false or fraudulent claim, for the reasons alleged above. Halliburton caused such false and fraudulent claims to be submitted.

52. The Defendants also knowingly made, used or caused to be made or used numerous false records or statements to get the false or fraudulent claims paid or approved. For instance, Defendants made false statements regarding the source of reefer trailers, the actual cost of reefer trailers, and the number of reefer trailers in use.

53. Relator Conyers was an employee discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against in the terms and conditions of employment by his employer because of lawful acts done by the Conyers in furtherance of an action under the False Claims Act. This included his investigation for this action and his refusal to participate in the fraud.

**WHEREFORE**, for this claim, Relator Conyers requests the following relief from each of the Defendants, jointly and severally:

A. All relief necessary to make the Relator whole;

B. An Order providing for reinstatement with the same seniority status that the Relator would have had but for the discrimination, or in the alternative, front pay;

C. Two times the amount of back pay and front pay;

D. Interest on the back pay and front pay;

E. Compensation for special damages sustained as a result of the retaliation, including but not limited to litigation costs, reasonable attorneys' fees and emotional distress damages;

F. Pre-judgment and post-judgment interest; and

  G. Such further relief as the Court deems just.

## RELATOR'S SECOND PERSONAL CLAIM: (BREACH OF CONTRACT)

54. All of the preceding allegations are incorporated herein.

55. KBR entered into an employment contract with Conyers. There was adequate consideration for the contract.

56. Conyers performed under the contract.

57. KBR breached the employment contract by terminating it prematurely and unlawfully.

58. KBR's actions were without lawful cause or justification.

59. KBR's breach of the contract caused and continues to cause Conyers harm, *i.e.,* the loss of the money due to and expected by Conyers under the natural term of his employment.

**WHEREFORE**, for this claim, Relator Conyers requests the following relief from each of the Defendants, jointly and severally:

  A. All relief necessary to make the Relator whole;

  B. An order providing for reinstatement with the same seniority status that the Relator would have had but for the discrimination, or in the alternative, front pay;

  C. Back pay;

  D. Interest on the back pay and front pay;

  E. Pre-judgment and post-judgment interest; and

  F. Such further relief as the Court deems just.

## JURY REQUEST

Relator requests a jury for all issues that may be tried by a jury.

Date:  January 6, 2014

                Respectfully submitted

                LAW OFFICE OF VICTOR A. KUBLI P.C.

By:   /s/ V. A. Kubli
       Victor A. Kubli, Esq.
       13948 Bromfield Road
       Germantown, Maryland 20874
       Ph: (301) 801-2330
       E-mail: Kubli@kublilaw.com

       Counsel for Relator

## Certificate of Service

I certify that, this 6th day of January 2014, a copy of the foregoing was served by U.S. Mail and e-mail upon:

MICHAEL D. GRANSTON
JUDITH RABINOWITZ
JOHN A. KOLAR
RUSSELL B. KINNER
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044


/s/ Victor A. Kubli
Victor A. Kubli