**E-FILED**
Wednesday, 08 January, 2014  09:28:45 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

_____

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| *ex rel.* **BUD CONYERS,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) Civil Action No. |
| | ) |
| **KELLOGG, BROWN & ROOT, INC.;** | ) 4:12-cv-04095-SLD-JAG |
| **KELLOGG BROWN & ROOT SERVICES, INC.;** | ) |
| **KELLOGG BROWN & ROOT LLC;** | ) **UNDER SEAL** |
| **OVERSEAS ADMINISTRATION SERVICES, LTD;** | ) |
| **LA NOUVELLE GENERAL TRADING &** | ) |
| **CONTRACTING COMPANY;** | ) |
| **LA NOUVELLE GENERAL TRADING &** | ) |
| **CONTRACTING COMPANY, WLL;** | ) |
| **LA NOUVELLE GENERAL TRADING &** | ) |
| **CONTRACTING CORP.;** | ) |
| **LA NOUVELLE GENERAL TRADING AND** | ) |
| **CONSTRUCTION CORP.;** | ) |
| **FIRST KUWAITI TRADING COMPANY;** | ) |
| **FIRST KUWAITI TRADING AND CONTRACTING;** | ) |
| **FIRST KUWAITI GENERAL TRADING &** | ) |
| **CONTRACTING COMPANY;** | ) |
| **FIRST KUWAITI GENERAL TRADING &** | ) |
| **CONTRACTING COMPANY, WLL; and** | ) |
| **FIRST KUWAITI TRADING & CONTRACTING, WLL,** | ) |
| | ) |
| **Defendants.** | ) |

_____

### COMPLAINT OF THE UNITED STATES OF AMERICA

The United States of America brings this action against the defendants, prime

contractor Kellogg Brown & Root Services, Inc. (KBR) and subcontractors La Nouvelle

and First Kuwaiti, for engaging in kickbacks and knowingly submitting, or causing to be

submitted, false or fraudulent claims for payment under a contract between the United

States Army and KBR for logistical support in the military theater (LOGCAP III).  The

United States asserts that this conduct gives rise to claims against KBR, La Nouvelle, and

First Kuwaiti under the Anti-Kickback Act, 41 U.S.C. §§ 53 and 55 (now codified at 41 U.S.C. §§ 8702 and 8706), the False Claims Act, 31 U.S.C. § 3729, and at common law.

## Jurisdiction and Venue

1. Subject matter jurisdiction is conferred on this Court by 31 U.S.C. §§ 1331 and 1345.

2. The Court has personal jurisdiction over the defendants because the defendants transact or transacted business in the United States and one or more of the acts proscribed by 31 U.S.C. § 3729 occurred in the United States.

4. Venue is proper in this district under 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a) because defendant KBR is doing business in this district, defendants First Kuwaiti and La Nouvelle did business in this district, and at least one of the acts proscribed by 31 U.S.C. § 3729 occurred in this district.

## The Parties

5. Plaintiff is the United States of America.

6. The defendants identified in this paragraph are referred to collectively as KBR:

(a) The Army awarded the LOGCAP III contract to Brown & Root Services, a division of defendant Kellogg Brown & Root, Inc., in December 2001. At the time, Kellogg Brown & Root, Inc. was owned by Halliburton Company (Halliburton), which guaranteed performance of LOGCAP III. On December 14, 2003, responsibility for LOGCAP III was transferred to defendant Kellogg Brown & Root Services, Inc., also owned by Halliburton. In April 2007, Halliburton spun-off its KBR subsidiaries, as KBR, Inc., a publicly-traded stock company.

As discussed in the allegations below, the acts attributed to KBR before December 14, 2003, were committed by Kellogg Brown & Root, Inc. and its agents; the acts attributed to KBR on or after that date were committed by Kellogg Brown & Root Services, Inc. and its agents.

(b)     Defendant Kellogg Brown & Root LLC, successor to Kellogg Brown & Root, Inc., is a Delaware corporation with its principal office and place of business located at 601 Jefferson Street, Houston, Texas 77002, and its registered agent for service is CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas Texas 75201.  At all times relevant to this complaint, Kellogg Brown & Root LLC owned Kellogg Brown & Root Services, Inc.; Brown and Root Services, a division of Kellogg, Brown & Root International, Inc.; and predecessor or successor related corporations.

(c)     Defendant Overseas Administration Services, Ltd (OAS) employed most of KBR's administrators working on LOGCAP III in Iraq and Kuwait at all times relevant to this complaint.  On information and belief, OAS was incorporated in the Cayman Islands and is headquartered in Dubai, and is a foreign, wholly-owned subsidiary of defendant Kellogg Brown & Root LLC.  KBR Technical Services, Inc. is a domestic subsidiary of Kellogg Brown & Root LLC and recruited and trained employees for OAS.  During the time relevant to this complaint up to April 2007, the employees of OAS and other defendant KBR entities were trained using the same personnel and procedure manuals, received employment benefits through the same human resources office, and used the same email network.

7.     The defendants identified in this paragraph are referred to collectively as La Nouvelle:  KBR awarded La Nouvelle multiple subcontracts under LOGCAP III for

3

the delivery of goods and services to support the United States military in Iraq and Kuwait.  La Nouvelle General Trading & Contracting Company, La Nouvelle General Trading & Contracting Company, WLL, La Nouvelle General Trading & Contracting Corp., and La Nouvelle General Trading and Construction Corp., all named as defendants, were various names used by La Nouvelle and Managing Partner Ali Hijazi (Hijazi) on documents relating to the La Nouvelle subcontracts.  On information and belief, La Nouvelle's and Hijazi's principal place of business is Omar Ibn Al Khatab Street, Al Shawafat, Bldg Block 5, Floor 5, P.O. Box 20744, Safat 13068, Kuwait.[1]

8.      The defendants identified in this paragraph are referred to collectively as First Kuwaiti:  KBR awarded defendant First Kuwaiti multiple subcontracts under LOGCAP III for the delivery of goods and services to support the United States military in Iraq and Kuwait.  First Kuwaiti Trading Company, First Kuwaiti Trading and Contracting, First Kuwaiti General Trading & Contracting Company, First Kuwaiti General Trading & Contracting Company, WLL, First Kuwaiti Trading & Contracting, WLL, all named as defendants, were various names used by First Kuwaiti and General Manager Wadih Al-Absi (Al-Absi) on documents relating to the First Kuwaiti subcontracts.  On information and belief, First Kuwaiti's and Al-Absi's principal place of business is Sharq, Ahmed Al-Jaber Street, Al-Jas Tower, 8th floor, Kuwait City, Kuwait.

---

[1] This is the post office box address listed on La Nouvelle's website.  Some contract documents list the address as Safat 93151 or Emad Abdul Salam, P.O. Box 919, Safat 13010.

**Factual Allegations**

**I.      The LOGCAP III Contract**

9.      On December 14, 2001, the Army awarded contract number DAAA09-02-D-0007, known as LOGCAP III, to Brown and Root Services, a division of Kellogg Brown & Root, Inc.  LOGCAP III is the third generation of contracts under the Army's Logistics Civil Augmentation Program for the provision of logistical support in the military theater.  Support services include transportation, facilities management, maintenance, dining, and living accommodations for the troops.

10.     LOGCAP III is an umbrella contract for an indefinite delivery of an indefinite quantity of services, known as an IDIQ contract.  IDIQ contracts operate through task orders, each of which prescribes a specific scope of work.

11.     LOGCAP III is a cost reimbursable contract.  The contract obligated the Government to pay KBR for its allowable costs of providing the services required under the task orders, plus a one percent base fee and a discretionary award fee of up to two percent.

12.     KBR performed a significant portion of its obligations under LOGCAP III through subcontractors.  These subcontractors invoiced KBR for the services they provided under their subcontracts.  KBR, in turn, vouchered the Government for its costs under the subcontracts, plus administrative costs and fees.  A Government official certified the vouchers as "correct and proper for payment" based on KBR's representations.  See FAR 53.301-1034.

II.    **Governing Regulations, Contract Terms, and Defense Department-Approved KBR Procedures to Ensure the Integrity of the Subcontracting Process**

A.    **Provisions Intended to Ensure That the United States Is Charged Only for KBR's Reasonable Costs**

13.    The Government's acquisition of goods and services is governed by the Federal Acquisition Regulation (FAR) (codified at Title 48 of the Code of Federal Regulations), the applicable provisions of which, including the FAR's cost principles, were incorporated into LOGCAP III.

