UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*<br>BUD CONYERS,<br><br>       Plaintiffs,<br><br>v.<br><br>KELLOGG, BROWN & ROOT, INC.;<br>KELLOGG BROWN & ROOT SERVICES,<br>INC.; KELLOGG BROWN & ROOT LLC;<br>OVERSEAS ADMINISTRATION<br>SERVICES, LTD; LA NOUVELLE<br>GENERAL TRADING & CONTRACTING<br>COMPANY; LA NOUVELLE GENERAL<br>TRADING & CONTRACTING COMPANY<br>WLL; LA NOUVELLE GENERAL<br>TRADING & CONTRACTING CORP.; LA<br>NOUVELLE GENERAL TRADING &<br>CONSTRUCTION CORP.; FIRST<br>KUWAITI TRADING COMPANY; FIRST<br>KUWAITI TRADING AND<br>CONTRACTING; FIRST KUWAITI<br>GENERAL TRADING & CONTRACTING<br>COMPANY; FIRST KUWAITI GENERAL<br>TRADING & CONTRACTING<br>COMPANY, WLL, and FIRST KUWAITI<br>TRADING & CONTRACTING, WLL,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 4:12-cv-04095-SLD-JEH<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>ORDER</u>

    Plaintiffs Bud Conyers and the United States are suing Kellogg, Brown, and Root and

affiliated companies (collectively, "KBR") and two subcontractors in a *qui tam* action under the

False Claims Act, 31 U.S.C. §§ 3729–3733.  Conyers and the United States allege varied acts of

fraud and misconduct in the execution of an Army contract to provide troop support in Iraq from

2003–2005.  Before the Court is the Government's Motion to Strike Answer to Amended

Complaint, ECF No. 68, First Kuwaiti Trading & Contracting WLL's ("First Kuwaiti") Motion

to Dismiss for Lack of Jurisdiction, ECF No. 71, KBR's Motion to Compel Arbitration and to

Dismiss or Stay, ECF No. 73, and First Kuwaiti's Motion to Supplement Motion to Dismiss for

Lack of Jurisdiction, ECF No. 81.  For the following reasons, the motion to strike, motion to

dismiss, and motion to compel arbitration are GRANTED, and the motion to supplement is

DENIED.

## BACKGROUND[1]

### I.        Parties

Bud Conyers initially sued as a private person on his own behalf and on the behalf of the

United States Government, as provided by 31 U.S.C. § 3730(b)(1).  Compl., ECF No. 1.  He

sued Halliburton Co., since dismissed from the litigation; Kellogg Brown & Root Inc.; and

Kellogg Brown & Root Services Inc.  The Government later intervened and filed its own

Complaint, ECF No. 55, as permitted by 31 U.S.C. § 3731(c), naming as defendants several

other Kellogg, Brown & Root corporate entities, two subcontractors, and various corporate

entities associated with those subcontractors.  The parties for whom attorneys have appeared are:

Plaintiffs:

1.   Relator[2] Bud Conyers, a former employee of KBR.

2.   The United States.

---

[1] In a motion to dismiss, all well-pleaded allegations in the complaint are taken as true and viewed in the light most favorable to the plaintiff.  *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (citation omitted).  The material set forth here is, unless otherwise noted, based on allegations in Plaintiffs' Amended Complaints, ECF Nos. 54, 55.  The Motion to Strike and Motion to Compel Arbitration do not challenge the facts laid out in the Complaints, or their sufficiency for any purpose; accordingly, the facts are construed here on the motion-to-dismiss standard.

[2] A "relator" is a person who files a False Claims Act action on behalf of the government, alleging that someone defrauded the government by false and fraudulent claims.  *See Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 912 (7th Cir. 2009).

<u>KBR Defendants ("KBR")</u>

3.  Kellogg Brown & Root, Inc. ("KBR, Inc."), a Delaware corporation headquartered in Texas.

4.  Kellogg, Brown & Root Services ("KBRSI"), formerly a division of KBR, Inc.

5.  Kellogg, Brown & Root LLC, headquartered in Texas, and successor to KBR, Inc.

6.  Overseas Administrative Services, Ltd. ("OAS"), a payroll company through which some KBRSI personnel were retained.

<u>Defendant First Kuwaiti</u>

7.  First Kuwaiti Trading & Contracting, WLL, a Kuwaiti corporation headquartered in Kuwait City.

First Kuwaiti states that all other First Kuwaiti entities identified in the Government's First Amended Complaint, ECF No. 55, are merely alternative names for First Kuwaiti Trading & Contracting, WLL.  Mem. Supp. Mot. Dismiss 7 n.1.  To date, service has not been executed on any of the La Nouvelle corporate entities named in the First Amended Complaint, nor has La Nouvelle appeared in court or otherwise waived service.

## II.  Allegations by Bud Conyers

On December 14, 2001, the U.S. Army Corp of Engineers awarded a 10-year contract to Brown and Root Services, a division of KBR, Inc., contract number DAAA09-02-D-0007, better known as LOGCAP III.  LOGCAP III was an "umbrella contract" for the indefinite delivery of an indefinite quantity of logistical support services in military theaters, including transportation, facilities management, maintenance, dining, and living accommodations for troops.

Conyers served in the Army from 1987–1989 and then worked as a truck driver.  In 2003, he went to work in Iraq as a truck driver and convoy commander for KBR.  He worked for

KBR's theater Transportation Mission, which provided transportation and support for United States forces in Iraq and Kuwait during the war.

In March 2003 the Army's 54th Quartermaster Company (the "54th") was deployed to Iraq as the only active Mortuary Affairs unit.  The 54th helped recover human remains from battle and transport them to burial sites.  The refrigerated trucks used to do this were colloquially known as "reefers."  The reefers used to transport human remains were thus "morgue reefers."

On or about June 16, 2003, Conyers observed Walla Wynia, David Milk, and six other KBR drivers working on a reefer's engine.  The truck had been broken for two weeks.  After fixing the engine, the drivers went to check the contents of the trailer, and found fifteen Iraqi corpses in different stages of decomposition, rotting in the 120-degree heat.  The bodies appeared to have been sitting there the whole time the truck was broken.  The truck and trailer were subsequently sent back to a Public Warehousing Company facility, and its trailer, Trailer R-89, was reused for delivery of potable ice and other supplies to United States forces.  KBR's Project Manager and Deputy Project Manager covered up the incident.

