United States District Court
Southern District of Texas
**ENTERED**
March 25, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| and | § | |
| BUD CONYERS, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:06-CV-04024 |
| | § | |
| HALLIBURTON COMPANY | § | |
| and | § | |
| KELLOGG BROWN & ROOT INC. | § | |
| and | § | |
| KELLOGG BROWN & ROOT SERVICES | § | |
| INC., *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

### I.   INTRODUCTION

On January 8, 2014, the United States government (the "Government") intervened in this lawsuit and filed a complaint against Kellogg Brown & Root, and its affiliates (collectively, "KBR"), and two foreign subcontractors.[1] The foreign subcontractor defendants, Kuwaiti corporations First Kuwaiti Trading & Contracting, WLL and La Nouvelle General Trading and Contracting Co., have since been dismissed from this suit. The Government's complaint alleges that KBR and its former co-defendants committed varied acts of fraud and misconduct in the execution of an Army contract to provide logistical support services to the Army in Iraq between 2002 and 2005.

---

[1] Former relator-plaintiff Bud Conyers, previously a KBR employee, first brought this action on December 20, 2006 as a *qui tam* suit under the federal False Claims Act against KBR and the two subcontractors. Conyers passed away in 2018. On July 18, 2018, David Conyers, Bud Conyers' son and the representative of his estate, was substituted for Bud Conyers in this case.

Pending before the Court is KBR's motion for summary judgment (Dkt. 336) and the Government's motion for partial summary judgment (Dkt. 337-1). KBR and the Government have both timely filed responses and replies to each other's respective motions. After having carefully considered the parties' motions, responses, replies, the record, and the applicable law, the Court determines that KBR's motion for summary judgment should be GRANTED IN PART and DENIED IN PART. Likewise, the Government's motion for partial summary judgment should be GRANTED IN PART and DENIED IN PART.

## II.    FACTUAL BACKGROUND

On December 14, 2001, the United States Department of the Army (the Army) entered into contract No. DAAA09-02-D-0007 with Brown & Root Services, then a division of Kellogg Brown & Root, Inc., pursuant to the federal Logistics Civil Augmentation Program (the "LOGCAP III" contract). On July 1, 2003, Kellogg Brown & Root Services, Inc. ("KBRSI") became the successor-in-interest to the LOGCAP III contract.[2] (For purposes of this opinion, the Court will refer to the Kellogg Brown & Root entities collectively as "KBR").  Under LOGCAP III, KBR would provide logistical support services for the Army's operations in Iraq. LOGCAP III was an "umbrella" contract under which the Government would execute individual Task Orders prescribing a particular scope of work (SOW) for the procurement of goods or services. The Task Orders at issue in this case had a "cost-plus-award-fee" structure, meaning that, in addition to being reimbursed for its costs, KBR would earn a one percent "base fee" and could earn up to a two percent performance-based "award fee." Each fee was calculated as a percentage of the Task Order's final "negotiated estimated costs" agreed upon by the Army and KBR.

---

[2] However, Kellogg Brown & Root, Inc. remained identified as "payee" on reimbursement vouchers submitted to the Government as late as September 17, 2005.

KBR sought payment from the Army by submitting to the Defense Contract Audit Agency (DCAA) invoices called "public vouchers." A separate agency, the Defense Contract Management Agency (DCMA), was also involved in administering LOGCAP III. KBR's vouchers included the applicable Task Order number, the amount being billed, the date(s) that the goods or services were delivered, and line-item summaries that typically indicated the subcontractor that performed the job. The Government's allegations in this case concern vouchers submitted by KBR for services performed under LOGCAP III between 2002 and 2004.

KBR performed these services under three Task Orders issued by the Army. Task Order 43 required KBR to transport goods and supplies to U.S. troops throughout the war theater and, specifically, to provide refrigerated transportation of items such as food, ice, and medicine. Task Order 36 tasked KBR with providing tankers that would deliver and store diesel fuel at a military airport near Kuwait. Task Order 27 required KBR to construct and maintain Camp Arifjan, a facility in Kuwait that was to be used as a staging ground for Army personnel. KBR entered into subcontracts with local firms in order to complete these Task Orders. The allegations of misconduct by KBR's employees in connection with the subcontracting process, as detailed below, serve as the basis for the Government's lawsuit. The parties have filed competing summary judgment motions on the issues of liability only.

III.    THE PARTIES' CONTENTIONS

In Count I, the Government alleges that KBR, acting through one of its employees, violated former section 53 (now section 8706(a)(2))[3] of the federal Anti-Kickback Act (AKA) by including kickback fees in the contract price that KBR charged the Government for the costs of

---

[3] Prior to 2011, the AKA was codified at 41 U.S.C. §§ 51–58. Congress re-codified the AKA without substantive change, at 41 U.S.C. §§ 8701–07. *See* Public Contracts—Enact Certain Laws, Pub.L. No. 111–350, § 3, 124 Stat. 3677, 3838–41 (2011). This opinion will refer to the re-codified statutory sections of the Act.

Subcontracts 167 and 190. In its dueling motion, KBR contends that the AKA claims are barred by the statute of limitations or, alternatively, that KBR's employee lacked the requisite scienter for the Government to establish a violation of the statute.

Both parties also move for summary judgment as to Counts II and III, which implicate Subcontracts 167, 190, 39, and Change Order 1 to Subcontract 167. KBR, but not the Government, also moves for summary judgment on these two counts as to Subcontract 11. On Counts II and III, respectively, the Government alleges that KBR violated the federal False Claims Act (FCA) by (i) knowingly presenting, or causing to be presented to the Government, false claims for payment or approval; and (ii) knowingly making, using, or causing to be made or used, false records or statements to get false claims paid or approved by the Government. KBR asserts that the Government cannot create a fact issue as to three elements of its FCA claims, and, for Subcontract 39, as to the requirements for a "claim."

KBR also moves for summary judgment on Counts IV, V, and VI. Counts IV and V allege that, as to each subcontract at issue, KBR violated the FCA by conspiring with its former co-defendants to defraud the Government by getting a false claim paid. *Id.* As to Count VI, the Government's common law fraud claim, KBR asserts arguments similar to those made against the FCA claims, along with an argument that such a claim is time-barred.

Finally, the parties present cross summary judgment motions on Count VII, the Government's claim that KBR breached the LOGCAP III contract by claiming costs that were not allowable under the contract's terms. KBR responds that the Court lacks jurisdiction over the contract claim and, alternatively, that the Government cannot establish that the costs KBR submitted for Subcontracts 11, 39, 167, and 190 were unreasonable.

## IV.    APPLICABLE LAW

### a.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment against a party who fails to make a sufficient showing of the existence of an element essential to the party's case and on which that party bears the burden at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant bears the initial burden of "informing the Court of the basis of its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *see also Martinez v. Schlumber, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008). If the movant meets its burden, the burden shifts to the nonmovant to "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996) (citing *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). "To meet this burden, the nonmovant must 'identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s].'" *Stults*, 76 F.3d at 656 (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871, 115 S. Ct. 195, 130 L. Ed.2d 127 (1994)). It may not satisfy its burden "with some metaphysical doubt as to the material facts, by conclusory allegations, by

unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotation marks and citations omitted).  Instead, it "must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Intern.*, 343 F.3d 401, 405 (5th Cir. 2003) (citing *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998)).