14.    Under the FAR and the contract, KBR was entitled to reimbursement for its allowable costs.  To be allowable, a cost must be incurred, reasonable, allocable to the contract, and not otherwise unallowable under applicable statutes and regulations. FAR 31.201-2.

15.    A cost is reasonable "if . . . it does not exceed that which would be incurred by a prudent person in the conduct of competitive business."  FAR 31.201-3. Reasonableness depends on a "variety of considerations and circumstances," but generally includes the contractor's (a) adherence to sound business practices, (b) commitment to arm's length bargaining, (c) attention to its responsibilities to the Government, and (d) adherence to its own established practices.  *Id.*

16.    Under the FAR, KBR had a duty, when awarding subcontracts for LOGCAP III work, to "[c]onduct appropriate cost or price reasonableness analyses to establish the reasonableness of proposed subcontract prices."  FAR 15.404-3(b)(1).

17.    The two preferred methods for ensuring the reasonableness of subcontract prices are adequate price competition and comparison of the price with previous prices for the same or similar items.  FAR 14.404-1(b)(2)(i) and (ii), and (b)(3).  In fact, the

6

FAR (and LOGCAP III) required KBR to award subcontracts on a competitive basis "to the maximum practical extent." FAR 52.244-5.

18. During the relevant time period, KBR maintained a Government Procurement Procedures Manual (Oct. 1993 ed.) (Manual) "to facilitate the implementation of the [FAR] in the federal government procurement actions of Brown & Root, Inc. . . . The manual reflects the intent of applicable public laws and statutes and good business practices in the acquisition process. . . ." Manual, Introduction, p. 1.

19. The procedures set forth in the Manual are approved by the Department of Defense. The Department of Defense relied on KBR to follow these procedures in procurement actions undertaken in support of Government contracts, including LOGCAP III. *See* FAR Part 44; FAR 52.244-2.

21. The Manual mandated the use of a Material Requisition to identify specific requirements, plus a defined statement of work, cost estimate, and other procurement planning documents as standard procedure at the beginning of the procurement process. Manual, Part II-1, p. 1.

22. The Material Requisition was the first step to a sound procurement action and, with limited exception, had to be completed and approved before soliciting bids for a subcontract. Manual, Part II-2, p. 1.

23. A Material Requisition was required even for emergency acquisitions. *Id*.

24. If the purchase exceeded $2,500, the Manual mandated that subcontract administrators use competitive bidding to ensure that it was advantageous to the Government. Manual, Part II-4, p. 7.

7

25.     The Manual also provided that awarding a subcontract without competition should be the exception, Manual, Part II-2, p. 4, and mandated competition even for priority acquisitions, Manual, Part II-1, p. 2.

26.     The Manual made clear that awarding a subcontract without competition to a single source, a practice called "sole sourcing," was appropriate only when no competition was available.  To sole source a subcontract, the KBR employee requisitioning the services had to justify the sole source purchase in writing and have it approved by the project manager **before** awarding the subcontract.  Manual, Part II-2, p. 4; Part II-4, p. 7.

27.     The Manual required subcontract administrators to obtain the signature of a KBR official higher in the management chain if the dollar amount of a subcontract exceeded his or her authority.  The Manual made clear that the level of authority necessary for a change order to a subcontract depended on the total revised value of the subcontract, not on the change order alone.  Manual, Part I-7, p. 1.

28.     The Manual also prescribed the process for paying invoices.  The subcontract administrator was instructed (a) to verify that each invoice was for work within the scope of a signed subcontract at the agreed price, (b) to resolve any significant errors discovered in the process, and (c) to then forward the invoice to the appropriate official for approval and payment.  The subcontract administrator was also responsible for seeing that a copy of the invoice and any backup documents were inserted in the subcontract file.  Manual, Part IV-4, p. 2.

8

### B.    Provision Prohibiting Kickbacks

29.    In addition to provisions on reasonable cost, LOGCAP III  also incorporated FAR 52.203-7, entitled "Anti-Kickback Procedures."  This provision incorporates the prohibitions of the Anti-Kickback Act, 41 U.S.C. §§ 51-58, substantially verbatim and required KBR to include the provision in each of the subcontracts at issue in this complaint.  The provision also authorized the contracting officer to withhold or offset an amount equal to the amount of any kickback in the event of a violation.

### C.    The Defendants' Noncompliance with These Provisions

30.    As explained more fully below, KBR, through its subcontract administrators, conspired with La Nouvelle and First Kuwaiti to take kickbacks in return for giving La Nouvelle and First Kuwaiti favorable treatment in the award and performance of subcontracts, and while engaged in these kickback arrangements knowingly awarded numerous subcontracts to La Nouvelle and First Kuwaiti contrary to the requirements of LOGCAP III, the FAR, and KBR's Manual.

31.    KBR committed these acts through subcontract administrators Stephen Lowell Seamans, Jeff Alex Mazon, and Anthony Martin.  As subcontract administrators, Seamans, Mazon, and Martin were responsible for negotiating and awarding subcontracts on behalf of KBR.  At all times pertinent to this complaint, Seamans, Mazon, and Martin were acting with apparent authority and within the scope of their employment.  Their conduct, therefore, is imputed to KBR.

32.    As explained more fully below, KBR, through Seamans, Mazon, and Martin, knowingly awarded subcontracts to La Nouvelle and First Kuwaiti at prices greatly in excess of reasonable cost.  By failing to enforce LOGCAP III, FAR, and KBR Manual requirements, KBR acted, at a minimum, with reckless disregard or deliberate

9

ignorance with respect to the truthfulness of its claims for payment and the records underlying those claims.

33.     La Nouvelle and First Kuwaiti acted with actual knowledge, reckless disregard, or deliberate ignorance when they created false invoices and made other false records and statements to get false or fraudulent claims paid or caused KBR to submit false claims.

### III.     Seamans, Mazon, and Martin Plead Guilty to Charges of Taking Kickbacks and Making False Statements

34.     La Nouvelle Managing Partner Hijazi, and First Kuwaiti General Manager Al-Absi, promised and paid kickbacks to KBR subcontract administrators Seamans, Mazon, and Martin in exchange for favored treatment in the award, pricing, and performance of KBR subcontracts under LOGCAP III.

#### A.     Seamans

35.     On March 10, 2006, Seamans pleaded guilty to accepting $124,000 in kickbacks for the award of a subcontract to KBR subcontractor Tamimi Global Company, Ltd, in violation of the Anti-Kickback Act.  In pleading guilty, Seamans also admitted that he accepted $305,000 from Hijazi/La Nouvelle:  First, Seamans admitted receiving a $5,000 kickback in November 2002, for the award of a subcontract to La Nouvelle for cleaning services at Camp Arifjan in Kuwait (Subcontract 11).  Seamans awarded the subcontract to La Nouvelle for $98,287, even though another subcontractor submitted a bid for the same subcontract for less than half the price.  Second, Seamans admitted receiving $300,000 in May 2003, while still working for KBR, as an advance on Hijazi's offer to hire Seamans or enter into a consulting agreement with him for an annual payment of $1.2 million.

**B.** **Mazon**

36. On March 24, 2009, Mazon pleaded guilty to making a false written statement in connection with a subcontract he awarded to La Nouvelle in 2003 for fuel tankers (Subcontract 39).

37. Mazon also played a role in Subcontract 11, originally awarded under a kickback arrangement between Seamans and La Nouvelle. Mazon issued two change orders increasing the price of the subcontract from $98,287 to $2,259,840 without a proportionate increase in the scope of work of the subcontract.

38. On September 18, 2003, soon after Mazon left KBR, Hijazi gave Mazon a Kuwaiti bank draft for $1 million that concealed the fact that La Nouvelle was the source of the money. (Mazon later tried to disguise the payment as a loan.) The $1 million was a reward for giving La Nouvelle favored treatment in the award and pricing of subcontracts. By the time he left KBR, Mazon had participated in the award of more than $90 million in subcontracts and change orders to La Nouvelle.

39. Hijazi also promised kickbacks to former KBR transportation manager Michael Ely. Hijazi made overtures about "providing [Ely] something for some help on the subcontracts." Hijazi told Ely, "help me and I'll help you." Hijazi offered to pay Ely's expenses for a trip to Dubai.