More than two months later, Convoy Commander Jeff Allen's August 31 mission log indicated that of 5,000 pounds of ice loaded onto Trailer R-89, "approx. 1,800 pounds" of it was "biocontaminated."  The transportation and distribution of biocontaminated ice to United States forces contravened portions of the Army's Center for Health Promotion and Preventing Medicine's Technical Guide, and Halliburton's Code of Business Conduct.

Conyers also discovered that one of his supervisors, Willie Dawson, took kickbacks from the leasing companies that supplied reefers and other trucks under the LOGCAP III contract.  Dawson was apparently not concerned about whether the trucks were functional or not.  Of KBR's fleet of 200 reefers, only 50 ever worked, but KBR still submitted false claims to the

4

Government for all 200, so that Dawson and others taking kickbacks could get paid.  Fraudulent repair bills were also submitted for the reefers.  Rob Nuble, a KBR employee, also took kickbacks from the supplier of flatbed trucks, and charged the Army for more trucks than were ever delivered.  When Conyers complained about all of this, the local leasing company manager offered him a cut—"a kickback on all equipment that hits the ground, good or bad."  Conyers refused and filed complaints with KBR's Internal Affairs Office; nothing happened.

When working in Kuwait, Conyers discovered that Serbian and Kosovar women were working as prostitutes for KBR managers and being paid as salaried LOGCAP III employees.  Conyers reported this as well; nothing happened.

On October 24, 2003, Conyers told Jim Coin, KBR's Employee Relations manager for LOGCAP III, about an impropriety with another morgue reefer.  Conyers was relieved of his LOGCAP III duties the following day, and KBR stopped paying him.  When Conyers complained, he was told that this was what happened when you were not a "team player."  KBR never reimbursed Conyers for the cost of a replacement leg prosthesis he was forced to buy when his own prosthetic leg broke while working in Iraq.  KBR officially fired him on December 28, 2003.

Conyers now brings suit for retaliation under the False Claims Act, 31 U.S.C. § 3730(h), and breach of contract against KBR, Inc. and KBRSI.

### III.   Allegations by the United States

#### A.  Terms and Conditions of LOGCAP III

LOGCAP III was a "cost reimbursable" contract, which obligated the Government to pay KBR all allowable costs incurred in the provision of services the Government requested, plus a one percent fee and a discretionary award fee of up to two percent.  The Government's requests

were made via Task Orders.  Much of the work KBR did under LOGCAP III was performed by subcontractors.  When KBR used subcontractors, it would voucher the government for its costs under the subcontracts, adding administrative fees and costs.  Costs were deemed allowable by a Government official, who relied on representations made by KBR about the work done by the subcontractors.

The Government's acquisition of goods and services is governed by Title 48 of the United States Code, otherwise known as the Federal Acquisition Regulation ("FAR").  LOGCAP III incorporated FAR's cost principles.  These principles required all of KBR's allowable costs to be incurred, reasonable, allocable to the contract, and not otherwise unallowable.  FAR defines a reasonable cost as "one that "does not exceed that which would be incurred by a prudent person in the conduct of competitive business."  Under the terms of LOGCAP III, it was KBR's duty to ensure price reasonableness in the award of subcontracts.  The preferred methods of doing so under FAR were "adequate price competition" and the comparison of a subcontract price with other previous prices for similar contracts.  Gov't Am. Compl. ¶ 17.  LOGCAP III also incorporated sections of FAR that correspond to the Anti-Kickback Act, 41 U.S.C. §§ 51–58.

During the time period in question, KBR also maintained a Government Procurement Procedures Manual; the Government relied on KBR to use the Manual in awarding subcontracts. In soliciting subcontracts, the Manual required KBR to use a Material Requisition to identify specific requirements, a defined statement of work, cost estimate, and other procurement planning documents.  If a purchase exceeded $2,500, the Manual required subcontract administrators to use a competitive bidding process.  The Manual also stated that awarding a subcontract without competition ought to be the exception, rather than the rule.  The practice of rewarding a contract without competition, called "sole sourcing," was deemed appropriate only

in the absence of any available competition for the contract.  If the amount of the contract exceeded certain dollar values, a subcontract administrator was required to get the signature of a supervising KBR official.  The Manual also required that the subcontract administrator verify that invoices from subcontractors were for the scope of work performed, resolve significant errors in the invoice, and forward all invoices to appropriate officials for payment.  The subcontract administrator was required to retain a copy of the invoice and any attached documents.

### B.  Alleged Payment of Kickbacks by La Nouvelle and First Kuwaiti

Stephen Seamans, Jeff Mazon, and Anthony Martin were all subcontract administrators for KBR.  On March 10, 2006, Seamans pleaded guilty to accepting $124,000 in kickbacks from KBR subcontractor Tamimi Global Company, Ltd ("Tamimi").  In his plea, he also admitted to accepting $305,000 from La Nouvelle for various kickback schemes.  On March 24, 2009, Mazon pleaded guilty to making a false written statement in connection with a 2003 subcontract he awarded to La Nouvelle for fuel tankers.  On July 13, 2007, Martin pleaded guilty to violating the Anti-Kickback Act in awarding a $4.67 million subcontract to First Kuwaiti.  Each man was involved in various kickback schemes on different occasions with La Nouvelle and First Kuwaiti, described bellow.

### 1.  La Nouvelle Allegations

The Government alleges that on several occasions, KBR negotiated in bad faith to award contracts to La Nouvelle, and then overpaid La Nouvelle in a variety of ways, passing the bill along to the United States under LOGCAP III.  However, since the allegations are lengthy and rich with detail, and La Nouvelle is not the subject of any of the motions before the Court—

indeed, it has not been served—the Court will forego a recitation of these allegations, and move on to the facts about First Kuwaiti.