"A fact is material only if its resolution would affect the outcome of the action, . . . and an issue is genuine only 'if the evidence is sufficient for a reasonable jury to return a verdict for the [nonmovant].'" *Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009) (internal citations omitted). When determining whether a genuine issue of material fact has been established, a reviewing court is required to construe "all facts and inferences . . . in the light most favorable to the [nonmovant]." *Boudreaux v. Swift Transp. Co., Inc*., 402 F.3d 536, 540 (5th Cir. 2005) (citing *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)). Likewise, all "factual controversies [are to be resolved] in favor of the [nonmovant], but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Boudreaux*, 402 F.3d at 540 (citing *Little*, 37 F.3d at 1075 (emphasis omitted)). In sum, "[t]he appropriate inquiry [on summary judgment] is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, (1986)).

### b.     The Anti-Kickback Act

The AKA makes unlawful the provision, acceptance, or inclusion, in claims for reimbursement, of kickbacks—or "commercial bribes"—by parties doing business with the federal government. *United States ex rel Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 346 (5th Cir. 2013). The AKA defines as "kickback" broadly as:

any money, fee, commission, credit, gift, gratuity, thing of value, *or compensation of any kind* that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee to improperly obtain or reward favorable treatment in connection with a prime contract[4] or a subcontract[5] relating to a prime contract.

41 U.S.C. § 8701(2) (2012) (emphasis added). The AKA's prohibitions are as follows:

A person may not—

(1) provide, attempt to provide, or offer to provide a kickback;

(2) solicit, accept, or attempt to accept a kickback; or

(3) include the amount of a kickback prohibited by paragraph (1) or (2) in the contract price—

> (A) a subcontractor charges a prime contractor or a higher tier subcontractor; or

> (B) a prime contractor charges the Federal Government.

41 U.S.C. § 8702. Under the AKA, the term "person" includes "a corporation, partnership, business association of any kind, trust, joint-stock company, or individual." *Id.* § 8701(3). The AKA's strict liability provision allows the Government to recover the amount of a kickback from a company "whose employee, subcontractor, or subcontractor employee violates section 8702 . . . by providing, accepting, or charging a kickback." *Id.* § 8706(a).

### c.      The False Claims Act

A person is liable under the FCA if that person, *inter alia*, (1) "knowingly presents or causes to be presented to [the Government] a false or fraudulent claim for payment or approval" or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid by the Government." 31 U.S.C. § 3729(a) (2006). On Counts II

---

[4] A "prime contract" is "a contract or contractual action entered into by the Federal Government to obtain supplies, materials, equipment, or services of any kind." 41 U.S.C. § 8701(3).

[5] A "subcontract" is "a contract or contractual action entered into by a prime contractor or a subcontractor to obtain supplies, materials, equipment, or services of any kind under a prime contract." 41 U.S.C. § 8701(7).

and III, the Government must establish each of the following elements: (1) there was a false statement or fraudulent course of conduct; (2) the claim, record, or statement was made "with the requisite scienter"; (3) the claim, record, or statement was material; and (4) the claim, record, or statement caused the Government to pay out money or to forfeit moneys due (*i.e.*, involved a claim). *United States ex rel Lemon v. Nurses to Go, Inc.*, 924 F.3d 155, 159 (5th Cir. 2019). Also at issue in this case is a theory of conspiracy liability under the FCA. Under the FCA version applicable here,[6] a person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid" is subject to FCA liability. 31 U.S.C. § 3129(a)(3) (2006).

## V.    ANALYSIS AND DISCUSSION

Each subcontract at issue in this case is the subject of multiple theories of liability alleged by the Government. While it appears the Fifth Circuit has not addressed this issue, the Court of Federal Claims has held that a court may impose both civil penalties under the AKA, and separate civil penalties and treble damages under the FCA for the same acts. *Morse Diesel Int'l, Inc. v. United States,* 79 Fed. Cl. 116, 124 (Ct. Fed. Cl .2007). Accordingly, the Court examines the Government's claims under both the AKA and the FCA. Except as to Count VI, the Court addresses the parties' arguments in turn, beginning with a summary of the relevant facts. Unless expressly stated otherwise, where summary judgment is granted the facts in support of that summary have been established by competent summary judgment evidence.

Importantly, the parties have made certain stipulations as to the timeliness of the Government's claims. As noted, the Government filed its complaint on January 8, 2014. KBR has stipulated that for the purpose of statutes of limitations, laches, or other time bars, the period

---

[6] Congress amended the FCA in 2009, including the conspiracy provision. However, because the events giving rise to this suit occurred between 2001 and 2005, the pre-2009 version of the statute is applicable here.

from August 4, 2008 to March 31, 2012 is excluded. Therefore, the parties agree, pursuant to a series of tolling agreements, that the Government's FCA, AKA, and breach of contract claims are not time-barred, to the extent those claims accrued after May 9, 2004.

### a.    Common Law Fraud (Count VI)

The Court grants summary judgment for KBR as to Count VI, the Government's common law fraud claim. KBR asserts, and the Government does not dispute, that a three-year limitations period applies to this claim. 28 U.S.C. § 2415(b) (setting forth a three-year statute of limitations for "every action for money damages brought by the United States or an officer or agency thereof which is founded upon a tort"). The Government does not allege that any unlawful conduct by KBR occurred after May 2007, or within three years prior to the date suit was filed (accounting for the excluded period of August 4, 2008 to March 31, 2012). Any fraud claim concerning conduct prior to May 2007 is time-barred. Therefore, the Court grants summary judgment to KBR as to Count VI.

### b.    Subcontracts 167 and 190

#### i.    <u>Factual Summary</u>

The Government's claims concern two subcontracts that KBR entered into in furtherance of its performance under Task Order 43. On June 17, 2003, KBR executed Subcontract GU49-KU-S00167 (Subcontract 167) with Kuwaiti firm First Kuwait Trading and Contracting, WLL (FKTC), to lease 50 trucks ("heads") and 50 refrigerated trailers ("reefers") for six months. (The Court will use the term "truck-trailer unit" to refer to a unit consisting of one truck and one trailer.). On August 19, 2003, KBR executed GU49-KU-S0090 (Subcontract 190) with FKTC for a six-month lease of 150 truck-trailer units. Both awards were the result of a kickback arrangement between FKTC and KBR employee Anthony (Tony) Martin. In his capacity as KBR's subcontract administrator, Martin was responsible for soliciting bids from prospective

subcontractors and for negotiating and awarding subcontracts under the LOGCAP III contract on KBR's behalf.

In exchange for an agreed payment of 50 Kuwaiti Dinars (KD) per month per truck-trailer unit leased through a subcontract, Martin provided FKTC Manager Wadih Al-Absi with critical information about the bids of FKTC's competitors. In total, Martin was to receive $50,239.50 in kickbacks for Subcontract 167, and $150,265.35 for Subcontract 190. Ultimately, Martin received only a $10,000 advance from Al-Absi. He admitted to the foregoing conduct in his plea agreement with the Government, which Martin entered into on May 8, 2007.[7]

Martin awarded Subcontract 167 to FKTC in the amount of $4,672,273.50 and Subcontract 190 in the amount of $8,865,656. On February 17, 2005, KBR submitted reimbursement vouchers to the Government for reimbursement a voucher that included costs associated with Subcontract 167. On July 30, 2004 and again on March 31, 2005, KBR also submitted reimbursement vouchers to the Government that included costs associated with Subcontract 190.