**C.** **Martin**

40. On July 13, 2007, Martin pleaded guilty to violating the Anti-Kickback Act in connection with the award of a $4.67 million subcontract to First Kuwaiti for 50 tractors and 50 refrigerated trailers (Subcontract 167). As part of his plea, Martin admitted participating in a kickback scheme with First Kuwaiti in which the company

11

agreed to pay Martin 50 Kuwaiti Dinars (KWD) ($167)[2] per tractor per month under any subcontract Martin awarded to the company. Under the kickback agreement, Martin would have received about $50,000 for the initial term of Subcontract 167. Martin admitted including the agreed kickback amount in the price of the subcontract.

41. During his plea hearing, Martin also admitted awarding First Kuwaiti an $8.87 million subcontract for 150 tractors (Subcontract 190) and including the agreed kickback amount in the price of the subcontract. Under the kickback agreement, Martin would have received about $150,000 for the initial term of Subcontract 190.

42. Between Subcontracts 167 and 190, Martin awarded First Kuwaiti a $3.31 million subcontract for 60 tractors (Subcontract 203). Consistent with Martin's admission that his kickback arrangement with First Kuwaiti included a 50 KWD ($167) kickback per tractor per month under any subcontract Martin awarded to the company, Martin would have received about $60,000 for the initial term of Subcontract 203.

43. Hijazi told Seamans that Martin also took a kickback from La Nouvelle. Hijazi said that "Tony" just wanted his $100,000 to get out and start his own business.

**IV. Defendants' False Claims in Connection with Subcontracts Awarded by Seamans, Mazon, and Martin**

44. Seamans, Mazon, and Martin awarded numerous subcontracts to La Nouvelle and First Kuwaiti while engaged in kickback schemes. As detailed below, they awarded these subcontracts (a) without regard to mandated procedures regarding Material Requisitions and authority; (b) despite lower bids from non-kickback paying subcontractors or without competition at all; (c) on a sole source basis without proper

---

[2] The dollar amounts following the KWD amounts in this complaint are the approximate equivalents in U.S. dollars.

justification or analysis to ensure that the prices were reasonable; (d) without regard to the quality of the goods and services provided; and/or (e) knowing that the prices were inflated.  Mazon and Martin also approved invoices for payment under these subcontracts, even when they knew that (a) a valid, signed contract did not exist; (b) the amount of the invoice exceeded the amount agreed to in the subcontract; (c) the goods and services had not or would not be provided in accordance with the subcontract; and/or (d) the amount of the invoice was inflated by kickbacks or was otherwise unreasonable. These costs were, therefore, unallowable, rendering the claims for those costs false or fraudulent for reasons **in addition to** the fraud attributable to the kickback schemes.  The details of these subcontracts follow.

> **A.**      **La Nouvelle – Subcontract 11 (Cleaning Services)**
>
> **i.**       **Award and Change Orders**

45.     On November 7, 2002, Seamans issued a solicitation for subcontract GU49-KU-S00011 (Subcontract 11) for cleaning services at Camp Arifjan in Kuwait. The deadline for bids under the solicitation was November 14, 2002.  As stated above, Seamans admitted in his guilty plea that he had awarded this subcontract to La Nouvelle in exchange for a kickback.

46.     Seamans consistently ignored mandated procurement procedures in awarding Subcontract 11:

> (a)      Seamans awarded the subcontract to La Nouvelle even though there was a bid from another subcontractor at less than half the price.
>
> (b)      Seamans prepared a false Justification for Award to Other Than Low Bidder, stating that he was not convinced the low bidder could perform the work,

even though that company had included in its bid numerous certificates from the Army attesting to its good work.

(c) Seamans solicited a bogus bid from Tamimi (the subcontractor at the center of his guilty plea for accepting kickbacks) for an amount higher than La Nouvelle's bid to enhance the appearance of competition.

(d) Seamans prepared a false Bid Tabulation/Justification Worksheet, stating that the bids had all been received by the deadline, November 14, 2002, when La Nouvelle's and Tamimi's bids were dated after the deadline on November 17 and 18, 2002.

47. Seamans and Hijazi executed Subcontract 11 on November 20, 2002, for 29,784 KWD ($98,287) for a one-year term. Hijazi paid Seamans a $5,000 kickback for the award the same month.

48. As a further reward for awarding La Nouvelle the subcontract, Hijazi/ La Nouvelle offered to hire Seamans or enter a consulting agreement with him for $1.2 million a year. Hijazi told Seamans that he liked to "take care" of those people who have "taken care" of La Nouvelle and explained to Seamans how the cleaning services subcontract at Camp Arifjan had opened the door to the award of additional subcontracts by KBR to La Nouvelle. (Ultimately, La Nouvelle was awarded more than $90 million in subcontracts.) Hijazi transferred $300,000 to Seamans' bank account in Maryland around May 20, 2003, as an advance payment on the $1.2 million agreement.

49. On December 20, 2002, only one month after Seamans awarded Subcontract 11 to La Nouvelle, Mazon issued Change Order 1 to the subcontract. The change order increased the price from 29,784 KWD ($98,284) to 274,800 KWD

14

($906,840).  Mazon justified the price increase by stating that the scope of work had been increased and the period of performance had been extended one month.  In fact, Change Order 1 increased the monthly price of the subcontract nearly eight-fold for what was at most twice the work.  Change Order 1 also included tasks outside the scope of work and, therefore, outside the scope of the subcontract.

50.    On April 25, 2003, Mazon issued Change Order 2, increasing the price of Subcontract 11 again, this time from 274,800 KWD ($906,840) to 684,800 KWD ($2,259,840).  Mazon again justified the price increase by stating that the scope of work had been increased.  Change Order 2 reverted to the one-year term of the original subcontract.  In other words, Subcontract 11 went from 29,784 KWD ($98,287) for 12 months, to 274,800 KWD ($906,840) for 13 months, to 684,800 KWD ($2,259,840) for the same 12 months as the original award.  In fact, Change Order 2 more than doubled the price from Change Order 1 (which was already inflated), while decreasing the period of performance, without a commensurate increase in the scope of work.

51.    Mazon ignored mandated procurement procedures.  Change orders of the magnitude of Change Orders 1 and 2 required Mazon to compete the work or justify awarding it on a sole source basis.  KBR's file on Subcontract 11 contains no justification for awarding Change Orders 1 and 2 without competition and no price reasonableness analysis.  In fact, the purported increase in work from the original award to Change Order 2 was grossly disproportionate to the 23-fold increase in price from the original award and, therefore, was not justified.

15

### ii.    Invoices

52.    Mazon, Martin, and other KBR procurement personnel continued to ignore procurement procedures and show favoritism to La Nouvelle during the invoicing and payment process.

53.    La Nouvelle began invoicing for its work on Subcontract 11 in January 2003.  Each invoice was for a month of services.

(a)    La Nouvelle consistently invoiced for amounts in excess of the subcontract price.  For example, La Nouvelle's invoices for the third and fourth months of the subcontract term (February 10 - April 9, 2003) were 69,300 KWD each.  This amount was more than three times the Change Order 1 price that was in effect at the time and even exceeded the Change Order 2 price, which would not be signed until two weeks after the period invoiced.

(b)    La Nouvelle continued to bill at 69,300 KWD a month for the next five months (April 10 - September 9, 2003).  These invoices represented that La Nouvelle had provided the Change Order 1 level of work (for which the price was 22,990 KWD a month), but billed at 69,300 KWD – 3 times the Change Order 1 price and even exceeding the Change Order 2 price (57,067 KWD a month).

(c)    These invoices were consistently approved by Mazon, Martin, and other KBR procurement personnel without verifying that the amounts requested were for work within the scope of the subcontract and at the agreed upon price.

54.    In late 2003 or early 2004, La Nouvelle submitted new invoices to replace those referred to above.  These invoices charged 63,900 KWD a month.  KBR approved

16

these invoices for payment, even though they still exceeded the 57,067 KWD a month price under Change Order 2.

### B.      La Nouvelle – Subcontract 39 (Fuel Tankers)

55.     LOGCAP III, Task Order 36, directed KBR to establish an Aerial Port of Debarkation (APOD).  (An APOD is a military airport.)  As of January 21, 2003, the task order required KBR to "receive, store, account for and issue retail" fuels of several types up to a total capacity of 65,000 gallons.

56.     On January 26, 2003, KBR issued a Material Requisition for 16 fuel tankers with capacities of 3,000 and 5,000 gallons.  The estimated cost of fulfilling the requirement was $685,080.

57.     On February 2, 2003, Mazon solicited bids via email.

58.     On February 14, 2003, Mazon awarded La Nouvelle subcontract GU49-KU-S00039 (Subcontract 39) for 1,673,100 KWD ($5,521,230).  The subcontract was supposed to be for a term of six months through August 14, 2003, but mistakenly carried a termination date of July 13, 2003.