### 2.   First Kuwaiti and Each Truck Subcontract Awarded by Martin or Based on Rates Martin Established

Martin divulged in his guilty plea the terms of kickback arrangements between him and First Kuwaiti for two subcontracts: 167 and 190.  First Kuwaiti had agreed to pay Martin $167 per truck-head per month on any subcontract Martin awarded First Kuwaiti.  The cost of the kickback was to be incorporated into the amount of the contract award.  Martin repeatedly awarded First Kuwaiti subcontracts over lower bidders, or on a sole-source basis.

### 3.   First Kuwaiti and Subcontract 93, Water Trucks

On April 14, 2003, Martin awarded Subcontract 93, for five water trucks for six months, to First Kuwaiti at a price of $252,195.  Martin awarded the contract to First Kuwaiti even though there was a lower bidder, stating that the other contractor could not meet the required schedule.  The contract's value triggered the need for additional approvals, but Martin did not get them.  When the trucks arrived, KBR declared them unfit for service and canceled the subcontract.  On April 17, 2003, KBR awarded the replacement subcontract again to First Kuwaiti.  First Kuwaiti went on to claim payment on the first, canceled contract for three and a half months, plus repair costs.  KBR settled these claims for $63,852.50.

### 4.   First Kuwaiti and Subcontract 121, Fuel Trucks

On April 21, 2003, Martin awarded Subcontract 121, for the use of two fuel trucks for six months, to First Kuwaiti for a total of $170,814.30.  The subcontract was awarded without competition.  Martin did not seek approval even though he was required to because of the size of the subcontract.  First Kuwaiti failed to deliver the trucks until after the subcontract period had

run.  On October 23, 2003, KBR paid First Kuwaiti for two 10,000 gallon fuel trucks, even though First Kuwaiti had provided only one 8,000 gallon truck and one 3,000 gallon truck.

### 5.   First Kuwaiti and Subcontract 167, Fifty Heads and Fifty Reefers

On June 17, 2003, Martin awarded First Kuwaiti Subcontract 167 for fifty heads and fifty reefers.  There was no Material Requisition to support the subcontract.  First Kuwaiti's bid was incomplete, offering to supply only reefers and not heads.  Martin then emailed First Kuwaiti General Manager Wadih Al-Absi, stating that the contract had been awarded to First Kuwaiti, stating a price for the reefer/head combination that was higher than the price offered by the low bidder on the initial subcontract bid.  Martin's Price Reasonableness Determination stated that there was adequate competition, even though it listed lower contemporaneous and prior bids than First Kuwaiti's.  Both this document and a Bid Tabulation/Justification Worksheet were dated months after the award of the contract, in contravention of KBR's Manual.  Authority to award the contract was granted only four months after its actual award.  By the contract's supposed completion date, First Kuwaiti had delivered only 19 heads and 16 reefers; First Kuwaiti never delivered all of the heads and reefers, although it billed KBR in full.

In summer 2004, KBR determined that 41 units had been returned to First Kuwaiti, and eight of the remaining nine had been destroyed.  KBR determined that Al-Absi refused to submit a claim or execute a change order.  Nonetheless, First Kuwaiti demanded payment for all fifty heads and reefers, and KBR subsequently settled the claim by increasing the length of the contract *ex post*, and increasing the contract price to $7,267,981.  KBR also paid for nine lost units, even though it eventually recovered four of the "lost" reefers.

### 6.   First Kuwaiti and Subcontract 203, Sixty Heads

KBR prepared a Material Requisition for sixty heads for six months, with delivery by June 24, 2003.  Martin solicited bids on July 2, 2003, with a bid deadline of July 5.  Two companies, including First Kuwaiti, responded with identical bids, although the other company offered two additional heads with one-week delivery, and First Kuwaiti offered immediate delivery.  Martin awarded the subcontract to the other company but demanded by email that it provide a detailed delivery schedule, and then voided the award, awarding it to First Kuwaiti instead.  The heads did not begin arriving until July 14, and a month after full delivery was promised, only 22 of the sixty heads had arrived.  Later, in July 2004, when negotiations were conducted about the price of lost or damaged heads to be paid to First Kuwaiti, Al-Absi demanded the like-new price of lost heads, a price that KBR's negotiator called "highway robbery."  Nonetheless, KBR settled the dispute by extending the contract period, *ex post*, to August 10, 2004, and more than doubling its price, to $7,192,364.  KBR paid for ten lost or destroyed heads even though all but four were returned.

### 7.   First Kuwaiti and Subcontract 190, 150 Heads

On August 19, 2003, Martin awarded Subcontract 190 to First Kuwaiti for 150 heads with delivery due by August 30, 2003.  The Material Requisition that supported the subcontract was dated after the award.  Martin awarded the subcontract at 2,950 Kuwaiti Dinars (KWD) per head per month, even though two other companies bid 2,900 KWD per head per month.  The per-month difference equals Martin's admitted kickback rate with First Kuwaiti.  The agreed delivery schedule was dated before the award date of the subcontract, which was approved three months after the award by KBR officer Drew Bacon.  Even though First Kuwaiti failed to deliver the heads timely under the terms of the contract, it billed and KBR paid for the full contract period.  KBR later issued three change orders that extended Subcontract 190 by eleven months,

for a total price of $25,120,332.  Despite the recognition by KBR's negotiator that the company

was again being swindled, KBR agreed to pay First Kuwaiti for twelve months at rates that

exceeded the low bidders on the original contract, for heads that were not delivered, and for 25

heads that had been reported as lost or destroyed.    After the twelve-month period, KBR

continued to pay First Kuwaiti for 125 heads until December 24, 2004, at the rates initially

established by Martin.

### C.  Defective, Damaged, Inoperable, and Unsanitary Reefers

Many of the reefers and heads provided to KBR by La Nouvelle and First Kuwaiti were

insufficient to perform the tasks required by the Task Order that requested them.  Some of them

lacked even the basic equipment necessary to work as a reefer.  According to KBR driver Wynia,

whoever procured them must not have looked at them.  Another KBR employee, Ken Blalock,

looked over 200 or so reefers located at Camp Arifjan in September 2003, and determined that

only about 25 percent of them were usable.  Some lacked compressors, doors, or tires.

Morgue Reefer R-89's refrigeration motor broke down, causing KBR to send it back to

Kuwait for repairs.  Afterward, KBR used it to transport potable ice but did not properly sanitize

it before this change in use.  KBR also failed to properly sanitize other repurposed morgue

reefers.