### ii.     The Anti-Kickback Claims (Count I)

In connection with Subcontracts 167 and 190, the Government seeks summary judgment under the AKA's strict liability provision, section 8706(a)(2), alleging that KBR is strictly liable for violating section 8702(3) of the statute by "includ[ing] the amount of a kickback . . . in the contract price" that KBR, a "prime contractor," charged the Government. KBR contends that the AKA's six-year limitations period bars the Government's claims as to the foregoing subcontracts

---

[7] Martin reaffirmed his conduct while testifying in front of a grand jury in his criminal case and during the criminal trials of KBR employees Jeff Mazon and Stephen Seamans, as well as during his deposition taken in this case.

and, also, that the Government cannot establish that the amounts billed to the Government under these subcontracts included any kickback amounts.

a.   <u>The Statute of Limitations</u>

The AKA requires the Government to bring a civil action under section 8706 no later than six years after the date on which (1) the prohibited conduct establishing the cause of action occurred, or (2) the Government first knew, or should reasonably have known, that the prohibited conduct had occurred. 41 U.S.C. § 8706(b). The parties stipulate that the limitations period for the AKA claims began to run on May 9, 2004. However, KBR contends that to the extent the Government seeks to derive KBR's liability from section 8702(3),[8] the "inclusion" of kickback amounts in the contract prices occurred when the prices of the respective subcontracts were "fixed" or "set," not when KBR actually billed the Government for the costs it incurred.[9] The Government responds that the "prohibited conduct" occurred when KBR *submitted* the vouchers for Subcontracts 167 and 190 to the Government.

Finding no reason to depart from the statute's plain language, the Court agrees with the Government's interpretation. *Calogero v. Shows, Cali & Walsh, L.L.P.*, 970 F.3d 576, 582 (5th Cir. 2020) ("[W]ords generally should be interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute."). The AKA expressly prohibits inclusion of a kickback amount in the contract price that a prime contractor "charges" the Government.[10] Therefore, a

---

[8] This section prohibits "includ[ing] the amount of a kickback . . . in the contract price that a prime contractor to the Federal Government."

[9] KBR also points out that KBR employees Seamans and Martin accepted kickbacks in 2003 and that, as to any liability premised on violation of section 8702(2), "the prohibited conduct establishing the cause of action" occurred prior to May 9, 2004. The Government, however, derives KBR's liability from a violation of section 8702(3).

[10] The term "charge" means "to demand a fee" or "to bill." *See* Charge, BLACK'S LAW DICTIONARY (11th ed. 2019). The Court must assume that if Congress had wished to instead use a word other than "charge," it would have done so. *See also* 41 U.S.C. § 8706(a)(2) (permitting recovery from a person whose agent "violated section 8702 . . . by providing, accepting, or *charging* a kickback" (emphasis added)).

violation of section 8702(3) occurred, and the Government's cause of action accrued, when the offense's final element—charging the government—was completed. *United States v. Ongaga*, 820 F.3d 152, 159–60 (5th Cir. 2016) ("Generally, the statute of limitations begins to run when the crime is complete, meaning that all the elements of the crime have been satisfied.").

Furthermore, the Government's cause of action under the AKA accrued separately on each date that KBR submitted to the Government a voucher that included a kickback amount for reimbursement. *See, e.g.*, *United States v. Gelais*, 952 F.2d 90, 96–97 (5th Cir. 1992) ("Each wire transmission in furtherance of a scheme to defraud constitutes a separate crime."). KBR submitted vouchers associated with Subcontract 167 to the Government on February 17, 2005 and submitted vouchers associated with Subcontract 190 on July 30, 2004 and March 31, 2005. Therefore, the Government's AKA claims as to these vouchers are not time-barred.

b.   The Merits of the AKA Claims

KBR also seeks to avoid summary judgment on the Government's AKA claims by arguing that the Government cannot establish, as a matter of law, that the vouchers submitted to the Government for Subcontract 167 and 190 included the kickback amounts agreed upon by its employee, Tony Martin. KBR does not dispute that Martin entered into a kickback arrangement with FKTC manager Wadih Al-Absi, agreeing to inform FKTC of its competitors' bids in exchange for a monthly payment of 50 KD per truck leased through each subcontract. Martin ultimately awarded Subcontracts 167 and 190 to FKTC, and KBR, subsequently, submitted vouchers to the Governments for costs associated with each subcontract.

By this evidence, the Government has carried its initial burden to show that KBR's charges to the Government included the kickback amounts agreed upon by Martin and FKTC. That is, having established Martin's kickback arrangement, the Government is entitled to the rebuttable presumption that FKTC's bid would "reflect the amount [it] contemplates paying as a

kickback, and [that] [its] inflated bid will be reflected in the prime contractor's bid to the Government." *See United States v. Acme Process Equip. Co.*, 385 U.S. 138, 143–44 (1966).

Seeking to rebut the Government's initial showing, KBR cites Martin's deposition testimony in this case that he did not personally know whether FKTC's bids to KBR, or the amounts charged by KBR to the Government, included the kickback amounts that he negotiated. However, Martin's personal knowledge on this point is immaterial. "Kickbacks being made criminal means that they must be made—if at all—in secrecy." *Id.* at 144. The *Acme* Court noted that kickbacks in government contracts "*necessarily* inflate the price to the Government[.]" *Id.* (emphasis added). KBR, therefore, has failed to create a fact issue as to whether the reimbursement voucher "include[d] the amount of a kickback . . . in the contract price" that KBR, a "prime contractor," charged the Government. Under Section 8706(a), KBR is strictly liable for the conduct of its employees. 41 U.S.C. § 8706(a)(2). Therefore, KBR is liable for each instance in which its employees charged the Government a kickback amount—here, on February 17, 2005 (Subcontract 167) and on July 30, 2004 and March 31, 2005 (Subcontract 190). The Court grants summary judgment to the Government as to each violation.

### i.     False Claims Act Liability (Counts II and III)

As to Counts II and III, KBR asserts that the Government cannot establish three of the four elements necessary under 31 U.S.C. § 3729(a)(1)(A) to maintain its claim for an FCA violation, *i.e.*, falsity of the claim, record, or statement; scienter, or knowledge; and materiality. The Court addresses each element in turn. The Court then examines Count V, which alleges liability under the FCA's conspiracy provision.

### 1.     Falsity

The Government can establish the "falsity" element of its FCA theory for Counts II and III by showing that KBR submitted a claim to the Government that was either "factually false" or

"legally false." *United States ex rel. Bennett v. Medtronic*, 747 F.Supp.2d 745, 765 (S.D. Tex. 2010). The Government argues that KBR's claims associated with Subcontracts 167 and 190 were false under either definition, while KBR asserts that neither category of falsity is satisfied. The Court is of the opinion that the claims at issue were factually false, as a matter of law.

A factually false claim involves "'an incorrect description of goods or services or a request for reimbursement for goods or services never provided.'" *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 590, 593 (S.D. Tex. 2016). *See also United States ex rel Ruscher v. Omnicare, Inc.*, No. 4:08–cv–3396, 2014 WL 2618158, at *6 (S.D. Tex. June 12, 2014) ("The most straightforward FCA claims arise when a claimant requests compensation for services which he has not performed, or overcharges for those that he has completed."). KBR's arguments on this point resemble its argument as to the Government's AKA claims and are premised on Anthony Martin's deposition testimony that he did not know whether FKTC's bids to KBR, or the amounts charged by KBR to the Government, included the kickback amounts that he negotiated.