59.     Mazon manipulated procurement procedures to award Subcontract 39 to La Nouvelle at an inflated price:

(a)      Mazon awarded the subcontract to La Nouvelle even though La Nouvelle's bid did not contain sufficient information to determine what its bid was. On information and belief, Mazon constructed the price using information in the high bid. Specifically, La Nouvelle's bid contained a price per tanker (6,500 KWD), but did not specify how many tankers the company would provide.  Mazon constructed La Nouvelle's bid by multiplying the 6,500 KWD per tanker by 13 – the number of

17

tankers quoted by the high bidder – for a total subcontract price of 507,000 KWD (13 tankers at 6,500 KWD per tanker per month, for 6 months).

(b)    Mazon then inflated La Nouvelle's bid three-fold by taking his constructed price of 507,000 KWD, converting it to dollars, but putting the number in KWD on the Bid Tabulation/Justification Worksheet, and then converting it **again**, bringing the price to $5,521,230.[3]  Mazon applied the same procedure to the high bidder to give the appearance of competition and at the same time make an award to La Nouvelle at the inflated price (after eliminating the low bidder).

(c)    Because La Nouvelle's price ($5,521,230) so far exceeded KBR's estimate ($685,080) for the subcontract, Mazon had to get the approval of the KBR project manager.  In a Memorandum for the Record, Mazon stated that he informed the project manager and had his approval.  In his guilty plea, Mazon admitted that this statement was false.

(d)    La Nouvelle advised KBR that it would provide only 10 tankers, not the 13 tankers Mazon used to construct La Nouvelle's bid price.  Despite this knowledge, KBR failed to reduce the price of the subcontract.

60.    As awarded, the monthly price of the subcontract was 278,850 KWD ($920,205).[4]  La Nouvelle submitted six invoices at 278,850 KWD each under the intended six-month subcontract.  Mazon and Martin approved several of these invoices.

---

[3]  Mazon used a conversion rate of 3.3 dollars/KWD.  507,000 KWD times 3.3 equals $1,673,000.  Multiplied again by 3.3 equals $5,521,230.

[4]  1,673,100 KWD per month $\div$ 6 months $=$ 278,850 KWD; $5,521,230 per month $\div$ 6 months $=$ $920,205.

61. In September 2003, Martin issued Change Order 1 under Subcontract 39 to correct the term of the subcontract from five months to the six months originally intended. The change order did not affect the price of the subcontract.

62. La Nouvelle invoiced, and KBR paid, the inflated invoices for six months under Subcontract 39.

63. Subcontract 39 was inflated by at least $4,234,230:

| | A<br><br>PRICE PER TANKER PER MONTH | B<br><br>NUMBER OF TANKERS | C<br><br>NUMBER OF MONTHS | (A x B x C)<br><br>TOTAL PRICE |
|---|---|---|---|---|
| PRICE AS AWARDED, INVOICED, AND PAID | 21,450 KWD | 13 | 6 | 1,673,100 KWD |
| | $70,785 | | | $5,521,230 |
| PRICE AS BID AND PERFORMED | 6,500 KWD | 10 | 6 | 390,000 KWD |
| | $21,450 | | | $1,287,000 |
| INFLATED COST (award less bid before inflation) | | | | 1,283,100 KWD |
| | | | | **$4,234,230** |

64. On October 15, 2003, Martin issued Change Order 2 under Subcontract 39, extending the term of the subcontract six months and increasing the subcontract price by 1,673,100 KWD ($5,521,230) – the same price as for the original six months of the subcontract.

65. Martin ignored mandated procurement procedures by awarding Change Order 2 without conducting any analysis to determine whether the price was reasonable.

66. In fact, the price was not reasonable because it extended by six months the inflated price of the subcontract as awarded by Mazon and continued to price the subcontract as though La Nouvelle were supplying 13 tankers when it was supplying only 10.

19

67.    Consequently, Subcontract 39, including the Change Order 2 extension, was inflated by at least $8,468,460.

**C.    La Nouvelle – Subcontract 124 (Fuel Tankers)**

68.    Subcontract 39 provided sufficient capacity to fulfill the Army's requirement under the Statement of Work for Task Order 36 for 65,000 gallons of fuel storage at the APOD.

69.    On February 3, 2003, the Army reduced the requirement to 45,000 gallons.  LOGCAP III, Task Order 36, Change 6 (Statement of Work) (Feb. 3, 2003).

70.    Nevertheless, in early March 2003, Mazon and La Nouvelle agreed to a second six-month subcontract for fuel tankers at the APOD for an **additional** 68,000 gallons of capacity.  In other words, Mazon and La Nouvelle agreed to a second subcontract that would increase the fuel capacity to 136,000 gallons, even though the Army had reduced the requirement to 45,000 gallons and any capacity beyond that would be outside the scope of KBR's contract with the Army.

71.    The agreement was committed to writing in subcontract GU49-KU-S000124 (Subcontract 124), signed June 20, 2003.  The price of the subcontract was 254,400 KWD ($845,371).

72.    Mazon ignored mandated procurement procedures in awarding the subcontract to La Nouvelle:

(a)    Mazon verbally awarded the subcontract without a Statement of Work requirement under Task Order 36 and without a Material Requisition.  (The only Material Requisition in KBR's file for the award of Subcontract 124 is dated May 22, 2003 – almost three months after the oral agreement.)

(b)    The subcontract was awarded to La Nouvelle on a sole source basis without obtaining competing bids and without preparing a sole source justification.

(c)    Mazon directed La Nouvelle to begin performance immediately, without a written subcontract.

73.    Significantly, the scopes of work for Subcontracts 124 and 39 are virtually identical. Even the typos are the same. The work covered by these subcontracts, therefore, appears to be the same.

74.    In fact, KBR's files for Subcontracts 124 and 39 contain documents that identify the tankers by number and 10 tankers appear under both subcontracts:  651, 691, 693, 695, 696, 697, 713, 715, and 790. On information and belief, La Nouvelle knowingly charged KBR, and KBR knowingly paid, for these tankers twice.

75.    More generally, La Nouvelle invoiced, and KBR paid, for at least four months for the services La Nouvelle purportedly delivered under Subcontract 124, even though they were unnecessary and outside the scope of LOGCAP III.

**D.    La Nouvelle – Subcontract 51 (Forward Area Refueling Point)**

76.    In late February 2003, Mazon solicited proposals for subcontract GU49-KU-S00051 (Subcontract 51) to construct a forward area refueling point. (A forward area refueling point is a refueling area near combat operations.) Three companies responded:

| | |
|---|---|
| AGT | 78,000 KWD ($257,400) |
| Al-Hamara | 223,000 KWD ($735,900) |
| La Nouvelle | 240,000 KWD ($792,000) |

77.    Rather than making an award, Martin, on March 5, 2003, broadcast an email referring to an alleged verbal amendment to the solicitation with additional

requirements. The email requested new bids within two and a half hours. Al-Hamara increased its bid to 343,750 KWD ($1,134,375) to cover the new requirements. A new bidder, Earthsafe, submitted a bid for 565,697 KDWs ($1,867,460). Despite the new requirements, La Nouvelle's bid remained unchanged at 240,000 KWD ($792,000). La Nouvelle had gone from the high bidder for the original solicitation to the low bidder for the solicitation with the alleged verbal amendment.

78.　On March 6, 2003, Mazon awarded Subcontract 51 to La Nouvelle for 240,000 KWD ($792,000).

79.　La Nouvelle completed the work under Subcontract 51 around April 30, 2003. A month and a half later, on June 17, 2003, Mazon issued Change Order 4 to the subcontract, retroactively increasing the price to 603,982 KWD ($1,993,141) – a price in excess of the previous high bid for the subcontract. Mazon issued the change order as a favor to Hijazi and at Hijazi's insistence. Hijazi justified the price increase by La Nouvelle's use of stainless steel piping. Mazon accepted the justification even though KBR had not asked for, accepted, or approved the stainless steel piping in advance. La Nouvelle invoiced, and KBR paid the invoices, under the subcontract.

### E.　La Nouvelle – Subcontract 53 (Buses)

80.　On March 17, 2003, Mazon awarded subcontract GU49-KU-S00053 (Subcontract 53) to La Nouvelle for eight buses at 80,000 KWD ($264,000). The term of the subcontract was one month, from March 17, 2003 to April 16, 2003. Mazon awarded the subcontract to La Nouvelle on a sole source basis without obtaining competing bids and without preparing a sole source justification.