### D.  KBR's Claims and the Instant Litigation

KBR submitted claims for the costs incurred under each contract described above to the

United States, plus administrative costs and fees, with knowledge of the ways in which the

subcontracts had violated LOGCAP III, the FAR, and KBR's own Manual.  These claims were

submitted to the United States from early 2003 to 2005.  KBR agreed in writing that for the

purpose of statutes of limitations, laches, or other time-bars, the time period from August 4, 2008 to March 31, 2012 would be excluded.

The United States now sues KBR, La Nouvelle, and First Kuwaiti under the Anti-Kickback Act, 41 U.S.C. §§ 8702, 8706; the False Claims Act, 31 U.S.C. §§ 3729(a)(1), 3729(a)(1)(B); and for common law fraud.  The United States sues KBR and La Nouvelle under the False Claims Act, 31 U.S.C. § 3729(a)(3), and KBR for breach of contract. It sues La Nouvelle and First Kuwaiti for unjust enrichment

## DISCUSSION

### I.    The Government's Motion to Strike KBR's Affirmative Defenses

#### A.  Legal Standard on a Motion to Strike

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," on its own motion or by motion of a party.  "Motions to strike 'are not favored and will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense.'"  *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1400 (7th Cir. 1991) (quoting *Glenside W. Corp. v. Exxon Co.*, 761 F. Supp. 1100, 1115 (D.N.J. 1991)).  "But where . . . motions to strike remove unnecessary clutter from the case, they serve to expedite, not delay."  *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989)

What constitutes an "insufficient defense" is governed by Rule 8, which supplies the general rules of pleading.  Rule 8 is divided into three parts:  Subsection (a), which supplies the standard for "[a] pleading that states a claim for relief," i.e. a complaint; subsection (b), which governs defenses, admissions, and denials; and subsection (c), which governs affirmative

defenses. Rule 8(a)(2) provides that a pleading stating a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," while Rule 8(b)(1)(A) requires only that defenses be "short and plain," and Rule 8(c) requires just that "a pleading party affirmatively state" his defense. Until the Supreme Court's rulings in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), an 8(a)(2) claim had to provide only "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). *Twombly* and *Iqbal* clarified the pleading requirement for a complaint, requiring not only that an 8(a)(2) pleading provide notice, but also that there be "well-pleaded factual allegations . . . [that] plausibly give rise to an entitlement for relief." *Iqbal*, 556 U.S. at 679.

While courts have divided over whether the *Iqbal* standard applies also to subsections (b) and (c), which govern defenses and affirmative defenses, [3] it is clear that at a minimum, defenses and affirmative defenses must conform to the older *Conley* standard, and provide a plaintiff with fair notice of the defense being raised. *See Midwhey*, 883 F.2d at 1295 (affirming district court's decision to strike affirmative defenses that were "nothing but bare bones conclusory allegations . . . [and which] omitted any short and plain statement of facts and failed totally to allege the necessary elements of the alleged claims"); *Riemer v. Chase Bank USA, N.A.*, 274 F.R.D. 637, 640 (N.D. Ill. 2011) (striking "affirmative defenses [that were] . . . inadequately pled under pre-*Twombly* case law since . . . they do not give fair notice of what is being alleged . . . . [and] are nothing more than statements that do not provide fair notice to the plaintiff.").

---

[3] An affirmative defense is "one that admits the allegations in the complaint, but avoids liability, in whole or in part, by new allegations of excuse, justification or other negating matters." *Riemer v. Chase Bank USA, N.A.*, 274 F.R.D. 637, 639 (N.D. Ill. 2011)

## B. Analysis

The Government argues that KBR's affirmative defenses 1–2, 5–10, and 12 should be stricken because they "fail to meet basic pleading standards and alternatively fail as a matter of law."  Mem. Supp. Mot. Strike 1, ECF No. 69.

KBR's first defense is that "[t]he Complaint fails to state a claim upon which relief can be granted."  Answer 35.  The Government argues that this is a "summary legal conclusion . . . containing no supporting facts whatsoever."  Mem. Supp. Mot. Strike 3.  KBR replies that no more facts are needed, because *Twombly* and *Iqbal* apply only to claims for relief, Mem. Opp. Mot. Strike 3, and many district courts have held that only fair notice is required, *id.* at 4. However, KBR's defense merely states a legal conclusion, offering not a word of logical support and giving Plaintiff no notice of which parts of its complaint purportedly fail.  Such a conclusory recitation of the 12(b)(6) standard for dismissal is insufficient whether or not *Twombly* and *Iqbal* apply.  *See Renalds v. S.R.G. Rest. Grp.*, 119 F. Supp. 2d 800, 803 (N.D. Ill. 2000) (finding affirmative defenses including conclusory failure-to-state-a-claim defense "insufficient on their face because they are bare-bones conclusory allegations, simply naming legal theories without indicating how they are connected to the case at hand"); *Codest Eng'g v. Hyatt Int'l Corp.*, 954 F. Supp. 1224, 1231 (N.D. Ill. 1996) (striking a defense that was "no more than a recitation of the standard for a motion to dismiss under Rule 12(b)(6).").  The defense is stricken, without leave to amend, because in filing an answer without plausibly contesting the facial validity of the Government's claims, KBR has conceded the claims' facial validity.  *See Flasza v. TNT Holland Motor Exp., Inc.*, 155 F.R.D. 612, 614 (N.D. Ill. 1994) ("[Defendant] did not file a motion to dismiss; instead, it answered [Plaintiff's] complaint. Thus, [Defendant] concedes that [Plaintiff] states a cognizable claim.").

KBR's second defense is that:

> Defendants are not legally responsible for acts or omissions allegedly undertaken by employees, subcontractors, and others to the extent that those acts or omissions prove to have been undertaken outside the scope of employment or authority, as criminal acts, in secret, and/or without the knowledge of persons having legally sufficient levels of responsibility or authority within the relevant Defendant companies.