As discussed *supra*, it is not relevant whether Martin had personal knowledge that FKTC's bids and KBR's vouchers to the Government included the agreed-upon kickbacks. Martin's purported lack of knowledge does not rebut the Government's initial showing that KBR's charges included the kickback amounts. *Acme*, 385 U.S. at 143–44. It follows, then, that KBR passed on to the Government the cost of the kickbacks that were baked into each of FKTC's bids. Because those costs did not correspond to any service that KBR—or the Government—actually received, KBR, by definition, overcharged the Government. *Ruscher*, 2014 WL 2618158, at *6. KBR's vouchers associated with Subcontracts 167 and 190 were, therefore, factually false claims, under section 3729(a)(1)(A), and factually false records, under section 3729(a)(1)(B).

2.      Knowledge

The FCA provides that a defendant acts "knowingly" if the defendant (i) has actual knowledge of information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). The standard for recklessness, in the civil context, is an objective one; the term describes an act "entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007). Under these FCA provisions, the Government need not show that a defendant had the specific intent to defraud the Government. *Id.* Additionally, an employee's knowledge may be imputed to his employer for purposes of FCA liability if the employee was acting (1) within the scope of his authority and (2) for the purpose of benefitting the corporation. *United States v. Hangar One, Inc.*, 563 F.2d 1155, 1158 (5th Cir. 1977) (citing *United States v. Ridglea State Bank*, 357 F.2d 495 (5th Cir. 1966)).[11]

The record evidence establishes that, in executing Subcontracts 167 and 190 for inflated amounts, Martin knowingly caused the making or use of a false record related to KBR's subsequent claims for payment. Furthermore, at a minimum, Martin recklessly disregarded the fact that his corrupt award of the subcontracts to FKTC would cause KBR to bill the Government for the cost of his illicit arrangement with FKTC—*i.e.*, to submit an inflated, or false, claim for payment. Thus, Martin, created an "unjustifiable risk" that KBR would seek reimbursement for a false claim.

---

[11] Despite the Government's arguments that *Ridglea*'s "intent-to-benefit" requirement for imputing an employee's knowledge to its corporate employer no longer applies, the Fifth Circuit recently declined to overrule its precedent. *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 352, n.12 (5th Cir. 2013) ("*Ridglea* is our court's precedent in FCA cases.").

The Government has also satisfied both requirements for Martin's knowledge to be imputed to KBR. The record evidence shows that Martin agreed to the kickback arrangements and awarded Subcontracts 167 and 190 to FKTC in the course of performing his core responsibilities—soliciting bids from prospective subcontractors, negotiating subcontracts, and awarding subcontracts under LOGCAP III. *See, e.g.*, *United States v. BNP Paribas SA*, 844 F.Supp.2d 589, 614 (S.D. Tex. 2012) (holding that a bank employee responsible for negotiating lines of credit with the bank's clients acted within the scope of his employment when he accepted a bribe in exchange for helping a foreign entity improperly access financing from a government program).

Similarly, Martin rigged the bidding process and awarded the subcontracts to FKTC to benefit not only himself, but also KBR. In deposition, Martin attempted to justify his award of Subcontract 190 to FKTC on the grounds that "[i]t supported the Army and made sure they got" the vehicles the Army needed. Likewise, in a memorandum executed two days after the award of Subcontract 167 to FKTC, Martin stated that "[t]he urgency of KBR to meet the deliveries of food and medicinal requirements to the Army substantiated the immediate award[.]" In other words, Martin believed that his conduct would benefit KBR by enabling it to timely perform its obligations under LOGCAP III. *United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*, No: SA-13-CA-004-XR, 2019 WL 5026934, at *3 (S.D. Tex. July 1, 2019) ("The fact that the scheme benefitted both Craighead and CCM&D does not negate the fact that it benefitted, and was intended to benefit, CCM&D."). Thus, as a matter of law, Martin's scienter is imputed to KBR.

3.    Materiality

A false claim, record, or statement is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *United States ex rel.*

*Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 159 (5th Cir. 2021). The FCA's materiality requirements is "demanding." Therefore, a court should consider: (1) whether the defendant's false claim violated an express condition of payment; (2) whether the Government would have denied, or did deny, the defendant's reimbursement claim, given actual knowledge of the false claim; and (3) whether the falsity of the claim is "minor or insubstantial." *Id.* at 163.

As to the first factor, the Court notes that LOGCAP III specifically incorporated a FAR regulation[12] that prohibited "including, directly or indirectly, the amount of any kickback in the contract price charged by a prime Contractor to the United States." *See* FAR 52.203-7. KBR violated the AKA by submitting vouchers related to Subcontracts 167 and 190 that included the costs of kickbacks arranged by Martin. The first factor under *Lemon* is, therefore, satisfied.

Regarding the second factor, there is no evidence that the Government knew of Martin's kickback arrangement when it paid vouchers related to Subcontracts 167 and 190. The Government had paid all vouchers associated with Subcontracts 167 and 190 by May 2005, and Martin entered his guilty plea in July 2007. KBR concedes that the DCAA learned of Martin's kickback arrangement sometime in 2008.[13] Yet, KBR argues that, after learning of Martin's plea agreement, the Government did not offset, or otherwise attempt to recoup, unallowable costs from KBR's subsequent vouchers submitted under Task Order 43. In deposition, DCMA representative Jerry Conry testified that the DCMA learned of the plea agreement sometime in early 2008 and subsequently notified KBR that it intended to disallow approximately $25 million

---

[12] The Federal Acquisition Regulation system (FAR) governs procurement procedures for all executive agencies, as well as the Army. FAR is codified at Chapter 1 of Title 48 of the Code of Federal Regulations. *See* 48 C.F.R. 1.

[13] Citing a letter dated May 19, 2008, KBR alleges that "DCMA . . . specifically considered how Martin's kickback arrangement should affect the government's payment of KBR's claims for the costs of FKTC subcontracts." The record does not contain such a letter, and the Court has no basis to conclude that the Government "specifically considered" Martin's kickback arrangement in any audit that it conducted of vouchers submitted under Task Order 43.

in costs as a result. The limited summary judgment evidence suggests that the parties continued to negotiate into the summer of 2008 regarding the intended disallowance. The record indicates neither, how long KBR continued billing the Government under Task Order 43, nor the result of the parties' negotiations. The Court is unwilling to infer from these facts that the Government considered the kickback-related costs immaterial.

The third factor asks whether KBR "knew or had reason to know" that the Government would "attach[] importance to the specific matter 'in determining [its] choice of action[.]'" *Lemon*, 924 F.3d at 163. The Court answers this question in the affirmative, given LOGCAP III's incorporation of FAR 52.203-7 as a contract term. The Court is of the opinion that such a violation would be considered material by the Government in deciding whether to pay KBR's claims. Accordingly, the materiality element is satisfied, and the Government is entitled to summary judgment on Counts II and III, as related to Subcontracts 167 and 190.

### ii.      Conspiracy Liability under the FCA (Count V)

KBR also moves for summary judgment on Count V, alleging that KBR violated the FCA by conspiring with its co-defendants to defraud the Government by getting a false claim paid. As to Subcontracts 167 and 190, the Government has offered no evidence of an injury that is independent of that arising under Counts II and III. *White v. United States*, 507 F.2d 1101, 1103 (5th Cir. 1975) ("[N]o duplicating recovery of damages for the same injury may be had."). Therefore, having granted summary judgment for the Government on Counts II and III, the Court now grants summary judgment to KBR on Count V, as it relates to Subcontracts 167 and 190.