81.    La Nouvelle delivered the first buses under the subcontract on April 7, 2003 – eight days before the subcontract ended – and completed delivery on April 15, 2003, at the earliest.  Despite its failure to perform at least 22 days of the 30-day term of the subcontract, La Nouvelle invoiced, and KBR paid, for the full month.

82.    On June 7, 2003, Mazon retroactively extended the subcontract from April 17 to August 17, 2003.  La Nouvelle continued to invoice, and KBR continued to pay, under the subcontract.

### F.    La Nouvelle – Subcontract 63 (Fuel Trucks)

83.    On March 17, 2003, Mazon awarded subcontract GU-49-KU-S00063 (Subcontract 63) to La Nouvelle for five fuel trucks at 6,500 KWD ($13,333) per truck per month for a six-month term from March 17, 2003 to September 16, 2003.

84.    Mazon ignored mandated procurement procedures in awarding the subcontract:

(a)    There are no bids in KBR's file for Subcontract 63.

(b)    There are two Bid Tabulation/Justification Worksheets, but neither of these supports an award to La Nouvelle.  The first worksheet is dated before the award and lists four bids.  Each bid is lower than the award price and none of the purported bidders is La Nouvelle.  The second worksheet, completed after the award, lists only La Nouvelle and states that a "sole source justification is unavailable."

85.    La Nouvelle invoiced, and KBR paid, under the subcontract.

### G.    La Nouvelle – Subcontracts 240 and 76 (Reefers)

86.    The Army directed KBR to procure "initially 100 (and up to 400) commercially leased refrigerated truck systems."  LOGCAP III, Task Order 43, Change

23

Order 1 (¶ 3.5) (February 14, 2003).  Task Order 43, which supported the Theater Transportation Mission (TTM), generally required KBR to procure trucks and trailers to transport food, fuel, equipment, and supplies for the troops.  The "truck," "head," or "tractor" is the motorized end of the "system."  The motorized end pulls the "trailer" or "tail," which is basically a storage container for fuel, food, or other cargo.  Refrigerated trailers are called "reefers."

87.     In early March 2003, Mazon gave a verbal direction to La Nouvelle to supply seven reefers for 1,600 KWD ($5,280) per reefer per month.   Mazon awarded the procurement to La Nouvelle on a sole source basis without obtaining competing bids and without preparing a sole source justification.  The verbal direction was committed to paper and called Subcontract GU49-KU-S100240 (Subcontract 240), but only after the fact.

88.     In early April 2003, the Army issued orders to increase the number of reefers to 400.

89.     On April 29, 2003, Mazon awarded subcontract GU49-KU-S00076 (Subcontract 76) to La Nouvelle, for 287 reefers at 1,600 KWD per reefer per month.

90.     Mazon ignored mandated procurement procedures in awarding the subcontract:

(a)     On April 6, 2003, KBR issued Material Requisition R946261 for 294 reefers with a required delivery date of April 7, 2003.  The requirement was later reduced to 287.  On April 7, 2003, Hijazi sent Mazon an email offering an unspecified number of reefers at 1,600 KWD ($5,280) per reefer per month, beginning the following day.  Mazon agreed to procure the reefers from La Nouvelle the same day without a

24

written subcontract and without seeking competing bids, even though Mazon knew that there were other reefer suppliers.  In fact, Mazon had awarded a reefer subcontract to NCC a month earlier for 1,258 KWD ($4,150) per reefer per month.

(b)     Mazon justified the sole source award on the ground that La Nouvelle would deliver 25 reefers a day "over the next several weeks" and not invoice KBR until all the reefers had been delivered.  At 25 reefers a day, it would take La Nouvelle 12 days to deliver 287 reefers, or until April 20, 2003.  Under the agreed schedule, La Nouvelle should have delivered all 287 reefers by April 20, 2003.  Based on documents prepared by KBR and submitted to the Army, La Nouvelle had delivered only 136 of the 287 reefers promised as of April 29, 2003 – the date the subcontract was signed.

91.     In fact, La Nouvelle ultimately delivered only 173 reefers under Subcontract 76.

92.     KBR's file for Subcontract 76 contains four invoices from La Nouvelle covering the four months from April 8 to August 7, 2003.  La Nouvelle billed KBR the full subcontract price for 255 reefers for each of those months.  Martin approved these invoices in July and September 2003, even though he knew that La Nouvelle's deliveries were late and that it failed to deliver more than 173 reefers, and even though Mazon had justified the award on La Nouvelle's delivery schedule and agreement not to invoice until all the reefers had been delivered.

93.     KBR admitted La Nouvelle's failure to deliver in a July 2004 internal memorandum in which KBR acknowledged that it could confirm the delivery of only 173 reefers.  KBR appears to have discovered the shortfall sometime in early May 2003,

25

when Martin began awarding subcontracts to another company in an apparent effort to make up for La Nouvelle's shortfall.

(a) On May 3, 2003, Martin awarded Kuwait Establishment Company (KEC) a subcontract for 24 reefers at 3,150 KWD ($10,395) per reefer per month. The only Material Requisition that appears in KBR's file to support this subcontract is the same Material Requisition that Mazon used to support the award of Subcontract 76 to La Nouvelle – MR R946261, dated April 6, 2003, for 294 reefers.

(b) On May 29 and June 10, 2003, Martin awarded two more subcontracts to KEC for a total of 100 reefers (after a reduction in one of the subcontracts), also at 3,150 KWD ($10,395) per reefer per month. KBR's routine practice was to have the Army's Administrative Contracting Officer (ACO) sign the Material Requisition. Neither of the Material Requisitions for these subcontracts was signed by the ACO.

94. On May 25, 2005, ten months after the July 2004 memorandum in which KBR acknowledged that it could confirm the delivery of only 173 reefers, KBR issued Change Order 3 to Subcontract 76. Under the change order, La Nouvelle credited KBR 524,640 KWD. The credit reflected deliveries of 175 reefers in April 2003, 203 reefers in May and June 2003, and 231 reefers in July 2003, instead of the 255 reefers La Nouvelle had billed KBR for each of the four months. Because KBR knew that La Nouvelle had delivered only 173 reefers, KBR knowingly allowed La Nouvelle to retain payments for undelivered reefers when it issued Change Order 3.

26

95.    In addition, KBR's July 2004 memorandum documented that 12 of the reefers had the same vehicle identification number as reefers claimed under subcontracts with other suppliers, including First Kuwaiti.

96.    According to KBR theater transportation manager Michael Ely, it appeared that the subcontractors "owned" the same reefers.  On one occasion, Ely met with a subcontractor at a particular location (Third Ring Road, Kuwait City) to inspect the subcontractor's reefers.  On the same day, Hijazi took Ely to inspect La Nouvelle's reefers at the same location and identified the same reefers.  Ely advised KBR's procurement department, who told him not to worry about it.

97.    La Nouvelle also billed the same reefers simultaneously to Subcontracts 76 and 240, resulting in double billing.

### H.    First Kuwaiti – All Truck Subcontracts Awarded by Martin or Based on Rates Established by Martin

98.    In his guilty plea, Martin admitted to engaging in a kickback scheme with First Kuwaiti and including the amount of the kickback in the subcontract price for Subcontracts 167 and 190.  Under their agreement, First Kuwaiti would pay Martin 50 KWD ($167) per head (tractor) per month under any subcontract Martin awarded to First Kuwaiti.  Therefore, any subcontract awarded by Martin or based on rates established by Martin was inflated, at a minimum, in the amount of the promised kickbacks.  In addition to awarding First Kuwaiti subcontracts inflated by kickbacks, Martin (as detailed below) awarded First Kuwaiti subcontracts over lower bidders, on a sole source basis without justification, or in contravention of other requirements, which further inflated subcontract costs.

**I.      First Kuwaiti – Subcontract 93 (Water Trucks)**

99.      On April 14, 2003, Martin awarded subcontract GU49-KU-S00093 (Subcontract 93) to First Kuwaiti for five water trucks for six months at a price of 75,300 KWD ($252,195) .

100.      In awarding the subcontract, Martin ignored mandated procurement procedures:

(a)      Two companies submitted bids:  AGT for 60,000 KWD ($200,952) and First Kuwaiti for 75,300 KWD ($252,195).  Martin disqualified AGT on the ground that it "could not meet the schedule."