Answer 35.  It is not clear to the Court that this is an affirmative defense, rather than an observation that, if Plaintiffs fails to prove elements of the violations they have charged against KBR, their case will fail.  Regardless, as the Government observes, this defense provides Plaintiffs with no notice, in even the most general way, of which acts, omissions, employees, subcontractors, or potentially criminal acts are meant.  It is stricken.  If it is indeed meant as an affirmative defense, rather than a restatement of Plaintiffs' burden of proof, then KBR is granted leave to amend so that it does.  *See Heller*, 883 F.2d at 1294 ("Defenses are pleadings, and as such, leave to amend is freely granted as justice requires.").

KBR's fifth through tenth defenses list laches, estoppel, waiver, assumption of risk, unclean hands, and failure to mitigate, without any supplementary detail of any kind beyond the names of the defenses.  Answer 36.  The twelfth defense listed is accord and satisfaction, and is recited in a similarly bare-bones fashion.  *Id.*  The Court does not reach the parties' arguments about whether any of these defenses could apply to the instant case because none of the defenses is pleaded with clarity sufficient to give Plaintiffs fair notice, in even the most general way, of which persons, actions, and times are meant to be encompassed by each defense.  *See Heller*, 883 F.2d at 1295 (striking affirmative defenses that were "nothing but bare bones conclusory allegations"); *Fleet Bus. Credit Corp. v. Nat'l City Leasing Corp.*, 191 F.R.D. 568, 569–70 (N.D. Ill. 1999) (striking as insufficiently pled defenses of waiver and estoppel, laches, and failure to mitigate); *Riemer*, 274 F.R.D. at 640 ("[W]hen the gist of a party's affirmative defense does not

become apparent until its response to a motion to strike the defense, that defense is insufficient.").  KBR's affirmative defenses five through ten, as well as its twelfth affirmative defense, are stricken.  As with KBR's second defense, the Court grants leave to amend these pleadings, if KBR wishes to do so in conformity with this Order.

## II.     First Kuwaiti's Motion to Dismiss

First Kuwaiti moves to dismiss all claims in the Government's complaint as to itself—Claims 1, 2, 3, 5, 6, and 8—under Federal Rules of Civil Procedure 12(b)(2), lack of personal jurisdiction, and 12(b)(6), failure to state a claim upon which relief can be granted.  Mot. Dismiss 1.  Because the Court grants First Kuwaiti's motion on the basis of personal jurisdiction, it does not reach First Kuwaiti's 12(b)(6) arguments.

### A.  Legal Standard On a Motion to Dismiss for Lack of Personal Jurisdiction[4]

The plaintiff bears the burden of establishing personal jurisdiction.  *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012).  When challenged at the motion to dismiss stage, the plaintiff need only make a prima facie showing of facts establishing personal jurisdiction.  *Id.*  The court must accept as true all of the complaint's well-pleaded allegations, unless controverted by affidavit, but disputes between affidavits are resolved in the plaintiff's favor.  *Id.*; *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987), *superseded on other grounds as recognized in FMC Corp. v. Varonos*, 892 F.2d 1308, 1310 n.5 (7th Cir. 1990).

Due process prevents a court from exercising its jurisdiction over a defendant unless the defendant has "sufficient 'minimum contacts' with [the forum jurisdiction] such that the maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'" *Tamburo v. Dworkin*, 601 F.3d 693, 700–01 (7th Cir. 2010) (quoting *Int'l Shoe Co. v.*

---

[4] Because the FCA authorizes nationwide service of process, 31 U.S.C. § 3732(a), the Court looks to First Kuwaiti's contact with the United States as a whole to determine whether personal jurisdiction exists.  *See* Fed. R. Civ. P. 4(k)(1)(C); *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671–72 (7th Cir. 1987).

*Washington*, 326 U.S. 310, 316 (1945)).  Even if a defendant's contacts with the forum are not

"sufficiently extensive and pervasive to approximate physical presence" and thus confer general

personal jurisdiction, a court may still exercise specific personal jurisdiction if those contacts

arise out of or relate to the conduct at issue in the case.  *Felland*, 682 F.3d at 673 (quoting

*Tamburo*, 601 F.3d at 701); *see Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S.

408, 414 n.8 (1984).  Specific personal jurisdiction requires that: (1) the defendant "purposefully

availed [itself] of the privilege of conducting business in the forum state or purposefully directed

his activities at the state"; (2) the injury arose from the defendant's forum-related activities; and

(3) exercising jurisdiction does not violate traditional notions of fair play and substantial justice.

*Felland*, 682 F.3d at 673 (quoting *Burger King Corp. v.  Rudzewicz*, 471 U.S. 462, 472 (1985)).

Whether the court examines purposeful availment or purposeful direction depends largely

on the type of claim.  *Id.* at 674.  In contract suits, the focus is on whether the defendant

purposeful availed itself of the privilege of conducting business in the forum; with tort actions,

courts instead inquire whether the conduct giving rise to the claim was purposefully directed at

the forum.  *Id.*  Conduct is "purposefully directed" where it is (1) intentional, (2) expressly aimed

at the forum jurisdiction, (3) performed with knowledge that its effects would be felt there.  *Id.* at

674–75 (citing *Tamburo*, 601 F.3d at 703).  A defendant need not actually enter the forum so

long as its efforts are directed there.  *Purdue Res. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d

773, 781 (7th Cir. 2003) (citing *Calder v. Jones*, 465 U.S. 783, 788–89 (1984)).  "The question is

whether a defendant has followed a course of conduct directed at the society or economy existing

within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the

defendant to judgment concerning that conduct."  *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct.

2780, 2789 (2011).

The effects of an alleged tort are part of, not a substitute for, the analysis of the defendant's minimum contacts with the forum. *Medallion Prods., Inc. v. H.C.T.V., Inc.*, No. 06 C 2597, 2007 WL 3085913, at *6 (N.D. Ill. Oct. 18, 2007) (citing *Wallace v. Herron*, 778 F.2d 391, 395 (7th Cir. 1985)). "Whether these effects, either alone or in combination with other contacts, are sufficient to support in personam jurisdiction will turn upon the particular facts of each case." *Wallace*, 778 F.2d at 395. Experiencing the effects of an injury in a forum on its own is insufficient under a tort theory absent "something more directed at that [jurisdiction]." *Tamburo*, 601 F.3d at 706. As the Supreme Court recently explained in the context of intentional tort cases:

> [A]n injury is jurisdictionally relevant only insofar as it shows the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.

*Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014).

## B. Analysis

Both sides agree that the Court does not have general personal jurisdiction over First Kuwaiti, a foreign corporation. Mem. Supp. Mot. Dismiss 4–5, ECF No. 72; Resp. Mot. Dismiss 1, ECF No. 79. The issue is whether the Court has specific personal jurisdiction.[5]

The Court must first determine what facts support the basis for personal jurisdiction over First Kuwaiti. As described in detail above, First Kuwaiti is alleged to have entered into

---

[5] In an affidavit attached to its motion to dismiss, First Kuwaiti alleges many facts showing that it is neither physically present in a United States jurisdiction, nor did it possess contacts with a United States jurisdiction "sufficiently extensive and pervasive to approximate physical presence," *Felland*, 682 F.3d at 673, for general personal jurisdiction to apply. According to the affidavit, First Kuwaiti is incorporated and organized under the laws of Kuwait and performs most of its business in the Middle East. First Kuwaiti Decl. ¶¶ 5–6, ECF No. 72-1. It has never performed projects in the United States, *id*. ¶ 7, and is not licensed to conduct business in any United States jurisdiction, *id*. ¶ 8. On one occasion, it performed work directly for the United States, when it built the United States embassy in Baghdad, Iraq, between 2005 and 2008. *Id*. ¶ 14. First Kuwaiti has no office in the United States, *id*. ¶ 16, owns no property here, *id*. ¶ 18, does not pay taxes here, *id*. ¶ 20, and does not have an agent appointed for personal service of process here, *id*. ¶ 21. The statements in the affidavit are uncontradicted by the Government.

Subcontracts 93, 121, 167, 190, and 203 with KBR, all through the machinations of Martin, a subcontract officer at KBR.  Each of the contracts was for delivery to KBR in Kuwait or Iraq of water trucks, fuel trucks, and reefers.  There is no indication that any of this business was conducted outside of Iraq or Kuwait.  First Kuwaiti and its agents are not alleged to have traveled to or communicated with anyone in the United States in connection with the alleged fraudulent transactions.

As the Government correctly claims, Resp. Mot. Dismiss 8, the jurisdictional analysis of these facts proceeds on the tort-based test of whether First Kuwaiti, by its actions, "purposefully directed" its actions toward the jurisdictional United States.  Felland, 682 F.3d at 674. "Purposeful availment" is the test in contract actions.  *Id.*

On these facts, however, the Government has not carried its burden of showing a basis for this Court's exercise of personal jurisdiction, because it has not made a showing that First Kuwaiti purposefully directed its activities at the forum jurisdiction (the jurisdictional United States, as distinct from the United States Army or government).  The Government must plead sufficient facts for the Court to infer that First Kuwaiti "expressly aimed [its actions] at the forum state." *Id* at 675.  But all the Government has alleged is that First Kuwaiti, a foreign company based in and doing business in a foreign country, submitted fraudulent claims to an American company that was operating in that foreign country, for work done in the foreign country, with the collusion of the company's subcontract officers.  The Complaint, and the Government's Response to the Motion to Dismiss, are devoid of allegations giving rise to an inference that First Kuwaiti directed any of these activities at the United States.

The Government's argument that personal jurisdiction should apply appears ultimately to turn on two arguments.  The first argument is that, because one element of the charges against

19

First Kuwaiti is the submission of a false claim to the United States, and that claim was submitted, by KBR, in America, "an essential element of the cause of action against First Kuwaiti . . . was performed in United States territory."  Resp. Mot. Dismiss 4.  But the Government acknowledges that, wherever the claim was submitted and wherever the effects of the alleged violation of the FCA were felt, the test for jurisdiction over First Kuwaiti remains "whether the defendant intentionally aimed its conduct at the forum state."  *Id.* at 5 (quoting *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Associates of Houston Metroplex, P.A.*, 623 F.3d 440, 445 n.1 (7th Cir. 2010)).  Where elements or effects of an alleged offense may have occurred is, the Supreme Court has cautioned, "jurisdictionally relevant only insofar as it shows the defendant has formed a contact with the forum State."  *Walden*, 134 S. Ct. at 1125.  The relevance of where the claim was actually submitted, in other words, depends entirely on the extent to which it shows First Kuwaiti's purposeful direction of its actions toward the forum.

The Government's second argument is that because First Kuwaiti knew it would only get paid by KBR if KBR got paid on the claims it submitted to the United States, First Kuwaiti's actions were purposefully directed toward the United States (not just as the entity footing KBR's bill, but as a jurisdiction).[6]  Resp. Mot. Dismiss 7–8.  This theory of jurisdiction depends on the so-called "bank shot" approach.  Just as a basketball player banks her shot off a backboard in order to make a basket, a tortfeasor's "ultimate purpose" in acting toward a party outside a forum can be to produce an effect inside the forum.  The fact that his action directly affected the outside party alone does not change the fact that, like the ball aimed at the basket, his action was aimed at the forum.  *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1075 (10th Cir.

---

[6] The Court notes that the Government's claim about KBR's knowledge is supported by one email from a KBR official to Al-Absi, and a citation to one line in the parties' contract—hardly sufficient, in the Court's view, to show that payment for each and every kind of fraud alleged against KBR was conditioned on the successful submission of claims to the United States.  However, the analysis does not depend on this point; *see infra*.

2008) (finding that an infringement notice sent to eBay in California was aimed at shutting down an auction in Colorado).

Here, the Government points to language in the subcontracts, and emails between KBR and First Kuwaiti, tending to suggest that First Kuwaiti knew it would only get paid if the United States paid KBR.  Resp. Mot. Dismiss 7.  However, the Government does not allege that First Kuwaiti used KBR with the purpose of producing an effect in an American forum (defrauding the United States government).  Rather, these alleged facts suggest that First Kuwaiti aimed to swindle KBR, via a kickback scheme.  Just because KBR had to be persuaded or bribed into passing these costs along to the United States government does not mean that First Kuwaiti was targeting its allegedly tortious claims at a United States jurisdiction.  The Complaint describes a long series of fraudulent bids, followed by sometimes-protracted negotiations with KBR, in which it is apparent that First Kuwaiti's aim was to make KBR pay a certain subcontract price, or avoid having to credit KBR for certain quantities of reefers.  This is a debate between subcontractor and contractor, not an attempt on First Kuwaiti's part to insinuate a false claim against the United States.