### iii.      Breach of Contract Claims (Count VII)

The Court also finds that KBR breached the LOGCAP III contract by submitting to the Government reimbursement vouchers for unallowable costs—here, kickback amounts. Billing the Government these unallowable costs violated FAR 52.216-07, which LOGCAP III

incorporated as a contract term.[14] *See Laguna Constr. Co., Inc. v. Carter*, 828 F.3d 1364, 1371 (Fed. Cir. 2016); FAR 2.101 ("Unallowable cost means any cost that, under the provisions of any pertinent law, regulation, or contract, cannot be included in prices, cost-reimbursements, or settlements under a Government contract to which it is allocable."). However, because the Court determines that the FCA provides the Government with the greater recovery, and because the Government it entitled to but one recovery, the Court will not determine damages based on the Government's breach of contract claim. Accordingly, the Court grants summary judgment for KBR on Count VII, as it relates to Subcontracts 167 and 190.

### c.    Change Order 1 to Subcontract 167

#### i.    <u>Factual Summary</u>

Subcontract 167 contemplated a six-month lease for truck-trailer units, ending on December 20, 2003. However, between January and July 2004, FKTC continued to submit monthly invoices under the subcontract for the cost of leasing all 50 units (232,500 KD or $778,712.50). KBR's October 18, 2004 reconciliation of trucks leased from FKTC under Subcontract 167 showed that only two vehicles were returned to FKTC after January 4, 2004, and KBR manager Jim Folkestad determined that KBR owed FKTC $176,625.85 for the late-delivered vehicles. In a January 2, 2005 memorandum,[15] Folkestad stated that in May 2004, FKTC asserted that the return dates in KBR's reconciliation document were in fact the dates on which KBR delivered the vehicles to FKTC for repair, not return. FKTC "could not produce any

---

[14] Contrary to KBR's assertion, the federal Contract Disputes Act (CDA) does not strip this Court of jurisdiction to decide the Government's contract claim. *See, e.g.*, *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 903 F.Supp.2d 473, 480–81 (E.D. Tex. 2011) (affirming that a district court has jurisdiction over the federal government's breach of contract claims against contractors "where the events, transactions, and contracts at issue in the lawsuit give rise to fraud allegations"), *rev'd on other grounds*, 727 F.3d 343.

[15] Folkestad testified that the memorandum was mistakenly dated January 2, 2004.

other supporting documentation" for that position. By contrast, on July 22, 2004, KBR's Logistics Coordinator, Fatime Azemi, reported that she had obtained documentation from FKTC's workshop supervisor confirming that "only 7 Reefer Trailers [were] missing."

Folkestad's memorandum further stated that "it was agreed by both parties that the date of 30 March 2004 [sic] would be used as the expiration date of [Subcontract 167,] and that KBR would generate a change order to modify the subcontract to reflect this date." In December 2004, Azemi and another KBR employee, Asli Berbergolu, generated Material Requisition forms requesting funds equivalent to three months' worth of leasing 50 truck-trailer units, from December 21, 2003 to March 20, 2004. KBR subsequently issued Change Order 1 to Subcontract 167 ("Change Order 1"), which retroactively extended the lease period to March 30, 2004, and resulted in an additional payment to FKTC of $2,595,707.50. In its February 17, 2005 voucher to the Government, KBR requested reimbursement for costs associated with Change Order 1, totaling $2,655,018.28.

### ii.   False Claims Act Liability (Counts II, III, and V)

The Government alleges that KBR knowingly submitted false claims for costs incurred in connection with Change Order 1, and knowingly created, used, or caused to be created or used, false records related to those claims. The parties dispute the falsity, scienter, and materiality elements of these theories.

### 1.   Falsity

The Court finds that KBR's voucher for costs associated with Change Order 1 was a factually false claim. KBR has not been able to raise a genuine issue of material fact as to whether, for the period of Change Order 1, KBR in fact leased the number of vehicles that would substantiate the $2.6 million in costs for which it later charged the Government. Indeed, in October 2004, KBR had determined that all but two of the leased trailer units had been returned

to FKTC by January 4, 2004, and that KBR owed FKTC $176,625.85 for the delayed returns. According to Folkestad, FKTC "could not produce any other supporting documentation" to show that the vehicles had been brought to FKTC "for repair not [sic] return[.]"

KBR characterizes the amount of Change Order 1 as a "settlement of a dispute between KBR and FKTC regarding when the vehicles leased under [Subcontract 167] had been returned to FKTC." However, neither the voucher associated with Change Order 1, nor any of the documentation attached to the voucher indicated that KBR was billing for the cost of a settlement, rather than for an extended lease of the vehicles. The requisition forms created by KBR for Change Order 1 also stated nothing about a "settlement."[16] The voucher, as submitted to the Government, sought reimbursement for costs that did not correspond to any service that KBR—or the Government—actually received. Accordingly, KBR's claim associated with Change Order 1 was factually false. Additionally, both the voucher and the requisition forms created by KBR for Change Order 1 were false records. *Ruscher*, 2014 WL 2618158, at *6.

2. Knowledge

The Government has also established that, as a matter of law, KBR acted with the requisite scienter. The question is whether, in generating Change Order 1, KBR employees undertook an "unjustifiably high risk" that they were (i) causing KBR to present a false claim for payment or (ii) making or using a materially false record in connection with such a claim.

The record shows that KBR employees did not have an objectively reasonable basis to believe that a three-month extension for the lease of all 50 truck-trailer units was warranted. On July 21, 2004, FKTC supervisor Noor advised KBR's logistics coordinator Fatima Azemi that

---

[16] While KBR asserts that Folkestad's memorandum was in "[t]he KBR subcontract file, to which government auditors had access upon request," the FCA places the burden on the *contractor* to submit accurate information in its claims for reimbursement. *United States ex rel Ruscher v. Omnicare, Inc.*, 663 Fed. App'x 368, 723 (5th Cir. 2016) ("A claim is factually false when *the information provided to the government* for reimbursement is inaccurate." (emphasis added)).

KBR had returned all but seven trailers. Noor gave Azemi a supporting document with the status of each individual truck and trailer. This document was substantially consistent with KBR's internal documents, which showed that at most nine trailers had not been returned to FKTC as of February 18, 2004. However, Wadih Al-Absi, Noor's superior at FKTC, insisted that no vehicles would be considered "returned" without production of delivery tickets and that those vehicles in FKTC's possession were there for "maintenance," not "return." Yet, the subcontract's terms did not require production of "delivery tickets" for vehicles to be considered returned and, in any case, required FKTC to provide maintenance for the vehicles. As noted, Folkestad ultimately determined that FKTC could not produce documentation substantiating Al-Absi's claims and concluded that KBR owed FKTC $176,625.85 for the delayed returns.

KBR cites testimony of multiple former employees stating that, under the circumstances, the decision to settle with FKTC was reasonable. Construing all factual disputes in KBR's favor, the Court is of the opinion that the KBR employees' testimony, at most, raises a fact issue as to whether they *subjectively* believed that the parties' "settlement" was an expedient solution to the dispute.[17] But "recklessness" under the FCA requires application of an objective standard. *Burr*, 551 U.S. at 68. Put simply, no objective observer could conclude that KBR had leased all 50 truck-trailer units for an additional three months beyond the subcontract's original expiration date. Accordingly, in generating Change Order 1, KBR employees undertook an "unjustifiably high risk" that they would cause KBR to present a false claim for payment. Likewise, those employees acted recklessly in creating and using false records (the change order and associated requisition forms and invoices) in connection with such a claim.

---

[17] Indeed, KBR employees' contemporaneous statements in internal correspondence contradict their later deposition testimony on this point.