(b)      Martin awarded the subcontract, without additional approvals, even though his authority to award subcontracts at the time was limited to $50,000.

101.      Four days after First Kuwaiti delivered the trucks, KBR declared them unfit to perform the required task and canceled the subcontract.  On April 27, 2003, KBR awarded a replacement subcontract to AGT, even though just 13 days earlier KBR had awarded the subcontract to First Kuwaiti rather than AGT because the latter was allegedly unable to perform the subcontract.

102.      Despite the fact that First Kuwaiti's trucks were unfit to perform the subcontract and that the subcontract was cancelled 13 days after the award, First Kuwaiti claimed payment for three and a half months plus repair costs.  On July 8, 2004, KBR settled First Kuwaiti's claims for 19,065 KWD ($63,852.50), representing repair costs and one and a half months' performance, even though KBR knew that the claim was false.

28

**J.      First Kuwaiti – Subcontract 121 (Fuel Trucks)**

103.    On April 21, 2003, Martin awarded First Kuwaiti subcontract GU49-KU-S00121 (Subcontract 121) for two fuel trucks at 4,250 KWD per truck per month for six months, for a total of 51,000 KWD ($170,814.30) for the subcontract term.

104.    In awarding the subcontract, Martin ignored mandated procurement procedures:

(a)      Martin awarded the subcontract without competition.  Although there is a Bid Tabulation/Justification Worksheet that identifies a second bid submitted by La Nouvelle, that bid is for a different subcontract.   There is no other indication in KBR's file for Subcontract 121 that the contract was competitively bid.  Indeed, in a memorandum to the file, Martin stated that the companies he contacted failed to submit bids because they could not meet the urgent need for the tankers on such short notice

(b)      Martin awarded the subcontract, without additional approvals, even though his authority to award subcontracts at the time was limited to $100,000.

105.    Despite the urgent need asserted by Martin, First Kuwaiti failed to deliver the two trucks until May 28 and June 2, 2003 – more than a month after the subcontract award.

106.    On October 23, 2003, KBR paid First Kuwaiti for two 10,000-gallon fuel trucks, even though First Kuwaiti provided only one 8,000-gallon and one 3,000-gallon truck.

**K.      First Kuwaiti – Subcontract 167 (50 Heads/50 Reefers)**

107.    Martin awarded First Kuwaiti subcontract GU49-KU-S00167 (Subcontract 167) for 50 heads and 50 reefers on June 17, 2003.

108.    Martin ignored many mandated procedures in awarding the subcontract:

(a)    There is no contemporaneous Material Requisition to support the solicitation of a subcontract.  The only Material Requisition in KBR's file on Subcontract 167 is dated August 22, 2003, two months after the award of the subcontract.

(b)    Nevertheless, Martin issued a solicitation on June 15, 2003, seeking bids for "50 Reefers w/heads" no older than 2002, for six months.  Based on documents in KBR's subcontract file, Aratrans submitted a timely bid at 3,200 KWD per head/reefer combination per month, and could deliver on June 28, 2003.  First Kuwaiti submitted an incomplete bid, offering heads only at 2,750 KWD per head per month.  On June 20, 2003, Martin emailed Al-Absi notifying him that he was awarding the subcontract to First Kuwaiti, including reefers, for 4,650 KWD per head/reefer combination per month, and that he expected delivery to be completed by June 24, 2003. (By comparison, Aratrans had offered 3,200 KWD per head/reefer combination with delivery in full on June 28, 2003.)

(c)    A Price Reasonableness Determination prepared by Martin justified the price based on "adequate price competition per [the] attached Bid Tabulation.  However, there is no justification in the Bid Tabulation/Justification Worksheet for awarding the subcontract to First Kuwaiti at 4,650 KWD a month rather than to the low bidder, Aratrans, at 3,200 KWD a month.  The Price Reasonableness Determination also included a comparison to an earlier subcontract with NEC at 2,878 KWD, but this price is 40 percent lower than First Kuwaiti's.

(d)    The Price Reasonableness Determination is dated August 16, 2003, but the date on the "attached" Bid Tabulation/Justification Worksheet is September 5,

30

2003.  Although KBR's Manual mandates that both documents should be prepared before subcontract award or as soon as practicable after subcontract award, here they were prepared two months or more after the award.

(e)    Authority to award the subcontract was not given until November 26, 2003, more than four months after the award, by KBR official David Hadcock.

109.    By June 28, 2003 (the date Aratrans had promised to deliver all 50 head/reefer combinations), First Kuwaiti had delivered only 19 heads and 16 reefers.  First Kuwaiti did not complete delivery until July 14, 2003 (although some reefers may never have been delivered).

110.    First Kuwaiti billed, and KBR paid, the full subcontract price as though all 50 head/reefer combinations had been delivered as of June 20, 2003.

111.    The subcontract required First Kuwaiti to provide KBR with a list documenting the heads and reefers as they were delivered.  KBR officials reviewing the subcontract file nearly a year after the subcontract expired found the file deficient and had to ask First Kuwaiti for the information well after the fact on May 24, 2004.

112.    By June 2004, KBR's Theater Transportation Mission (TTM), the KBR unit responsible for the vehicles, had determined that it was "sure that 41 units were returned [to First Kuwaiti] on or before the expiration date of 20 Dec. 2003.  Of the remaining 9 units; eight (8) are believed to have been destroyed and one is currently being used . . . ."  By July 29, 2004, TTM reduced the number of unreturned units to five,

31

which it described as missing in action.  As to these, TTM stated, "Mr. Wadih Al-Absi refuses to submit a claim and/or execute a change order."[5]

113.    Despite delivering late and possibly failing to deliver some units at all, First Kuwaiti demanded payment as though every vehicle had been delivered by June 20, 2003 (on the first day of the subcontract term) and remained in operation through June 2004 – six months after expiration of the subcontract.

114.    Despite being "sure" that 41 of the 50 units had been returned by December 20, 2003, KBR settled First Kuwaiti's claims for alleged unpaid amounts under the subcontract by extending the subcontract, after the fact, through March 2004, and increasing the price to 2,170,000 KWD ($7,267,981).  KBR also paid First Kuwaiti for nine lost or destroyed head/reefer combinations despite recovering four of those units.

**L.    First Kuwaiti – Subcontract 203 (60 Heads)**

115.    KBR personnel prepared and approved a Material Requisition for 60 heads for six months in June 2003.  The document specified delivery by June 24, 2003, and estimated the cost at $4,000 per head per month.

116.    On July 2, 2003, Martin solicited bids setting a deadline of July 5, 2003.

117.    On July 5, 2003, Actel and First Kuwaiti responded with identical prices, with Actel offering two additional heads.  Actel offered delivery one week after signing the subcontract; First Kuwaiti offered immediate delivery.

---

[5]  Under the terms of the subcontracts, KBR paid a monthly rate to lease units from First Kuwaiti.  When a unit was lost or destroyed in the war, KBR would notify First Kuwaiti. This notice should have terminated KBR's obligation to make lease payments on the unit and triggered First Kuwaiti's obligation to present KBR with a claim for the depreciated value of the lost or destroyed unit.  As alleged above, KBR continued to make lease payments on lost or destroyed units and also paid First Kuwaiti's claims for the value of those units.

118. Martin awarded the subcontract to Actel on July 7, 2003, but demanded that Actel email Martin by 10 a.m. the same day a "detailed schedule of delivery of the 60 Heads that you were awarded." Martin warned Actel that "if the schedule is too extensive the contract will be voided. You [*sic*] commitment was for immediate delivery." Martin voided the award, purportedly because Actel could not deliver quickly enough.

119. Three days later, on July 10, 2003, Martin awarded subcontract GU49-KU-S00203 (Subcontract 203) to First Kuwaiti for 60 heads at 2,750 KWD per head per month for six months (July 10, 2003 to January 10, 2004). (According to KBR's file for Subcontract 203, the award was not authorized until five weeks later on August 17, 2003, by KBR official Steve Grumbach.)

120. Consistent with First Kuwaiti's promised delivery one day after signing, all 60 heads should have been delivered July 11, 2003. According to KBR's daily reports, however, deliveries did not begin until July 14, 2003, when 13 heads were delivered. By August 9, 2003 – one month after full delivery had been promised – only 22 (of the 60) heads had been delivered. For this first month (July 10 to August 9, 2003), First Kuwaiti billed, and KBR paid, the full price under Subcontract 203, as if First Kuwaiti had delivered all 60 heads on July 11, 2003.