There is no showing that First Kuwaiti knew or cared in what form KBR made its claim to the United States, or, indeed, if KBR paid First Kuwaiti without submitting a claim to the United States.  There is no showing other than the alleged behavior under the subcontracts to suggest that First Kuwaiti knew or cared about LOGCAP III or the United States's procedures for approving KBR's expenditures.  Finally, even if there were, there is not showing that First Kuwaiti's activities were aimed at the United States as a *jurisdiction*¸ its "society and economy," *Nicastro*, 131 S. Ct. at 2789, rather than its government as the payor on a contract.

Both parties make much of *Walden v. Fiore*, in which a police officer allegedly prepared a false affidavit after seizing cash carried by a couple traveling through Atlanta, Georgia on their way to Nevada.  The question in *Walden* was whether the officer had aimed his allegedly tortious activity at Nevada sufficiently for jurisdiction over him to lie there.  *Walden*, 134 S. Ct. 1121. The Supreme Court found that the officer lacked minimal contact with Nevada because, while the effects of his action were felt there, "the mere fact that his conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Id.* at 1126.  It was immaterial to the action the officer took that those against whom he took it happened to be from Nevada.  So too in the present case.  If Plaintiffs' claims are true, KBR's own obligations as a general contractor were immaterial to First Kuwaiti; all that mattered to First Kuwaiti was KBR's payment on the subcontract.  KBR could as well have been fulfilling a requisitions contract for France or Germany.

More topically, this Court refused to exercise personal jurisdiction over First Kuwaiti on a very similar matter, in which the Government alleged FCA violations when KBR submitted requests for equitable adjustment on LOGCAP task orders.  *United States v. Kellogg Brown & Root Servs., Inc.*, No. 4:12-CV-4110-SLD-JAG, 2014 WL 4948136 at *2 (C.D. Ill. Sept. 30, 2014).  In that case, First Kuwaiti dealt to some extent directly with the United States. *See id.* at *5–6.  Nevertheless, this Court held that "First Kuwaiti purposefully directed its alleged inflated claims to KBR, and such claims only affected the United States Government due to KBR's independent decision to bill the Government on their basis." *Id.* at *7.  Here too, the solicitations for subcontracts and allegedly inflated invoices were directed at KBR, not the United States. Because First Kuwaiti's conduct does not connect it with this forum in any meaningful way, the Court cannot exercise personal jurisdiction over First Kuwaiti.

Finally, because briefing by both parties on this motion was sufficient for the Court to decide the issue, and because replies to responses to motions to dismiss are not permitted, Local Rule 7.1(B)(3), First Kuwaiti's Motion to Supplement its Motion to Dismiss is denied.

### III.    KBR's Motion to Compel Arbitration as to Bud Conyers

Defendant KBR moves to compel Plaintiff Bud Conyers to submit his employment-related claims (an FCA retaliation claim, Bud Conyers Am. Compl. 12, and a breach of contract claim, *id.* at 14) to arbitration, pursuant to various written agreements made between him and KBR.  Mot. Compel Arbitration 1.  It further moves that these claims be dismissed in the instant action, or stayed pending arbitration.  *Id.*

### A.  Legal Framework

[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute.  The court is to make this determination by applying the "federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [Federal Arbitration] Act."

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (quoting

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983)).  The Federal

Arbitration Act ("FAA") provides, in relevant part:

A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  "Whether a particular issue is subject to arbitration is a matter of contract

interpretation, because 'a party cannot be required to submit to arbitration any dispute which he

has not agreed so to submit.'"  *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909

(7th Cir.1999) (quoting *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S.

574, 582 (1960)).  There is a strong federal policy in favor of arbitration, and any disputes about the scope of arbitrable issues should be resolved in favor of arbitration.  *Id.*

### B.  Analysis

KBR attaches to its motion two documents, signed by Conyers, that contain arbitration clauses.  Conyers does not dispute the authenticity of these documents.  One, an employment agreement, was executed with Service Employees International, Inc., a KBR affiliate, at the time Conyers was hired.  Mem. Supp. Mot. Compel Arbitration 1, ECF No. 74.  The contract reads, in relevant part:

> . . . You also agree that you will be bound by and accept as a condition of your employment the terms of the Halliburton Dispute Resolution Program which are herein incorporated by reference. You understand that the Dispute Resolution Program requires, as its last step, that any and all claims that you might have against Employer related to your employment, including your termination, and any and all personal injury claims arising in the workplace, you have against other parent or affiliate of Employer, must be submitted to binding arbitration instead of to the court system.
>
> It is expressly understood that, in the case of any controversy described above, all parent, subsidiary and affiliate or associated corporations of Employer, and of their officers, directors, employees, insurers and agents are third party beneficiaries to this provision and are entitled to invoke, enforce and participate in arbitration pursuant to this provision.

Decl. of Mary LaMance, Attachment 1 ¶ 26, ECF No. 74-2.  The second document is a "New Hire/Rehire" form Conyers also executed, which provides in relevant part:

> I also agree that I will be bound by and accept as a condition of employment the terms of the Halliburton Dispute Resolution Program which are herein incorporated by reference. I UNDERSTAND THAT THE DISPUTE RESOLUTION PROGRAM REQUIRES, AS ITS LAST STEP, THAT ANY AND ALL CLAIMS THAT I MIGHT HAVE AGAINST THE COMPANY RELATED TO MY EMPLOYMENT, INCLUDING MY TERMINATION, AND ANY AND ALL PERSONAL INJURY CLAIMS, ARISING IN THE WORKPLACE, I HAVE AGAINST ANY OTHER PARENT OR AFFILIATE OF THE COMPANY, BE SUBMITTED TO BINDING ARBITRATION INSTEAD OF TO THE COURT SYSTEM. I also agree that any employment contract or any other agreement which is inconsistent with the provisions of this

> notice or Dispute Resolution Program is absolutely void unless entered into in writing by the Chief Executive Officer.