The Court also finds that the recklessness of KBR's employees should be imputed to KBR because they acted in the scope of their authority and to benefit KBR. Folkestad and KBR Procurement and Supply Manager Tom Quigley negotiated, and Folkestad executed, Change Order 1 while performing their respective core responsibilities. Likewise, Azemi and Berbergolu generated the corresponding requisition forms, in their capacities as logistics coordinators, at Folkestad's direction. Further, internal correspondence demonstrates that the KBR employees believed they were acting for KBR's benefit. Accordingly, as a matter of law, the Government has satisfied the knowledge element.

3.    Materiality

The Court also concludes that KBR's false claim was material. FAR 52.216-7(a), which LOGCAP III incorporated as a contractual term, provides that "[t]he Government will make payments to the Contractor . . . in amounts determined to be *allowable* by the Contracting Officer . . . in accordance with [FAR] subpart 31.2 in effect on the date of this contract and the terms of this contract." Costs are allowable only if they are "reasonable." FAR 31.201-2(a). The inclusion of these regulatory provisions in LOGCAP III "confirm that reasonableness is material to payment." *United States v. DynCorp Int'l, LLC*, 253 F.Supp.3d 89, 103 (D.D.C. 2017). As discussed, KBR billed the Government $2.6 million for Change Order 1, when its best available information indicated that KBR owed FKTC approximately $176,625.85 for the lease of reefer units beyond Subcontract 167's original termination date. Such a discrepancy was far from reasonable, and "it is common sense that the [G]overnment would not pay claims if it knew that they were outrageously excessive." *Id*.   Additionally, KBR offers no evidence that the Government knew when it audited KBR's costs for the period of Change Order 1 that Changer

Order 1 contained a false amount.[18] The Court, thus, finds that the claim and requisition forms related to Change Order 1 were materially false. Having established all elements of its FCA theories, as a matter of law, the Government is entitled to summary judgment on Counts II and III related to Change Order 1.

On Count V, the conspiracy liability theory under the FCA, the Government offers no evidence of an injury that is independent of that arising under Counts II and III. Accordingly, the Court grants summary judgment to KBR on Count V, as it relates to Change Order 1.

### iii.      Breach of Contract Claim (Count VII)

The Court also finds that KBR breached the LOGCAP III contract by submitting to the Government reimbursement vouchers for unreasonable—and, therefore, unallowable—costs. *Boeing N. Am., Inc. v.* Roche, 298 F.3d 1274, 1281 (Fed. Cir. 2002). However, because the Court determines that the FCA provides the Government with the greater recovery, and because the Government is entitled to a single recovery, the Court will not determine damages based on the Government's breach of contract claim. Accordingly, the Court grants summary judgment for KBR on Count VII, as it relates to Change Order 1.

### d.      Subcontract 39

### i.      Factual Summary

Jeff Mazon was responsible for issuing and administering subcontracts on KBR's behalf in Kuwait in the lead-up to the Army's invasion of Iraq. On February 2, 2003, Mazon issued a request for proposals (RFP) to prospective subcontractors for a six-month lease of 17 storage tankers, to be used to deliver and store diesel fuel at a military airport (the "A-POD") used by the Army in Kuwait. Mazon had previously estimated the cost of fulfilling this item under Task

---

[18] The DCMA appears to have audited KBR's costs under LOGCAP III for fiscal year 2004 between November 2008 and November 2012.

Order 36 at $603,900, in a document called a Rough Order of Magnitude (ROM), and later at $685,080, in a material requisition form. Three firms submitetd bids in response, and, on February 14, 2003, Mazon awarded the subcontract to La Nouvelle General Trading and Contracting Co. (La Nouvelle) as Subcontract 39. La Nouvelle's bid totaled 507,000 KWD, or approximately $1,673,100, but Mazon ultimately awarded the subcontract at a price of $5,521,230.00. Mazon produced the final price by unnecessarily applying an additional currency conversion formula to the bid amount in a bid tabulation form.

In a February 14, 2003 internal memorandum regarding the award, Mazon stated that the prospective subcontractors' final bids included "additional fees . . . associated with the transfer of the tankers from [another] contract to support the US Government." These penalties, "topped off by the urgent and compelling need" of the request, "increased the total value of the requirement from the estimated $685,000 to a total of $5,521,230." Mazon testified in deposition that, at the time he prepared the memorandum, he was unaware of his double currency conversion and believed, without verifying, that the fees associated with the transfer of tankers from another contract accounted for the significant price increase.[19]

Mazon's memorandum further stated that "[t]he additional funds required were communicated to the Project Manager who signed approval on the Bid Tabulation for the subcontract on the date of the award." In a March 24, 2009 plea agreement with the Government, Mazon stipulated that when he wrote the memorandum, he "knew that he had not communicated to the LOGCAP III Project Manager [Butch Gatlin] the additional funds required for Subcontract

---

[19] La Nouvelle General Manager Ali Hijazi later told a KBR internal investigator that La Nouvelle had submitted a second bid incorporating the purported KNPC penalties. Mazon denied ever receiving a second bid, and none exists in the record.

39."[20] Mazon did send the final bid tabulation form with La Nouvelle's $5.5 million "bid" to Gatlin and supervisor Don Gavin, both of whom approved the award. However, the form did not indicate that La Nouvelle's final bid represented greater than an eight-fold increase from Mazon's prior estimates. Additionally, when Mazon sought approval of the subcontract from Gavin, Gavin asked, "Are you getting ACO [the Government Administrative Contract Officer's] Consent?" Mazon replied that ACO did not "sign consent to subcontract, unless it is over the value p[l]aced on ROM." Gavin understood Mazon to mean that the estimated cost in the ROM was at least $5.5 million and that Mazon had confirmed with the ACO that the ACO's consent was unnecessary. In fact, the ROM estimate was $603,900.[21] Between August 2003 and February 2004, La Nouvelle submitted, and KBR paid, invoices based on the $5.5 million subcontract amount. As discussed *infra*, the parties dispute whether KBR "re-billed" these amounts to the Government after May 9, 2004.

After ending his employment with KBR in late June 2003, Mazon met with Hijazi in Athens, Greece, where Hijazi offered Mazon $1 million to invest in Mazon's own business ventures. While Mazon insisted on structuring the payment as a loan and executed a loan agreement to that effect, Hijazi informed Mazon that he did not want or expect repayment. Additionally, while the loan agreement listed Hijazi as the lender, in subsequent email

---

[20] This quoted statement in Mazon's plea agreement, corroborated by Gatlin's and Gavin's trial testimony during Mazon's 2008 criminal trial, along with the actual documentation of the bid transmitted by Mazon to his superiors, is admissible under Fed. R. Evid. 807. Additionally, in deposition, Mazon refused to expressly contradict this part of his plea agreement.

[21] During Mazon's 2008 criminal trial, Gavin and Gatlin testified that Mazon did not inform them of the discrepancy between his original estimate and the final award amount. The Court overrules KBR's objection that their testimony is hearsay and, therefore, inadmissible summary judgment evidence. *Tremont LLC v. Halliburton Energy Servs.*, 696 F.Supp.2d 741, 764, n.22 (S.D. Tex. 2010) ("[Certified] transcripts [of prior court testimony] are not 'hearsay' merely because they consist of statements made by a witness in a prior proceeding."). Mazon's statements to Gavin via email correspondence are admissible under the state of mind exception to hearsay, pursuant to Fed. R. Evid. 803(3).

correspondence Hijazi referenced the money as coming from La Nouvelle.[22] On September 18, 2003, Hijazi issued a bank draft for the $1 million to be paid to Mazon's account in the United States.

### ii.      False Claims Act Liability (Counts II and III)

The Government alleges that KBR is liable under the FCA for billing the Government for the inflated $5.5 million amount of Subcontract 39. For liability to attach under the FCA, a defendant must have submitted a "claim" to the Government. The FCA defines a "claim" as involving a "request or demand . . . for money or property . . . that . . . is presented to . . . the United States." 31 U.S.C. § 3729(b)(2) (2006). The threshold question here is whether, after May, 9, 2004, KBR submitted vouchers to the Government for Subcontract 39 that were "claims" within the meaning of the FCA.

The Government alleges that, on June 30, 2004 and August 31, 2005, respectively, KBR "*resubmitted* additional vouchers [no's. 30 and 43] seeking reimbursement" for La Nouvelle invoices under Subcontract 39, invoices for which KBR had already sought reimbursement prior to May 9, 2004. The June 2004 and August 2005 vouchers contain line-item summaries that include the inflated costs billed by La Nouvelle, totaling approximately the final $5.5 million award price of Subcontract 39. The Government also cites a "billing summary" prepared by KBR that allegedly shows that on June 30, 2004 and August 31, 2005, KBR submitted vouchers for the inflated costs.

KBR contends that the June 2004 and August 2005 vouchers were not actual "billings" and, therefore, not "claims for payment" under the FCA. KBR asserts that these vouchers

---

[22] Both Hijazi's statements to Mazon and Mazon's statements to SAIC investigators concerning Hijazi's intent regarding the $1 million payment are admissible, pursuant to Fed. R. Evid. 803(3). The testimony of SAIC investigators Susan Frank and Tom Maslin at Mazon's trial are admissible summary judgment evidence. *Tremont*, 696 F.Supp.2d at 764, n.22.

represent accounting transactions that simply reassigned costs to Task Order 36 that were previously assigned to Task Order 27. In an affidavit, KBR representative Gregory Tashjian states that, following this re-assignment, KBR "submitted public vouchers reversing previous accounting transactions and rebooked the costs to a different internal Job Number on a new public voucher." Tashjian states that this process "did not impact the amount billed to the government" and that "the government was billed *once* for the costs[,] contemporaneous to when the costs were booked"—*i.e.*, under original Task Order 27. Tashjian's statements are consistent with the results of a detailed DCAA audit report of Subcontract 39, dated April 10, 2007. The DCAA conducted the audit after learning of Martin's inflation of Subcontract 39 and after KBR's alleged "re-billing" in June 2004 and August 2005. Nowhere does the audit report state that KBR sought payment for Subcontract 39 costs on those dates, as alleged by the Government.[23]

Based on the record evidence, the Government has not established that, as a matter of law, KBR submitted "claims for payment" on June 30, 2004 and August 31, 2005. Further, the Court is of the opinion that, if presented with the results of the Government's own audit, no reasonable juror could conclude that KBR submitted claims for payment on those dates. It would be unreasonable to conclude that the Government would have omitted from its exhaustive report almost $5.5 million in additional inflated claims. The only reasonable conclusion is that the Government did not consider the vouchers submitted on June 30, 2004 and August 31, 2005 to

---

[23] The audit report notes that KBR issued two credits to the Government "to cover potential over billings by La Nouvelle" for Subcontract 39: first, on January 23, 2004, for $5,521,230, and then again on June 30, 2004, for $5,634,808. According to the report, although KBR "re-billed" the $5,521,230 amount in August 2005, "th[is] transaction zeroed out the double credits issued" by KBR to the Government. Because KBR had originally issued the Government a double credit for the cost of Subcontract 39, the August 2005 transaction resulted in only the single credit, preventing the Government from obtaining a $5.5 million windfall.

be "claims for payment." Accordingly, the Court finds that KBR is entitled to summary judgment as to the Government's FCA claim pertaining to Subcontract 39.

### iii.     Conspiracy Liability under the FCA (Count IV)

On Count IV, the Government alleges that KBR violated the FCA by conspiring with La Nouvelle "to defraud the Government by getting a false or fraudulent claim allowed or paid," in connection with Subcontract 39. *See* 31 U.S.C. § 3729(a)(3) (2006). To allege and ultimately prove a conspiracy under the pre-2009 version of the FCA, the Government must show "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the government] and (2) at least one act performed in furtherance of that agreement." *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008). As part of that showing, the Government must demonstrate that the defendants "shared a specific intent to defraud the [G]overnment." *Id.* (internal citation omitted). Circumstantial evidence may be used to establish that the parties had an illicit agreement. *United States ex rel. Tran v. Computer Sci. Corp.*, 53 F.Supp.3d 104, 134 (D.C. Cir. 2014).

The Government has established a genuine issue of material fact as to each essential element of conspiracy liability under the FCA. A reasonable jury could conclude that Mazon and Hijazi entered into a tacit agreement to defraud the Government, based on: Mazon's "double-conversion" of the La Nouvelle's original bid; Hijazi's failure to produce a second bid to KBR investigators that he stated would explain Subcontract 39's price increase; Mazon's failure to inform his supervisors about the price increase and Mazon's 2009 plea agreement; and Mazon's and Hijazi's statements concerning Hijazi's $1 million "loan" to Mazon. A jury could also find that Mazon engaged in at least one overt act in furtherance of the conspiracy—for instance, by seeking his supervisors' approval of the inflated price and executing the subcontract with Hijazi. A jury could also reasonably conclude that Mazon and Hijazi formed the agreement while

Mazon was acting in the scope of his authority and to benefit KBR, such that Mazon's scienter should be imputed to KBR. Accordingly, KBR's summary judgment motion as to Count IV is denied.

### iv.      Breach of Contract Claim (Count VII)

The Government alleges that KBR breached the LOGCAP III contract by "vouchering the Government for the unallowable costs incurred" under Subcontract 39. As discussed *supra*, the Court has determined that KBR's vouchers related to Subcontract 39 did not constitute "claims for payment." Accordingly, the Court finds that KBR did not breach the LOGCAP III contract. Therefore, the Court grants summary judgment for KBR on Count VII, as to this subcontract.

### e.      Subcontract 11

### i.      Factual Summary

In September 2002, the Army issued a SOW under Task Order 27 for the construction of Camp Arifjan in Kuwait, a staging area for Army personnel. On November 20, 2002, Stephen Seamans, a Procurement, Materials, & Property Manager for KBR, awarded Subcontract 11 to La Nouvelle for cleaning services at Camp Arifjan, at a price of 29,784 KWD ($98,287) for a one-year term. Although La Nouvelle was not the lowest bidder, Seamans justified the award in a November 17, 2002 internal memorandum, stating that he disqualified the lowest bidder because its bid contained miscalculations and did not comply with all requirements in the RFP. While Seamans affirmed the memorandum's statements in an October 8, 2018 declaration, he disavowed them as "self-serving" in a subsequent declaration, and again during his deposition in this case. Once La Nouvelle had submitted its bid, Seamans contacted another company, Tamimi Global Company Limited ("Tamimi"), and asked Tamimi to "submit a bid that would be too high for the work performed under [Subcontract 11]" to "justify awarding the subcontract to La

Nouvelle." Additionally, around the time Seamans awarded Subcontract 11 to La Nouvelle, he solicited and received a $5,000 kickback from La Nouvelle General Manager Ali Hijazi.[24] The Government alleges that KBR submitted vouchers to the Government for costs related to Subcontract 11 in June 2004 and August 2005, which KBR disputes.

Seamans had no further procurement involvement with Subcontract 11 after the initial award and ended his employment with KBR in April 2003. Shortly after Seamans' departure, Hijazi offered Seamans a position at La Nouvelle with an annual salary of $1.2 million. When Seamans asked Hijazi why the latter was offering him a job, Hijazi responded that "he'd like to take care of people who took care of him."[25] Hijazi agreed to pay Seamans a $300,000 advance on his salary, and the money was wired to Seamans' bank account in the United States. Seamans formalized the employment offer as an employment agreement, which Seamans and Hijazi signed. In the October 2018 declaration, Seamans stated that the employment agreement and advance "had no impact on [his] previous award of Subcontract 11." However, both in the January 2019 declaration and during his deposition, Seamans stated that he understood Hijazi's offer of employment to be a "quid pro quo" for awarding KBR business to La Nouvelle and that he "rationalized the payment after-the-fact" and used the "acceptance of a sham employment offer to justify [his] receipt of the money."[26]

---

[24] Seamans stated in the October 8, 2018 declaration that he received the kickback "shortly after" the subcontract award, but he stated in the January 9, 2019 declaration that he received the kickback "no later than the same time as the formal award." During his October 20, 2020 deposition, Seamans stated that he did not recall the exact timing of when he solicited and received the kickback.

[25] Hijazi's statement regarding the job offer, reported through Seamans' deposition testimony, is admissible, pursuant to Fed. R. Evid. 803(3).

[26] In February 2006, Seamans entered into a plea agreement with the Government, pleading guilty to one count of wire fraud and one count of conspiracy to launder money in connection with these events. However, the Court does not base its factual findings on the factual statements that Seamans stipulated to in the plea agreement.

ii.     **False Claims Act Liability (Counts II and III)**

The Government offers two theories related to Subcontract 11 for both Counts II and III: (1) that, in submitting vouchers to the Government for Subcontract 11, KBR knowingly sought reimbursement of kickback amounts received by Seamans; and (2) that KBR sought reimbursement of payments to La Nouvelle for cleaning services at Camp Arifjan at higher prices than were authorized at the time the costs were billed to KBR. The Government does not contest KBR's motion as to the second theory, and the Court grants summary judgment for KBR on that theory.[27]

KBR is also entitled to summary judgment on the Government's first theory because the record evidence establishes that the Government did not consider the kickback-related costs that it incurred under Subcontract 11 to be material. Between December 2010 and August 2011, the DCAA audited costs related to Subcontract 11, including the period of performance relevant here—November 20, 2002 to April 16, 2004. The DCAA's August 2011 draft audit report indicates that, during its audit, the DCAA became aware of the facts surrounding Seamans' guilty plea in connection with Subcontract 11. Yet, in a March 20, 2015 DCAA memorandum regarding the audit of Subcontract 11, DCAA stated that it was "closing the assignment" because it had determined that the concerns raised in the audit "were not material enough to the respective incurred cost submission(s) to warrant additional efforts to issue the report and negotiate the costs." The DCAA reached this decision after learning that KBR's vouchers under Subcontract 11 may have included the costs of Seamans' kickbacks, in violation of LOGCAP III's prohibition on kickbacks. "[I]f the Government pays a particular claim in full despite its

---

[27] In its briefing, the Government offers no evidence that, after May 9, 2004: (1) KBR submitted false claims to the Government for services performed by La Nouvelle at Camp Arifjan in February and March 2003; or (ii) KBR and La Nouvelle made, used, or caused to be made or used false records or statements to get such false claims paid or approved.

actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Lemon*, 924 F.3d at 162 (citing *Univ. Health Servs, Inc. v. United States ex rel. Escobar*, 136 S.Ct. 1989, 1999, 195 L.Ed.2d 348 (2016)). The Government concluded that any false claims arising from Seamans' kickback arrangement were immaterial. Accordingly, the Court grants summary judgment to KBR as to Counts II and III, as to Subcontract 11.

### iii.    Conspiracy Liability under the FCA (Count IV)

On Count IV, the Government alleges that KBR violated the FCA by conspiring with La Nouvelle to defraud the Government by getting a false claim paid, in connection with Subcontract 11.[28] The Government has established a genuine issue of material fact as to each essential element of its conspiracy liability theory. A reasonable jury could conclude that Stephen Seamans and Ali Hijazi entered into a tacit agreement to defraud the Government, based on: Seamans' solicitation and receipt of a bribe from La Nouvelle around the time of the subcontract award; Seamans' "poisoning" of the bidding process through Tamimi; Hijazi's job offer to Seamans' following Seamans' resignation from KBR and Hijazi's statements concerning the job offer; and Seamans' deposition and affidavit statements that the job offer was a "sham." A jury could also find that Mazon took at least one overt act in furtherance of the conspiracy— for instance, by seeking his supervisors' approval of the inflated price or by executing the subcontract with Hijazi. A jury could also conclude that Seamans and Hijazi formed the agreement while Seamans was acting in the scope of his authority and to benefit KBR, such that Seamans' scienter should be imputed to KBR. Accordingly, KBR's summary judgment motion as to Count V is denied.

---

[28] The Government's briefing gives no suggestion that Count IV is also premised on allegations that KBR sought reimbursement of unauthorized payments to La Nouvelle for cleaning services at Camp Arifjan.

### iv.     <u>Breach of Contract Claim (Count VII)</u>

Opposing KBR's summary judgment motion on the Government's contract claim, the Government alleges that, after May 9, 2004, KBR resubmitted reimbursement vouchers for La Nouvelle invoices under Subcontract 11. The Government again cites the billing summary prepared by KBR that allegedly shows that, starting on June 15, 2004, KBR submitted vouchers for the inflated costs and that the Government paid those vouchers. Citing statements in the Tashjian affidavit, KBR asserts that these vouchers represent accounting transactions that simply reassigned previously-billed costs to a different task order. The Court is of the opinion that a genuine issue of material fact exists as to whether the transactions at issue were claims for payment submitted by KBR under Subcontract 11.[29] Accordingly, the Court denies KBR's summary judgment motion on Count VII, as it relates to Subcontract 11.

## VI.    ORDER

Based on the foregoing analysis and discussion, the Court finds KBR's motion for summary judgment should be GRANTED IN PART and DENIED IN PART. Likewise, the Government's motion for partial summary judgment should be GRANTED IN PART and DENIED IN PART. It is, therefore, ORDERED that:

1.    The Court grants summary judgment to the Government on Count I and on Counts II and III, as to Subcontracts 167, 190, and Change Order 1 to Subcontract 167;

2.    The Court grants summary judgment to KBR on Counts II and III, as to Subcontracts 11 and 39; on Counts IV and V, as to Subcontracts 167, 190, and

---

[29] Importantly, unlike with Subcontract 39, no DCAA audit report supports KBR's contentions regarding the disputed transactions under Subcontract 11. While DCAA's internal memorandum, dated March 20, 2015, stated that the concerns raised regarding Subcontract 11 "were not material enough to . . . to warrant additional efforts to issue the report and negotiate the costs," the Government is not required to show that a claim was material to prove its breach of contract claim.

Change Order 1 to 167, but denies summary judgment on Counts IV and V, as to

Subcontracts 11 and 39; and

3. The Court grants summary judgment to KBR on Count VI; and

4. The Court grants summary judgment to KBR on Count VII, as to Subcontracts

167, 190, 39, and Change Order 1 to Subcontract 167, but denies summary

judgment on Subcontract 11.

It is so **ORDERED**.

SIGNED on this 25th day of March, 2021.

_____
Kenneth M. Hoyt
United States District Judge