121. In July 2004, KBR and First Kuwaiti were trying to resolve First Kuwaiti's final billings under Subcontract 203. Apparently, First Kuwaiti was claiming $100,000 for each lost or destroyed head as though it were provided in new condition with the expectation that it would be returned in new condition (despite subcontract lease prices based on warzone conditions), **plus** the monthly subcontract price. In a July 29,

33

2004 email, KBR's negotiator in the matter stated, "it appears from the email that [Al-Absi] is expecting us to provide this equipment back to him in a like new condition. There is only one invoice outstanding against this subcontract. . . . [H]e is refusing to submit a [sworn] claim for [lost or destroyed heads].  He is expecting KBR to pay him $100,000 for each lost truck and it will be paid within 30 days of invoice presentation. This is absolute highway robbery."

122.    Despite this knowledge, KBR agreed to settle First Kuwaiti's claims by extending the subcontract, after the fact, to August 10, 2004 – seven months after expiration of the subcontract – and more than doubling the subcontract price to 2,147,423 KWD ($7,192,364).  On information and belief, KBR paid for 10 lost or destroyed heads even though all but 4 heads were returned.

### M.    First Kuwaiti – Subcontract 190 (150 Heads)

123.    On August 19, 2003, Martin awarded subcontract GU49-KU-S00190 (Subcontract 190) to First Kuwaiti for 150 heads at 2,950 per head per month for six months, totaling 2,655,000 KWD.  Delivery was required by August 30, 2003.

124.    In awarding this subcontract, Martin ignored mandated procurement procedures:

(a)    The Material Requisition that supported the solicitation is dated August 30, 2003, after the award.

(b)    Martin awarded the subcontract to First Kuwaiti at 2,950 KWD per head per month, even though there were two companies that bid 2,900 KWD per head per month.  In other words, First Kuwaiti's bid was 50 KWD per head per month more than

34

two lower bidders. This is the same amount as the kickback that Martin admitted in his guilty plea he had included in Subcontract 190's price.

(c)     The agreed delivery schedule pre-dates the award date of the subcontract.

(d)     The subcontract was approved November 23, 2003, three months after the award, by KBR official Drew Bacon.

125.     Under the subcontract, First Kuwaiti agreed to provide KBR with 150 heads for six months to be delivered 50 heads at a time on July 26, 27, and 28, 2003. According to KBR's daily reports to the Army, however, the number of heads KBR had on hand did not increase substantially until August 17, 2003, when 110 heads were delivered, and KBR did not receive the full complement of 150 heads until September 19, 2003. Yet First Kuwaiti billed, and KBR paid, for the first month under Subcontract 190, as though First Kuwaiti had delivered all 150 heads on July 24, 2003.

126.     KBR issued three change orders extending Subcontract 190 an additional 11 months for a total price of 7,500,174 KWD ($25,120,332). Had the subcontract been awarded to either of the lower bidders, KBR would have saved at least $406,000 over the extended term of the subcontract.

127.     In July 2004, KBR and First Kuwaiti were trying to resolve First Kuwaiti's final billings under Subcontract 190. KBR had paid First Kuwait for only two months at that point. First Kuwaiti was claiming compensation for lost or destroyed heads as well as the monthly subcontract price for operational heads. In a July 29, 2004 email, KBR's negotiator in the matter commented, "Mr. Al-Absi refuses to submit a [sworn] claim for the approximately 25 lost assets and insists on continuing to invoice

35

KBR [monthly under the subcontract]. I am tired of [First Kuwaiti's] ways of trying to milk KBR of extra money and false claims. I am going to work with [KBR's Theater Transportation] group to return ALL of his assets to him as quickly as possible and I will[,] unless directed to do differently[,] will [*sic*] not conduct business with this man."

128. Despite this knowledge, KBR paid First Kuwaiti for 12 months (to August 2004) at monthly rates that exceeded lower bidders, for vehicles that were not delivered as promised, and for 25 vehicles that had been reported as lost or destroyed in the spring of 2004. After the 12 months, KBR knowingly continued to pay First Kuwaiti for 125 vehicles through at least December 24, 2004, at the rates awarded by Martin.

## N.     Non-Mission Capable Reefers

129. Some of the reefer tractors and trailers leased to KBR by La Nouvelle and First Kuwaiti pursuant to the subcontracts identified above were defective, damaged, inoperable, or otherwise non-mission capable (NMC).

130. The Army's statement of work for Task Order 43 required that reefers be mission capable. Paragraph 3.5 stated: "The refrigeration system must have chilling and freezing capability." Paragraph 3.20.1 stated: "The equipment must be capable of performing its intended function, in a serviceable condition, and in a safe state of operation."

131. Some of the initial reefer trailers and trucks KBR procured lacked even the basic equipment to work as a reefer trailer. According to former KBR Theater Transportation Mission foremen Walter Wynia, whoever procured the trailers must not have looked at them.

132.    Another former KBR employee, Ken Blalock, personally took an inventory of the 200 or so reefers located at Camp Arifjan in September 2003. Blalock found over half the reefers in such poor condition that he believed whoever procured them must never have looked at them. According to Blalock, only about 25 percent of the reefers procured were in usable condition. Some reefers did not even have the basics needed to be a reefer, for example, they were missing compressors or doors. Other reefers were missing tires.

133.    According to former Theater Transportation Mission Manager Ely and Foreman Deborah McGinnis, the Government paid on a monthly basis for reefers that were "completely junk."

**O.    Morgue Reefers**

134.    Some reefers procured by KBR were used as temporary morgues, including a reefer identified as R-89.

135.    Sometime around July 2003, while R-89 was being used as a morgue, the refrigeration motor broke down, leading KBR to send it back to Kuwait for repairs.

136.    In late August 2003, after R-89 was repaired, KBR used the reefer to transport potable ice for the troops at Camp Matilda in Kuwait. KBR did not properly sanitize R-89 before loading it with potable ice for use by the troops.

137.    KBR also used other morgue reefers to transport ice and food for human consumption without properly sanitizing them first. KBR charged the Government for the costs of these reefers without disclosing that they had been used as morgue reefers and had not been properly sanitized. The use of these morgue reefers to transport ice and

37

food without proper sanitation was material to the Government's decision to pay KBR's claims for these costs.

## V.　KBR's Claims to the United States

138.　KBR submitted claims to the United States for the costs incurred under each of the subcontracts identified above, plus administrative costs and fees, knowing that the claims were false or fraudulent because (a) the subcontracts were awarded (i) without regard to mandated procedures regarding Material Requisitions and authority; (ii) despite lower bids from non-kickback paying subcontractors or without competition at all; (iii) on a sole source basis without proper justification or analysis to ensure that the prices were reasonable; (iv) without regard to the quality of the goods and services provided; and/or (v) knowing that the prices were inflated, and because (b) KBR paid invoices knowing that (i) a valid, signed contract did not exist; (ii) the amount of the invoice exceeded the amount agreed to in the subcontract; (iii) the goods and services had not or would not be provided in accordance with the subcontract; and/or (iv) the amount of the invoice was inflated by kickbacks or was otherwise unreasonable. As a result, these costs were unallowable and false. La Nouvelle and First Kuwaiti knowingly caused and conspired with KBR to submit these false claims. KBR, La Nouvelle, and First Kuwaiti intended their false statements and records related to these claims to influence the Government's decision to pay KBR, and this was the reasonably foreseeable result of such false statements and records.

## VI.　Statute of Limitations

139.　KBR's claims were presented to the United States from early 2003 to 2005 and possibly later.

38

140.     The United States' claims against KBR are timely for the following reasons:

(a)     KBR agreed in writing that for the purpose of calculating the statute of limitations, laches, or any similar time limitation on the United States' claims here, the time period from August 4, 2008 to March 31, 2012 would be excluded.  The United States' claims are therefore timely either because they are within the applicable six-year limitations period after excluding the agreed upon period, or because they are within the three-year limitations period following the date when the facts material to the Government's right of action were known or reasonably should have been known by the official charged with the responsibility to act, taking into consideration the agreed upon excluded period.

(b)     The statute of limitations was suspended by the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287, until five years after the termination of hostilities in Iraq and Afghanistan by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress, which events have yet to occur.

141.     The United States' claims against La Nouvelle and First Kuwaiti are timely for the following reasons:

(a)     La Nouvelle and First Kuwaiti were outside the United States for all or most of the period from 2003 to the present.  The United States' claims are therefore timely because they are within any applicable three- or six-year limitations period after excluding the time these defendants were outside the United States.

(b)     The statute of limitations was suspended by the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287, until five years after the termination of

hostilities in Iraq and Afghanistan by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress, which events have yet to occur.

## COUNT I

### Anti-Kickback Act, 41 U.S.C. §§ 53 and 55
### (now codified at 41 U.S.C. §§ 8702 and 8706)
### Against KBR, La Nouvelle, and First Kuwaiti

142.    The United States realleges paragraphs 1 through 141.

143.    KBR, acting through Seamans, Mazon, and Martin and in violation of the Anti-Kickback Act, 18 U.S.C. §§ 53 and 55 (now codified at 18 U.S.C. §§ 8702 and 8706), knowingly (a) solicited, accepted, or attempted to accept kickbacks from La  Nouvelle and First Kuwaiti in connection with subcontracts awarded to La Nouvelle and First Kuwaiti relating to LOGCAP III, or (b) included the amount of the kickbacks provided or offered by La Nouvelle and First Kuwaiti in claims for payment under LOGCAP III.  At all times relevant to this Count, Seamans, Mazon, and Martin were acting with apparent authority and within the scope of their employment with KBR.

144.    La Nouvelle, acting through Hijazi and others and in violation of the Anti-Kickback Act, 18 U.S.C. §§ 53 and 55 (now codified at 18 U.S.C. §§ 8702 and 8706), knowingly (a) provided, attempted to provide, or offered kickbacks to Seamans and Mazon in connection with subcontracts obtained from KBR relating to LOGCAP III, or (b) included the amount of those kickbacks in the subcontract price and in claims for payment under those subcontracts.  At all times relevant to this Count, Hijazi and others acting on behalf of La Nouvelle were acting with apparent authority and within the scope of their employment with La Nouvelle.

40

145.    First Kuwaiti, acting through Al-Absi and others and in violation of the Anti-Kickback Act, 18 U.S.C. §§ 53 and 55 (now codified at 18 U.S.C. §§ 8702 and 8706), knowingly (a) provided, attempted to provide, or offered kickbacks to Martin in connection with subcontracts obtained from KBR relating to LOGCAP III, or (b) included the amount of those kickbacks in the subcontract price and in claims for payment under those subcontracts.  At all times relevant to this Count, Al-Absi and others acting on behalf of First Kuwaiti were acting with apparent authority and within the scope of their employment with First Kuwaiti.

146.    As a result of their knowing violations of the Anti-Kickback Act, KBR, La Nouvelle, and First Kuwaiti are severally liable for civil penalties in the amount of twice the amount of the kickbacks involved in their violations plus $11,000 for each occurrence of prohibited conduct.

## COUNT II

### False Claims Act, 31 U.S.C. § 3729(a)(1) (2000)
### Against KBR, La Nouvelle, and First Kuwaiti

147.    The United States realleges paragraphs 1 through 141.

148.    KBR, La Nouvelle, and First Kuwaiti knowingly presented, or caused to be presented, to an officer or employee of the United States or a member of the Armed Forces, false or fraudulent claims for payment or approval, in violation of the 31 U.S.C. § 3729(a)(1), by submitting false claims for costs incurred under subcontracts that were awarded other than on the basis of fair competition and merit, and which were inflated by kickbacks or were otherwise unallowable under LOGCAP III.

149.    As a result of these false or fraudulent claims, the United States paid KBR and suffered damages to be determined at trial.  Under the False Claims Act, the United

41

States is entitled to 3 times the amount of damages sustained by the Government plus civil penalties of $5,500 to $11,000 for each violation.

## COUNT III

### False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2009)
### Against KBR, La Nouvelle, and First Kuwaiti

150. The United States realleges paragraphs 1 through 141.

151. KBR, La Nouvelle, and First Kuwaiti knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B), by falsifying records and statements to give the appearance that KBR's claims were for reasonable costs incurred on subcontracts that were awarded on the basis of fair competition and merit, when in fact they were influenced by kickbacks and the costs claimed were inflated by kickbacks or were otherwise unallowable under LOGCAP III.

152. As a result of these false or fraudulent claims, the United States paid KBR and suffered damages to be determined at trial. Under the False Claims Act, the United States is entitled to 3 times the amount of damages sustained by the Government plus civil penalties of $5,500 to $11,000 for each violation.

## COUNT IV

### False Claims Act, 31 U.S.C. § 3729(a)(3) (2000)
### Against KBR and La Nouvelle

153. The United States realleges paragraphs 1 through 141.

154. KBR conspired with Hijazi and La Nouvelle to defraud the Government by getting false or fraudulent claims allowed or paid.

155.    By reason of the defendants' conspiracy, the United States suffered damages to be determined at trial.  Under the False Claims Act, the United States is entitled to 3 times the amount of damages sustained by the Government plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT V

### False Claims Act, 31 U.S.C. § 3729(a)(3) (2000)
### Against KBR and First Kuwaiti

156.    The United States realleges paragraphs 1 through 141.

157.    KBR conspired with Al-Absi and First Kuwaiti to defraud the Government by getting false or fraudulent claims allowed or paid.

158.    By reason of the defendants' conspiracy, the United States suffered damages to be determined at trial.  Under the False Claims Act, the United States is entitled to 3 times the amount of damages sustained by the Government plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT VI

### Common Law Fraud
### Against KBR, La Nouvelle, and First Kuwaiti

159.    The United States realleges paragraphs 1 through 141.

160.    KBR, La Nouvelle, and First Kuwaiti made material misrepresentations or concealed material facts that induced the Government to pay amounts that were unallowable under LOGCAP III.

161.    KBR, La Nouvelle, and First Kuwaiti are liable for damages in an amount to be determined at trial.

## COUNT VII

### Breach of Contract
### Against KBR

162.    The United States realleges paragraphs 1 through 141.

163.    LOGCAP III permitted KBR to bill the Government only for its allowable costs under the contract.  To be allowable, costs must be incurred, reasonable in amount, allocable to the contract, and not otherwise unallowable under applicable statutes and regulations.  *See* FAR.52.216-7(a) ("The contractor may submit to an authorized representative of the Contracting Officer, in such form and reasonable detail as the representative may require, an invoice or voucher supported by a statement of the claimed allowable cost for performing this contract.") (incorporated into LOGCAP III).

164.    KBR claimed costs incurred in connection with subcontracts with La Nouvelle and First Kuwaiti, as identified in this Complaint, that were not allowable for the reasons alleged above.

165.    By reason of KBR's breach, the United States suffered damages in an amount to be determined at trial.

## COUNT VIII

### Unjust Enrichment
### Against La Nouvelle and First Kuwaiti

166.    The United States realleges paragraphs 1 through 141.

167.    La Nouvelle and First Kuwaiti were unjustly enriched by the amounts KBR paid them in excess of their reasonable and allowable costs under the subcontracts and in the amounts of their profits under subcontracts procured by kickbacks.

44

168.    La Nouvelle and First Kuwaiti are liable to the United States in the amounts they were unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff United States prays for judgment against KBR, La Nouvelle, and First Kuwaiti as follows:

a.    Under Count I (Anti-Kickback Act) against KBR, La Nouvelle, and First Kuwaiti, severally, civil penalties in the amount of twice the amount of the kickbacks involved in each of their violations plus $11,000 for each occurrence of prohibited conduct;

b.    Under Counts II, III, IV, and V (False Claims Act) against KBR, La Nouvelle, and First Kuwaiti, jointly and severally, 3 times the amount of damages sustained because of the acts of the defendants, plus civil penalties as allowed by law;

c.    Under Count VI (common law fraud) against KBR, La Nouvelle, and First Kuwaiti, jointly and severally, for the amounts the defendants caused the United States to pay due to their fraudulent acts and otherwise as allowed by law;

d.    Under Count VII (breach of contract) against KBR, damages in the amount of KBR's claims for unreasonable or otherwise unallowable costs under LOGCAP III paid by the Government;

e.    Under Count VIII (unjust enrichment) against La Nouvelle and First Kuwaiti for the amounts by which each was unjustly enriched; and

f.    Such other relief as the Court may deem just and proper, together with interest, costs, and the disbursements of this action.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

JAMES A. LEWIS
United States Attorney
Central District of Illinois


/ s /
_____

MICHAEL D. GRANSTON
JUDITH RABINOWITZ
RUSSELL B. KINNER
JACK A. KOLAR
Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Post Office Box 261, Ben Franklin Station
Washington, D.C.  20044
Telephone:  202-307-1089

Attorneys for the United States of America


Dated:  January 6, 2014

46