Decl. of Mary LaMance, Attachment 2.  The parties agreed that the terms of the contract were to be governed by the laws of the state of Texas, "except that with respect to all matters or disputes related to the validity or enforceability of [the arbitration clause], all issues shall be governed by and construed in accordance with the Federal Arbitration Act."[7]  Decl. of Mary LaMance, Attachment 1 ¶ 25.

Conyers thus agreed, twice, to submit to binding arbitration "any and all claims against [his employer] related to [his] employment, including [his] termination."  Decl. of Mary LaMance, Attachment 1 ¶ 19, Decl. of Mary LaMance, Attachment 2.  Conyers's Breach of Contract claim alleges that KBR breached "by terminating [his employment contract] prematurely and unlawfully."  Conyers Am. Compl. ¶ 57.  His FCA retaliation claim, filed pursuant to 31 U.S.C. § 3730(h),[8] alleges that Conyers "was an employee discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against in the terms and conditions of employment by his employer because of lawful acts done by the [sic] Conyers in furtherance of an action under the False Claims Act."  *Id.* ¶ 53.  Both causes of action fall within the ambit of Conyers's agreement to submit to arbitration because both regard his employment

---

[7] The Court has supplied the phrase "the arbitration clause" in place of what the document itself states, or "provision 28, below."  The quoted clause comes from Provision 25, which is immediately followed by Provision 26, the arbitration clause.  However, provision 28, entitled "Agreement and Release," covers an employee's abandoned luggage.  Since no party disputes the overwhelmingly more sensible reading—that the arbitration clause, rather than the lost-luggage clause, was to be governed by the terms of the Federal Arbitration Act—the Court interprets this as a scrivener's error and the contract as unambiguously providing that its arbitration clause be interpreted with reference to the FAA.  *See Youngs v. Fin. Ctr. Fed. Credit Union*, No. 1:13-CV-00901-SEB, 2014 WL 1317134, at *6 (S.D. Ind. Mar. 31, 2014) (disregarding a scrivener's error).

[8] "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."  31 U.S.C. § 3730(h).

and termination.  Because the parties agreed that the FAA applies, these contracts must thus be interpreted on its terms.

It does not matter that the FCA retaliation claim is a statutory cause of action associated with the *qui tam* action itself.  There is no indication that Congress intended to exempt § 3730(h) actions from arbitrability, and in the absence of such an indication, the general presumption in favor of arbitration governs.  *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991) ("Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue."); *Mikes v. Strauss*, 889 F. Supp. 746, 755–56 (S.D.N.Y. 1995) (finding that a § 3730(h) retaliation claim should be arbitrated because of a contractual arbitration provision).  The FAA requires enforcement of the arbitration clauses as to both of Conyers's claims unless he can point to "such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

Conyers argues that enforcement of the arbitration clauses as to his claims would be unconscionable, because it would be costlier for him to argue his FCA claim in arbitration than in the instant *qui tam* action where, pursuant to 31 U.S.C. § 3730(c), the Government will take charge of the case.  Resp. Mot. Compel Arbitration 1–2, ECF No. 76.  While creative, the argument is not factually supported.  KBR claims that the Halliburton Dispute Resolution Program, under which Conyers agreed to arbitrate his claims, places all the administrative costs on the employer, provides for recovery of attorney's fees by successful claimants, and requires only a $50 filing fee.  Mot. Compel Arbitration 3–4.  Conyers does not dispute this, but replies that however he proceeds, he "must establish the legitimacy of the Government's claims in order to prove his FCA § 3730(h) claim," Resp. Mot. Compel Arbitration 4, and that thus, in order for him to prevail on his § 3730(h) claim, he or the Government will have to show everything the

Government now seeks to show.  He does not have the means, he claims, to muster such evidence on his own, here or in arbitration, as he would be forced to do if he were sent there; and mustering such evidence twice, both in a trial by the Government and by him in arbitration, would be wasteful.  *Id.*

However, the language of the statute and the case law Conyers himself cites undercuts this argument.  Section 3730(h) requires only that a plaintiff show he was terminated for "lawful acts . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."  In *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994) (*overruled on other grounds by Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, (2005)), which Conyers cites, Resp. Mot. Compel Arbitration 3–4, the Seventh Circuit explained that the statute "expressly covers investigatory activities preceding litigation." *Honeywell*, 33 F.3d at 864.  There is, and would be in arbitration, no requirement that Conyers prove any element of fraud, or of the Government's many additional claims; just that he was fired for actions that he took in furtherance of an action under the FCA.  *See id.*

Furthermore, the argument that it would be costly for Conyers to prove elements of his employment claims against KBR—insofar as that is his argument—does nothing to overcome the presumption in favor of arbitration, or the contract that he signed in favor of arbitration.  The mere logistical difficulty of proving a claim on one's own cannot be a bar to arbitration, so long as that arbitration is not in and of itself unduly costly.  *See Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000).

Plaintiff urges that, if his claims are dismissed so that arbitration can proceed, arbitration should be stayed pending the outcome of the present litigation.  Resp. Mot. Compel Arbitration 1.  However, since the Court has found meritless Conyers's argument that he would have to

prove elements of the Government's case in arbitration, Conyers has offered no convincing reason why arbitration should be stayed.  Conyers's claims are dismissed without prejudice so that they may go to arbitration.

## CONCLUSION

Accordingly, the Government's Motion to Strike Answer to Amended Complaint, ECF No. 68, is GRANTED, First Kuwaiti's Motion to Dismiss for Lack of Jurisdiction, ECF No. 71, is GRANTED, and KBR's Motion to Compel Arbitration and to Dismiss or Stay, ECF No. 73 is GRANTED.  First Kuwaiti's Motion to Supplement Motion to Dismiss for Lack of Jurisdiction is DENIED.  KBR is granted leave to amend its Answer in conformity with this Order.  The Government's claims as to First Kuwaiti are DISMISSED WITH PREJUDICE, and First Kuwaiti is dismissed from the case.  Plaintiff Bud Conyers's claims are DISMISSED WITHOUT PREJUDICE, and he is dismissed from the case.


Entered this 30th day of March, 2015.

_____
s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE