**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* BUD CONYERS, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 4:06-cv-04024 |
| v. | ) ) | |
| KELLOGG BROWN & ROOT, INC., *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**THE UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION
TO RELATOR'S MOTION FOR A SHARE OF THE SETTLEMENT PROCEEDS**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JENNIFER LOWERY
United States Attorney
Southern District of Texas

DANIEL D. HU
Assistant United States Attorney
Southern District of Texas
Texas Bar # 10131415
SDTX ID: 7959

JAMIE ANN YAVELBERG
MICHAL TINGLE
ASHLEY N. BAILEY
ELSPETH A. ENGLAND
JEFFREY A. MCSORLEY
DAVID W. TYLER
Attorneys, Civil Division
Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C.  20044

October 25, 2022

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

RELEVANT SUMMARY OF THE PROCEEDING................................................1

ISSUES TO BE RULED UPON BY THE COURT................................................3

GENUINELY UNDISPUTED FACTS ...................................................................3

    A.    The Task Force Investigation and the Conduct at Issue ...........................3

    B.    Relator's *Qui Tam* Action...........................................................................6

    C.    The Government's Partial Intervention and Addition of Claims............................7

    D.    The Government's Notice and Relator's Abandonment........................................9

    E.    Partial Summary Judgment and Pre-Trial.............................................10

    F.    The Settlement of Claims and Relator's Dismissal of His *Qui Tam* Action..........................................................................................................11

    G.    The Parties' Subsequent Interactions and Relator's Motion..................................13

ARGUMENT .........................................................................................................13

    A.    The FCA Does Not Permit Relators to Share in All Proceeds of All Settled Claims .........................................................................................14

        1.    For Purposes of Determining Relator Share, the FCA Treats Each Claim in a Multi-Claim Complaint as If It Stands Alone .........................................................................14

        2.    Relator Misinterprets the Statute ...............................................17

            a.    Relator Misreads "[t]he [P]roceeds of the [A]ction" .....................18

            b.    Relator Misreads "[t]he [P]roceeds of the … [S]ettlement of the [C]laim" ...........................................19

    B.    Relator is Not Entitled to Any Share Because the Government Settled Claims Involving Different Fraud Schemes Than Relator Alleged.....................................................................................................21

    C.    Even If Relator Alleged the Same Schemes, He Cannot Obtain the Relief He Seeks.......................................................................................24

CONCLUSION......................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Fowler v. Gen. Ins. Co. of Am.*,
    No. 3:14-CV-2596-G, 2014 WL 5879490 (N.D. Tex. Nov. 13, 2014) ............................ 20

*Holy Trinity Church v. United States*,
    143 U.S. 457 (1892)........................................................................ 20

*Kennard v. Comstock Res., Inc.*,
    363 F.3d 1039 (10th Cir. 2004) .......................................................... 24

*Koch v. Koch Indus., Inc.*,
    179 F.R.D. 591 (D. Kan. 1998)........................................................... 9

*Krzalic v. Republic Title Co.*,
    314 F.3d 875 (7th Cir. 2002) ............................................................. 20

*MacArthur v. San Juan Cnty.*,
    416 F. Supp. 2d 1098 (D. Utah 2005).................................................... 9

*Morse Diesel Int'l, Inc. v. United States*,
    79 Fed. Cl. 116 (2007) .................................................................... 17

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)........................................................................ 19

*Rille v. PricewaterhouseCoopers LLP*,
    803 F.3d 368 (8th Cir. 2015) ......................................... 16, 18, 20, 22

*Roberts v. Accenture, LLP*,
    707 F.3d 1011 (8th Cir. 2013)............................................................ 22

*Rockwell Int'l Corp. v. United States*,
    549 U.S. 457 (2007)........................................................................ 15

*SFA Sys., LLC v. 1-800-Flowers.com, Inc.*,
    940 F. Supp. 2d 433 (E.D. Tex. 2013).................................................. 18

*Smith v. Gulf Oil Co.*,
    995 F.2d 638 (6th Cir. 1993) ............................................................. 9

*Tesfamichael v. Gonzalez*,
    411 F.3d 169 (5th Cir. 2005) ............................................................. 20

*United States ex rel. Alt v. Anesthesia Servs. Assocs., PLLC*,
    No. 3:16-cv-0549, 2021 WL 3115157 (M.D. Tenn. July 22, 2021)................ 16

*United States ex rel. Banigan v. Organon USA, Inc.*,
No. H-08-3314, 2013 WL 12142351 (S.D. Tex. Feb. 1, 2013) ...................................... 15

*United States ex rel. Barajas v. United States*,
258 F.3d 1004 (9th Cir. 2001) ........................................................................................ 17

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
342 F.3d 634 (6th Cir. 2003) .......................................................................................... 16

*United States ex rel. Boothe v. Sun Healthcare Grp., Inc.*,
496 F.3d 1169 (10th Cir. 2007) ...................................................................................... 15

*United States ex rel. Ferrara v. Novo Nordisk, Inc.*,
No. 11-74 (RBW) (lead case no.), 2019 WL 4305503 (D.D.C. Sept. 11, 2019) ............. 16

*United States ex rel. Fisher v. JPMorgan Chase Bank N.A.*,
413 F. Supp. 3d 569 (E.D. Tex. 2019) ........................................................................... 15

*United States ex rel. Jamison v. McKesson Corp.*,
649 F.3d 322 (5th Cir. 2011) .......................................................................................... 24

*United States ex rel. Kennedy v. Novo A/S*,
5 F.4th 47 (D.C. Cir. 2021) ...................................................................................... 17, 25

*United States ex rel. Mayman v. Martin Marietta Corp.*,
894 F. Supp. 218 (D. Md. 1995) ..................................................................................... 17

*United States ex rel. McGuire v. Millenium Labs.*,
923 F.3d 240 (1st Cir. 2019) .......................................................................................... 16

*United States ex rel. Merena v. SmithKline Beecham Corp.*,
205 F.3d 97 (3d Cir. 2000) ........................................................................... 14, 15, 17, 22

*United States ex rel. Mustafa v. Najjar*,
120 F. Supp. 3d 1322 (M.D. Fla. 2015) ......................................................................... 23

*United States ex rel. Ormsby v. Sutter Health*,
444 F. Supp 3d 1010 (N.D. Cal. 2020) ........................................................................... 22

*United States v. Anthony J. Martin*,
No. 4:07-cr-40042 (C.D. Ill.) ............................................................................................. 6

*United States v. Jeff Alex Mazon & Ali Hijazi*,
No. 4:05-cr-40024 (C.D. Ill.) ............................................................................................. 4

*United States v. Shire Regenerative Med., Inc.*,
No. 8:11-CV-176-T-30MAP (lead case no.), 2017 WL 6816615 (M.D. Fla. Nov. 20,
2017) .............................................................................................................................. 17

iii

*United States v. Stephen Lowell Seamans,*
    No. 4:06-cr-40017 (C.D. Ill.) ...................................................................... 4, 5

*United States v. Williams,*
    400 F.3d 277 (5th Cir. 2005) ................................................................... 16, 20

**Statutes**

31 U.S.C. § 3730(b)(1) ................................................................................. 14

31 U.S.C. § 3730(c)(1) ................................................................................. 14

31 U.S.C. § 3730(c)(3) ................................................................................. 14

31 U.S.C. § 3730(c)(5) ................................................................................. 17

31 U.S.C. § 3730(d)(1) ........................................................................... passim

31 U.S.C. § 3730(e) ..................................................................................... 12

31 U.S.C. § 3730(e)(3) ............................................................................ 17, 24

31 U.S.C. § 3730(e)(4) ................................................................................. 17

31 U.S.C. § 3730(e)(4)(A) ............................................................................ 24

31 U.S.C. § 3731(c) .............................................................................. passim

**Rules and Regulations**

FAR 52.203-7 ............................................................................................... 3

Fed. R. Civ. P. 7(b)(1)(C) ............................................................................ 25

Fed. R. Civ. P. 9(b) ...................................................................................... 24

Fed. R. Civ. P. 16 .......................................................................................... 9

Fed. R. Evid. 408 ......................................................................................... 13

**Other Authorities**

"Ex-Halliburton staff in Saudi kickback," *Al Jazeera*, Mar. 24, 2006 ........................... 5

6A Charles Alan Wright *et al.*, *Federal Practice and Procedure* (1990) ......................... 9

Brett Clanton, "Former KBR employee pleads guilty in Kuwaiti kickback case," *Houston
    Chronicle*, July 14, 2007 .......................................................................... 6

*MacMillan Dictionary Online* ...................................................................................................... 18

Mark A. Stein, "Openers: Suits; Kickback With Bite," *N.Y. Times*, Dec. 10, 2006 ....................... 5

Ray Long and Andrew Zajac, "Ex-official of Halliburton is charged with fraud," *Chicago Tribune*, Mar. 18, 2005 ......................................................................................................... 4

Terry Frieden, "Ex-Halliburton employee indicted; Former worker at Halliburton unit KBR charged with attempt to defraud military of $3.5 million," *CNN Money*, Mar. 17, 2005 ... 4

## INTRODUCTION

Relator comes before the Court seeking an undeserved share from the Government's settlement of certain False Claims Act (FCA), Anti-Kickback Act (AKA), and contract claims with KBR.  Relator did not bring these "additional claims," and neither the Government nor Relator settled or pursued to judgment any of the intervened claims that Relator did bring.  In his motion, Relator does not seriously contend otherwise.  Instead, he relies on emotional appeals, *ad hominem* attacks, misstatements of fact, inapposite judicial precedent, and an interpretation of the FCA that contravenes its plain text, violates basic rules of statutory construction, and has been repeatedly rejected by federal courts—including the Supreme Court and courts within this Circuit.  None of these arguments supports the relief Relator requests or should alter the only outcome that the facts and law command:  Relator is *not* entitled to *any* share of the Government's settlement of its "additional claims" with KBR.  His motion should be denied.

## RELEVANT SUMMARY OF THE PROCEEDING

When the Government filed suit against KBR in early 2014, it partially intervened in certain FCA "claims" alleged in Relator's complaint, as the FCA permits.  31 U.S.C. § 3731(c).  Those intervened claims fell into two categories:  (1) claims that KBR improperly billed the Army for the cost of refrigerated trailers ("reefers") that were ineligible to transport ice because they had served as makeshift morgues to store dead bodies, and (2) claims that KBR's operational personnel received kickbacks from subcontractors in return for accepting delivery of inoperable or Non-Mission Capable (NMC) equipment in place of what was contractually required (or for saying that equipment was delivered when it was not).

Significantly, however, the Government's claims in this case were not limited to "the claims in which the Government … [partially] interven[ed]."  31 U.S.C. § 3731(c).  As further

1

permitted by Section 3731(c), the Government "add[ed] … additional claims" involving conduct that Relator did not (or could not) allege in his *qui tam* action and which the Government had investigated before Relator filed suit.   These latter claims involved allegations that KBR's *procurement* (not operational) personnel both (1) rigged the award of subcontracts in return for kickbacks and (2) orchestrated subcontract modifications and payments for returned vehicles after-the-fact.   Relator's complaint contains no mention of these separate allegations concerning the conduct of KBR's *procurement-level* personnel; nor was Relator, who worked for KBR as a truck driver, involved in this sort of *procurement* activity.

When the Government and KBR reached a settlement on the eve of trial, that settlement resolved only the Government's "additional claims," not "the claims in which the Government … interven[ed]."   This was for good reason:  although the Government initially intervened in and pursued Relator's morgue reefer and NMC claims, the Government filed a notice in 2018—*four years before the settlement*—informing the parties and the Court that it no longer intended to pursue *any* claims related to morgue reefers or NMC equipment.   After receiving this notice, Relator could have attempted to pursue the claims on his own but did not.   Indeed, Relator never conducted any discovery related to his claims, participated in summary judgment, or filed the pre-trial submissions required to present his claims at trial.   Moreover, as part of the Settlement Agreement that both Relator and his counsel signed, Relator agreed to dismiss his civil action even though his claims were not included within the "Covered Conduct" resolved through that Agreement.   In July 2022, Relator's unresolved FCA claims were in fact dismissed.

Fast-forward to October 2022.   Notwithstanding his own tactical decisions in this litigation, Relator now seeks a share of the settled claims that he did not (or could not) bring, based on conduct that he did not allege, in a litigation in which he did not participate, after voluntarily

dismissing the unresolved claims from his *qui tam* action.  The Government opposes this improper disbursement of taxpayer funds.

## ISSUES TO BE RULED UPON BY THE COURT

The primary question the Court must resolve is whether Relator is entitled to share in the proceeds of the Government's settled claims.  This entitlement turns on two issues:

1.  Whether the Government settled claims for different fraud schemes than Relator alleged.

2.  Whether, even if the Government settled claims for the same fraud schemes that Relator alleged, the FCA's public disclosure and alternate remedy provisions foreclose Relator from obtaining the relief he seeks.

## GENUINELY UNDISPUTED FACTS

### A.   The Task Force Investigation and the Conduct at Issue

1.  **The Task Force.**  In early 2004, following KBR's mandatory notification to the Army of potential kickbacks involving certain of its procurement personnel,[1] federal law enforcement began investigating kickback activity in connection with the Logistics Civil Augmentation Program (LOGCAP) III contract.  *See, e.g.*, Ex. 1 at 196:12-198:1.  In accordance with that objective, it formed a task force named "LOGJAM," which operated out of the Federal Bureau of Investigation's (FBI's) field office in the Quad Cities.  The task force was established in accordance with Department of Defense (DOD) Directive No. 5525.7, and its mission was to investigate fraud related to the performance of the LOGCAP III contract.

2.  **The Relevant Players.**  The LOGJAM task force investigated many individuals and entities.  As relevant here, they included Jeff Mazon, Stephen Seamans, Anthony ("Tony")

---

[1] Section "I" of the LOGCAP III contract incorporated certain provisions of the Federal Acquisition Regulation (FAR). *See* ECF 335-1 (Joint App'x for S.J., Part I) at JA 165.  These included FAR 52.203-7, which required KBR to report kickbacks when it had a reasonable basis to believe that they had occurred.  *Id.* (provision I-6).

Martin, Wadih Al-Absi, Ali Hijazi, First Kuwaiti Trading & Contracting Co. ("First Kuwaiti"), and La Nouvelle Trading & Contracting Co. ("La Nouvelle").  More specifically, the task force investigated kickbacks from Hijazi to Mazon in connection with a subcontract that Mazon awarded to La Nouvelle for fuel at a military airport (No. 39); kickbacks from Hijazi to Seamans in connection with a subcontract that Seamans awarded to La Nouvelle for cleaning services on a military base (No. 11); and kickbacks from Al-Absi to Martin in connection with two subcontracts that Martin awarded to First Kuwaiti for the lease of equipment (Nos. 167 and 190).

3. **Mazon's Indictment and Trials.**  On March 16, 2005, following the task force's extensive investigation of Mazon and Hijazi, a grand jury indicted the pair for an illegal kickback relationship that inflated the price of Subcontract 39.  *See* Ex. 2 (Indictment in *United States v. Jeff Alex Mazon & Ali Hijazi*, No. 4:05-cr-40024 (C.D. Ill.) ("*Mazon*")) at ¶¶ 15-20.  On March 17, 2005, the Department of Justice (DOJ) issued a press release concerning the indictment.  Ex. 3.  Shortly thereafter, the indictment was reported by media outlets like *CNN* and the *Chicago Tribune*.[2]  Mazon was subsequently tried on two separate occasions in the United States District Court for the Central District of Illinois (CDIL), and both trials were open to the public.  *See Mazon*, Minute Entries Apr. 14 & Sept. 29, 2008.

4. **Seamans' Plea and Sentencing.**  In March 2006, Seamans pleaded guilty to wire fraud in the CDIL.  Ex. 4 (Plea Agreement in *United States v. Stephen Lowell Seamans*, No. 4:06-cr-40017 (C.D. Ill.) ("*Seamans*"));  *Seamans*, Minute Entry Mar. 10, 2006 (plea hearing).  In his plea agreement, Seamans admitted to receiving kickbacks from Hijazi in connection with

---

[2] *See, e.g.*, Terry Frieden, "Ex-Halliburton employee indicted; Former worker at KBR charged with attempt to defraud military of $3.5 million," *CNN Money*, Mar. 17, 2005, https://money.cnn.com/2005/03/17/news/midcaps/halliburton/index.htm; Ray Long and Andrew Zajac, "Ex-official of Halliburton is charged with fraud," *Chicago Tribune*, Mar. 18, 2005, https://www.chicagotribune.com/news/ct-xpm-2005-03-18-0503180221-story.html.

Subcontract 11, which Seamans awarded to La Nouvelle for cleaning services at a military base. Ex. 4 at 18-19.  On March 23, 2006, the DOJ issued a press release concerning the plea.  Ex. 5. On December 1, 2006, Seamans was sentenced.  *Seamans*, Minute Entry Dec. 1, 2006.  From March through early-December of 2006, Seamans' plea and sentencing were covered by media outlets ranging from the *New York Times* to *Al Jazeera*.[3]  Seamans also testified about his conduct at Mazon's criminal trials.  *See, e.g.*, ECF 341-2 (Supp. Gov't App'x for S.J.) at SGA 519-522.

5.     **Martin's Confession and Prosecution.**  The LOGJAM task force identified Martin during its investigation of Mazon, at whose criminal trials Martin would later testify.  On December 7, 2006, after federal agents developed evidence of kickbacks implicating Martin, including through a confidential informant, *see* Ex. 6,[4] Martin confessed to them his kickback arrangement with Al-Absi of First Kuwaiti, *see* Ex. 7 (FBI Form 302) at 4-5 ("MARTIN was confronted about receiving kickbacks and MARTIN admitted taking a kickback from WADIH of FIRST KUWAITI TRADING COMPANY (FKTC).  MARTIN had a kickback agreement with WADIH and was to receive 50 Kuwaiti dinars per truck head or tail across the board for all future subcontracts with FKTC.").[5]  This was the same arrangement that this Court found on summary

---

[3]*See, e.g.*, "Ex-Halliburton   staff   in   Saudi   kickback," *Al   Jazeera*, Mar.   24,   2006, https://www.aljazeera.com/news/2006/3/24/ex-halliburton-staff-in-saudi-kickback; Mark A. Stein, "Openers: Suits; Kickback With Bite," *N.Y. Times*, Dec. 10, 2006, https://www.nytimes.com/2006/12/10/washington/business/openers-suits-kickback-with-bite.html (discussing Seamans' sentencing and noting that he "also admitted accepting $305,000 from another company he had hired on behalf of the Army," referring to La Nouvelle).

[4] Exhibit 6 is an April 2005 cooperation agreement with an informant who assisted in Martin's investigation for well over a year before Relator filed his *qui tam* action.  It is no longer subject to protection.

[5] The Government is publicly filing Exhibit 7, which was created during the criminal investigation, only because the CDIL previously ordered its disclosure during discovery.  In accordance with established law, the Government maintains that interview summaries and other materials created by or at the direction of DOJ civil counsel are subject to the attorney-client privilege (among other protections) and are protected from disclosure.

judgment.[6]  In May 2007, Martin signed a plea admitting to this arrangement, and, in July 2007,

the CDIL conducted his plea hearing.  Ex. 8 (Plea Agreement in *United States v. Anthony J. Martin*,

No. 4:07-cr-40042 (C.D. Ill.) ("*Martin*")); *Martin*, Minute Entry July 13, 2007 (plea hearing).  The

DOJ also issued a press release concerning his plea, *see* Ex. 9, and the plea was separately reported

by the news media.[7]  The CDIL later sentenced Martin in a public hearing.  *See Martin*, Minute

Entry June 6, 2008.  Martin also admitted his misconduct during his testimony at Mazon's criminal

trials.  *See, e.g.*, ECF 337-5 (Gov't App'x for S.J., Part 2) at GA 639-646, 702-708.

**B.    Relator's *Qui Tam* Action**

6.    **Relator's Complaint and Allegations.**  On December 20, 2006, Relator filed a

complaint, commencing his *qui tam* action.  Ex. 10 (ECF 1).  By the time Relator filed suit, (1)

Mazon had already been indicted, (2) Seamans had already pleaded guilty and been sentenced, and

(3) Martin had already confessed to the FBI.  In addition, Mazon's indictment and Seamans' plea

and sentencing had been publicly reported.   Still, Relator's complaint did not mention these

individuals or describe the type of *bid-rigging* kickback arrangements in which they engaged.  Nor

did Relator allege any improprieties during the *award* or *modification* of subcontracts.

Instead, Relator's allegations were three-fold.  First, Relator alleged that KBR billed the

Army for impermissible costs associated with reefer trailers that KBR used to transport ice after

the trailers had served as makeshift morgues.  *See* Ex. 10 at ¶¶ 15-34.  Second, Relator alleged—

in seven short paragraphs—that certain KBR employees took kickbacks to accept delivery of

inoperative or NMC equipment.  *Id.* at ¶¶ 35-41.  Specifically, Relator alleged that a KBR

---

[6] *See* ECF 346 at 9-10 (finding that "[b]oth awards [of Subcontracts 167 and 190] were the result of [the] kickback arrangement" equal to "50 Kuwaiti Dinars (KD) per month per truck-trailer unit leased through a subcontract").

[7] *See, e.g.*, Brett Clanton, "Former KBR employee pleads guilty in Kuwaiti kickback case," *Houston Chronicle*, July 14, 2007, https://www.chron.com/business/article/Former-KBR-employee-pleads-guilty-in-Kuwaiti-1592172.php.

6

employee named Willie Dawson took kickbacks to accept delivery of a fleet of 200 reefers when only about 50 of them ever worked, and that a "local leasing company manager offered [Relator] the same deal that … [Dawson] was getting:  'a kickback on all equipment that hits the ground, good or bad.'"  *Id.* at ¶¶ 36-38.  Relator further alleged that a KBR employee named Rob Nuble took kickbacks "of this kind," and for agreeing to accept equipment that was never delivered.  *Id.* at ¶ 40.  <u>Third</u>, Relator alleged that KBR billed the Army for prostitutes.  *Id.* at ¶¶ 42-43.

7.    **Relator's Amended Complaint.**  On January 6, 2014, Relator filed an amended complaint.  Ex. 11 (ECF 54).  By this point, Mazon had been indicted and tried (twice), Seamans had pleaded guilty and been sentenced, and Martin had pleaded guilty and been sentenced.  *See supra* ¶¶ 3-5.  In addition, the media had reported about all three, and Martin and Seamans had each testified at Mazon's criminal trials.  *Id.*  Once again, however, Relator did not mention any conduct involving these individuals, the sort of bid-rigging kickbacks in which they participated, or any improprieties in the award or modification of subcontracts.  He instead repeated the same allegations from his initial complaint, involving morgue reefers, prostitutes, and kickbacks to operational personnel for favorable treatment in the delivery of equipment already under contract.

## C.    <u>The Government's Partial Intervention and Addition of Claims</u>

8.    **The Government's Partial Intervention.**  On May 10, 2013, the Government filed a notice of its election to intervene in part and decline to intervene in part in Relator's claims.  *See* ECF 51.  On January 6, 2014, the Government filed its amended complaint, through which it partially intervened in Relator's FCA claims involving morgue reefers and NMC equipment.  *See* Ex. 12 (ECF 55) at ¶¶ 134-137 (morgue reefers) and ¶¶ 129-133 (NMC reefers).

9.    **The Government's Additional Claims.**  Separate and apart from "the claims in which the Government interven[ed]," the Government also "add[ed] … additional claims with

respect to which the Government contend[ed] it [wa]s entitled to relief," as the FCA expressly permits *and Relator has conceded*. 31 U.S.C. § 3731(c); ECF 462 at 4-5. Each of these additional claims—including claims under the FCA and AKA, and for breach of contract—involved a different fraud scheme and implicated different individuals within KBR, but they generally focused on two types of misconduct.

First, the Government added claims involving allegations that KBR employees (Martin, Mazon, and Seamans) engaged in bid-rigging in exchange for kickbacks (provided by Hijazi or Al-Absi). *See generally* Ex. 12 (excluding ¶¶ 129-137). To state the obvious, these bid-rigging schemes involved the *award* of subcontracts, not the actions of KBR's operational personnel who accepted delivery of equipment in the field; indeed, the bid-rigging schemes would have commenced before any equipment was delivered or contract performance was required. Second, the Government added "additional claims" that did not involve kickbacks, including claims related to subcontract modifications and overpayments to First Kuwaiti for equipment that had been returned.[8] *See id.* at ¶¶ 111-114. Again, these claims did not concern the actions of KBR's operational personnel, which was the subject of Relator's claims.

10. **Relator's Lack of Familiarity with the Government's Additional Claims.** During his time in Iraq and Kuwait, Relator served as a "Fuel Operator" (or "civilian truck driver") and "convoy commander." *See* Ex. 13 at 13 (Relator's Employment Agreement); Ex. 10 (Relator's Complaint) at ¶¶ 2-3. He was not involved in awarding or modifying any of the four subcontracts at issue (Subcontracts 11, 39, 167, and 190). Indeed, two of those subcontracts were awarded before Relator ever began working for KBR in Iraq. *See* Ex. 13 at 12 (noting Relator's "effective" employment date of May 21, 2003, which *post-dated* the award of Subcontracts 11 and 39).

---

[8] On summary judgment, the Court found KBR liable under the FCA on one of the Government's non-kickback claims, which was included in the Covered Conduct to the settlement. *Compare* ECF 346 at 19-23, *with* Ex. 15 at 4, ¶ D(4).

### D.      The Government's Notice and Relator's Abandonment

11.      **The Government's Notice of Its Decision Not to Pursue.**   Although the Government had partially intervened in Relator's FCA claims regarding morgue reefers and NMC equipment, it later decided to drop those claims in litigation.   More specifically, in a public filing dated May 29, 2018, with which Relator was served, the Government informed the Court and the parties that it was "not pursuing claims in this litigation … in connection with Non-Mission Capable Reefers and Morgue Reefers…." Ex. 14 (ECF 179 & 179-1) at 3.   Again, the FCA claims based on this conduct were the only claims in which the Government partially intervened.

12.      **Relator's Decision Not to Pursue the Intervened Claims.**   At no point after receiving the Government's notice did Relator communicate with the Government concerning its view on the dropped claims; seek to pursue them; conduct discovery on them; or file the required pre-trial paperwork indicating that Relator intended to pursue them at trial.[9]

13.      **Relator's Decision to Abandon the Case.**   Instead of pursuing his morgue reefer and NMC claims, Relator elected to do nothing.   In his motion, Relator attempts to deflect responsibility for this decision by claiming that "the Government fended off every offer of assistance from Relator's counsel." *See, e.g.*, ECF 462 at 6.   The truth is that Relator's counsel did not bother to contact Government's counsel *for years*, much less offer any meaningful assistance.[10]      Moreover, given that Relator and his counsel lacked familiarity with the

---

[9] Had Relator wished to pursue the claims, he presumably would have done these things.  *Cf. MacArthur v. San Juan Cnty.*, 416 F. Supp. 2d 1098, 1178 (D. Utah 2005) (party waived issue by failing to raise it in proposed pre-trial order or during pre-trial conference) (quoting an advisory committee note for Fed. R. Civ. P. 16, and *Smith v. Gulf Oil Co.*, 995 F.2d 638, 644 (6th Cir. 1993)); *Koch v. Koch Indus., Inc.*, 179 F.R.D. 591, 596 (D. Kan. 1998) ("'Just as a party may be bound by what he says at a pretrial conference, he also may be bound by what he fails to disclose.'") (quoting 6A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1527, p. 265 (1990)).

[10] The most Relator did, in *Spring 2022*, was make an eleventh-hour offer to "help" if the matter ever went to trial (which it did not), after nearly all the work in the case had been done.

Government's "additional claims," it is unclear what assistance Relator could have provided to facilitate their resolution.[11]

**E.**     **Partial Summary Judgment and Pre-Trial**

14.     **Briefing.**   In late 2020, the parties submitted summary judgment briefs.   As reflected in the thousands of pages of public briefing and record evidence, the Government did not rely on Relator's dropped allegations at all.   *See generally* ECF 337, 341, & 344 (Gov't briefs). Nor did the Government seek to defeat KBR's statute of limitations (SOL) arguments by arguing that its allegations related back to Relator's initial complaint.[12]   This was not an oversight; the claims and fraud schemes that the Government ultimately elected to pursue *did not* arise out of the same conduct, transactions, or occurrences as Relator's allegations, and therefore did not relate back.   The Government clarifies this issue only because Relator confuses it in his motion.[13]

15.     **This Court's Decision.**   The Court granted the Government's motion for partial summary judgment on several claims and made factual findings regarding the fraud schemes at issue.   *See generally* ECF 346.   Specifically, the Court found that the Government's claims involved fraud in the award or modification of subcontracts.   *See id.* at 9-10 ("Martin was responsible for soliciting bids … and for negotiating and awarding subcontracts"); *id.* at 24 ("Jeff Mazon was responsible for issuing and administering subcontracts"); *id.* at 31 ("Seamans had no

---

[11] The one example Relator offers of how he could have "help[ed]" the Government involves making an argument that was inapplicable to the claims the Government was litigating.   ECF 462 at 16 n.21; *see also infra* ¶ 14.

[12] As this Court knows, the Government relied on KBR's charges and claims after May 9, 2004, the SOL date based on the parties' tolling agreements.   *See, e.g.*, ECF 341 at 92 ("Because KBR submitted vouchers for costs incurred on *each of the four subcontracts at issue* after May 9, 2004, the Government's FCA allegations for costs incurred under each of the four subcontracts are timely."); ECF 337-1 at 11-12 (same for AKA claims); *id.* at 59 n.35 (same for contract claims); ECF 341 at 99 (same); ECF 344 at 1-6 (same for AKA claims).

[13] Relator spends several pages arguing, seemingly based on his lack of familiarity with the case, that "the Government *needed*" to relate back to Relator's complaint to defeat the SOL.   ECF 462 at 5; *id.* at 15-16.   But immediately thereafter, Relator concedes that the Government, which prevailed on partial summary judgment, did *not* rely on relation back—a clear indication that relation back was not "*needed*" to defeat the SOL.   *Id.* at 16 n.21.

further procurement involvement with Subcontract 11 after the initial award"); *id.* at 19-24 (finding fraud in the modification of Subcontract 167).

16.     **Pre-Trial Filings.**  Following summary judgment, the Government did not include or support Relator's claims in its pre-trial filings.  *See, e.g.*, ECF 379 (Joint Pre-Trial Order) at 4-8; ECF 379-1 (U.S. Exhibit List); ECF 427-1 (U.S. Amended Witness List as of Feb. 14, 2022). Nor, as noted above, did Relator make *any* pre-trial filings.

F.     <u>**The Settlement of Claims and Relator's Dismissal of His *Qui Tam* Action**</u>

17.     **The Settlement Agreement.**  In May 2022, on the eve of trial, the Government and KBR reached an agreement-in-principle to resolve certain of the additional claims that the Government added in its complaint-in-intervention, subject to resolution of written terms.   To preserve all parties' rights on issues of relator share and attorney's fees and costs and to permit Relator to address his employment-related personal claims that the CDIL earlier dismissed, the Government, in the interest of judicial efficiency, involved Relator in the negotiation of terms.  On June 13, 2022, following the negotiation, the parties executed the integrated Settlement Agreement.  Ex. 15.

18.     **The Covered Conduct.**  In the Settlement Agreement, KBR paid for a release of claims pertaining to certain alleged conduct.  This "Covered Conduct," located in Paragraph D of the Recitals, outlined exactly what claims from the Government's complaint KBR's payment was made to satisfy.  Ex. 15 at 2-5, ¶¶ D(1)-(6).  Specifically, the Covered Conduct included the bid-rigging schemes of Seamans and Hijazi (¶ D(1)); Mazon and Hijazi (¶ D(2)); and Martin and Al-Absi (¶¶ D(3), (5)).  It also included KBR's overpayment for returned vehicles under Subcontract 167, which did not involve kickbacks, and KBR's concealment of that overpayment through subcontract records (¶ D(4)).  Finally, it included KBR's payment for returned vehicles under

Subcontract 190, which did not involve kickbacks (¶ D(6)).  The Covered Conduct did not include either of Relator's intervened claims (*e.g.*, morgue reefers, NMC-related kickbacks).  Nor did the Covered Conduct include all the claims in the Government's complaint.

19.     **Terms Regarding Relator Share.**  The Settlement Agreement preserved all parties' rights on the issues of relator share and attorney's fees, including the Government's right not to pay any share.  Ex. 15 at 7-8, ¶¶ 5-6.  The Settlement Agreement further preserved the Government's right to argue that Relator was not entitled to a share based on the disclosure of the allegations or transactions on which Relator's claims were based in the news media, federal criminal proceedings, or this civil litigation.  *See id.* at 7, ¶ 5 (citing 31 U.S.C. § 3730(e)).

20.     **Relator's Review of Terms.**  During the negotiation of written settlement terms, Relator had ample opportunity to review the Covered Conduct and see that it did not include any of his intervened claims or allegations.[14]  Relator could have elected not to dismiss his *qui tam* action, and then attempted to pursue his unresolved claims, but he did not do so.

21.     **The Joint Stipulation of Dismissal.**  On July 21, 2022, Relator voluntarily dismissed his *qui tam* action "with prejudice to the Relator as to any claim the Relator has asserted against Defendants on behalf of the United States in this Action."  ECF 449 at 1.  On July 29, 2022, the Court entered an order formalizing the dismissal.  ECF 453 at 1, ¶ 1.  The Court retained jurisdiction only to resolve disputes over relator share and attorney's fees.  *Id.* at 2, ¶ 3.

---

[14] The Government initially provided Relator with a draft of the Agreement on May 17, 2022.  On May 26, after Relator suggested multiple rounds of edits, the Government sent Relator a revised draft, stating that it hoped to have the agreement finalized "in the next day or so."  On May 27, Relator suggested still more edits.  With the exception of two minor edits on June 8 (one of which Relator had originally proposed), the Agreement was final as of May 31.  Relator and his counsel did not sign the Agreement until two weeks later, giving them significant time to review.  Moreover, after the final language was settled and the Government requested Relator's signatures on both June 9 and June 10, Relator waited several additional days before signing, which delayed execution until June 13.

### G.   The Parties' Subsequent Interactions and Relator's Motion

22.   **The Parties' Settlement Discussions.**  Following the settlement, the Government and Relator engaged in several discussions, both written and oral, regarding the relator share issue. While the Government will not reveal the substantive contents of those discussions here, which are protected by Fed. R. Evid. 408, its counsel attempted in good faith to explain the basis for the Government's position.   Relator's counsel were truculent throughout their discussions with Government counsel[15] and unable to answer basic factual questions as to how Relator's allegations relate to the fraudulent schemes the Government settled.

23.   **Relator's Motion.**  On October 6, 2022, Relator re-filed his motion for a share.  In addition to legal and factual errors, the motion contains statements that, if true, would violate Fed. R. Evid. 408 (*e.g.*, ECF 462 at 8 n.8) and are contradicted by the public record.[16]  It also contains quotations and paraphrased statements that Relator inaccurately attributes to Government counsel.

### ARGUMENT

Relator's entire argument boils down to the repetition of a talking point that the FCA does not support and that courts have rejected:  because the Government elected to partially intervene in certain of Relator's "claims," at least for a time, Relator is entitled to a share of every additional claim the Government alleged and settled.   According to Relator, it does not matter that the additional claims the Government settled involved different fraud schemes than Relator alleged, or that federal law forecloses Relator from sharing in at least some (if not all) of the additional claims.   Nor does it matter that, after the Government decided not to pursue Relator's intervened

---

[15] Relator's counsel reverted to insults not protected by Fed. R. Evid. 408.  *See, e.g.*, Ex. 16 at 1 (accusing the Government of "Alice in Wonderland arguments," "16 years of mismanagement," and "'no decency,'" and then stating that, "[a]lthough we are willing to talk to you, as futile as that is sure to be, we are not willing to allow you to waste another week though [*sic*] that stalling tactic (notwithstanding the 800+ weeks that you have already wasted)").

[16] *Compare, e.g.*, ECF 462 at 8 (claiming that the Government never informed Relator of KBR's payment), *with* ECF 450 at 1 (July status report) ("On June 16, 2022, … the Defendants paid the agreed-upon settlement amount.").

claims, Relator dismissed them without settlement or resolution through litigation.   Relator contends that the only salient consideration is that the Government once intervened in part (regardless of what any of the parties did after that), and that the Government's intervention in any claim "automatically" granted Relator a right to a share of the Government's entire action in perpetuity.   ECF 462 at 11.

This is **not what the FCA says**, and it is **not how courts have interpreted it**.   To the contrary, the law is clear that relators are only permitted to share in the settlement of claims they are permitted to bring, based on the fraud schemes they allege.   This avoids relators receiving undeserved windfalls, at taxpayer expense, from the resolution of frauds that they did not, or could not, pursue.   In this case, the Government did not settle Relator's claims.   And, even if the Government *had* done that, the FCA would bar Relator from bringing those claims and receiving a share of their proceeds.

A.      **The FCA Does Not Permit Relators to Share in All Proceeds of All Settled Claims**

Relator begins his argument by saying that "*the FCA means what it says*," but then proceeds to ignore and misconstrue what the FCA says.   ECF 462 at 9-10.

1.      **For Purposes of Determining Relator Share, the FCA Treats Each Claim in a Multi-Claim Complaint as If It Stands Alone**

The FCA permits relators to "bring a civil action for a violation of [the FCA] for the person and for the United States Government."   31 U.S.C. § 3730(b)(1).   The Government then has the option to "proceed[] with the action" or decline to proceed with the action.   *Id.* at §§ 3730(c)(1), (3).   The Government may also elect to *partially intervene* in claims, in which case it takes over certain claims while declining others.   *See, e.g.*, *United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 101-02 (3d Cir. 2000) (Alito, J.) (noting that, while "the statute is based on the model of a single-claim complaint[,] … the government often decides to take over

only certain claims in a multi-claim action, and we are aware of no decision holding that this is improper").  When the Government does this, the FCA permits it to "file its own complaint or amend the [relator's] complaint … to clarify or add detail to *the claims in which the Government is intervening*."[17]  31 U.S.C. § 3731(c) (emphasis added).

In other words, the FCA treats "each claim in a multi-claim complaint … as if it stood alone."  *Merena*, 205 F.3d at 102.  "It follows, therefore, that in determining whether … relators … are entitled to a share of any proceeds that are attributable to … [certain] claims, [courts] must consider whether [relators] would have been entitled to such a share had their complaints asserted those claims alone."  *Id.*  Notably, both the Supreme Court and courts within this Circuit have endorsed this claim-by-claim approach, which is necessarily inconsistent with Relator's argument that relators are entitled to 15 to 25 percent of all settlement proceeds, irrespective of what claims the Government settled.  *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 476 (2007) (endorsing *Merena*); *Fisher*, 413 F. Supp. 3d at 577-78 (adopting *Merena*'s claim-by-claim analysis); *United States ex rel. Banigan v. Organon USA, Inc.*, No. H-08-3314, 2013 WL 12142351, at *26 (S.D. Tex. Feb. 1, 2013) ("The court must conduct a claim-by-claim analysis.") (citing *Merena*).

One reason for this claim-by-claim approach is that the FCA not only authorizes the Government to clarify "the claims in which [it] … interven[es]," but also to "add any additional claims with respect to which the Government contends it is entitled to relief."[18]  31 U.S.C. §

---

[17] "A 'claim' under the FCA is a discrete theory of fraudulent conduct."  *United States ex rel. Fisher v. JPMorgan Chase Bank N.A.*, 413 F. Supp. 3d 569, 581 (E.D. Tex. 2019) (citing *Rockwell*, 549 U.S. at 466, and *United States ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496 F.3d 1169, 1172, 1177 (10th Cir. 2007) (Gorsuch, J.) (stating that "each of the … fraudulent schemes" alleged "must be analyzed on its own terms")).

[18] By permitting the Government to combine claims into one lawsuit against the same defendant(s), instead of forcing the Government to pursue intervened FCA claims through separate actions, the FCA promotes judicial efficiency.

15

3731(c).  The FCA places no limitations on what additional claims the Government may add, and, in fact, it expressly permits the Government to add claims on which relators cannot recover— rendering Relator's all-or-nothing approach inconsistent with the statute as a whole.  *Cf. United States v. Williams*, 400 F.3d 277, 281 n.2 (5th Cir. 2005) ("each part or section of a statute should be construed in connection with every other part or section to produce a harmonious whole").

First, the Government may add FCA claims that involve entirely different fraud schemes than those the relator alleges.[19]  *See Rille v. PricewaterhouseCoopers LLP*, 803 F.3d 368, 374 (8th Cir. 2015) (*en banc*); *see also* 31 U.S.C. § 3731(c) (providing that only claims "aris[ing] out of the conduct, transactions, or occurrences" identified in a relator's complaint will relate back for SOL purposes, which would make no sense if the Government was unable to add claims pertaining to separate conduct, transactions, or occurrences).  It is well-established that a relator has no right to recover on additional claims based on different fraud schemes than the relator alleged.  S*ee, e.g.*, *Rille*, 803 F.3d at 373 ("[T]he relator also has no right to a share if the government adds the non-overlapping claim to the original action after intervening.") (citing *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 651 (6th Cir. 2003), which remanded a case for the district court to determine "whether the conduct contemplated in the … settlement agreement overlaps with the conduct alleged by Relator in bringing his *qui tam* action").  Relator's attempt to minimize courts' acceptance of this well-established principle, *see* ECF 462 at 15, is baseless.[20]

---

[19] To illustrate, Relator alleged that Willie Dawson and Rob Nuble took kickbacks to accept delivery of inoperable "trucks, trailers and equipment," which has nothing to do with the Government's allegation that Seamans rigged the award of a cleaning services subcontract for kickbacks.  *Compare* Ex. 10 at ¶¶ 35-41, *with* Ex. 15 at 2, ¶ D(1).

[20] *See, e.g.*, *United States ex rel. McGuire v. Millenium Labs.*, 923 F.3d 240, 252 (1st Cir. 2019) (adopting analysis in *Rille*); *United States ex rel. Alt v. Anesthesia Servs. Assocs., PLLC*, No. 3:16-cv-0549, 2021 WL 3115157, at *3 (M.D. Tenn. July 22, 2021) (citing *Rille* for the proposition that a relator must establish an overlap between his allegations and the conduct settled); *United States ex rel. Ferrara v. Novo Nordisk, Inc.*, No. 11-74 (RBW) (lead case no.), 2019 WL 4305503, at *11 (D.D.C. Sept. 11, 2019) ("The Court therefore cannot conclude that relator Dastous alleged the MTC Risk Conduct claims, and thus, he is not entitled to share in the proceeds of the government's settlement of those

16

Second, the Government may add FCA claims involving fraud schemes on which the FCA forecloses the relator (but not the Government) from recovering, including claims subject to the Government action and public disclosure bars.  31 U.S.C. §§ 3730(e)(3)-(4); *Merena*, 205 F.3d at 102.  Indeed, *even if the Government intervenes*, relators are not entitled to recover on claims they are barred from bringing.  *See, e.g.*, *Merena*, 205 F.3d at 105-106 (rejecting the contrary argument).

Third, the Government may add *non*-FCA claims seeking relief in which relators cannot share because the claims are not the "types of false or fraudulent *claims* that the [FCA] recognizes and for which a *qui tam* action could have been litigated," *United States ex rel. Kennedy v. Novo A/S*, 5 F.4th 47, 58 (D.C. Cir. 2021), and, therefore, do not "take[] the place of an FCA remedy," *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1011 (9th Cir. 2001); 31 U.S.C. § 3730(c)(5) (FCA's provision for alternate remedies).  Of significance here, neither AKA claims nor breach of contract claims are the types of false or fraudulent claims for which a *qui tam* can be litigated; nor do they take the place of FCA remedies, as this Court has already held.[21]  As such, they are not "alternate" remedies in which Relator can share.

## 2.     Relator Misinterprets the Statute

Relator's argument ignores the FCA as a whole and focuses solely on 31 U.S.C. § 3730(d)(1), which states, in relevant part:

> If the Government proceeds with *an* action brought by a person
> under subsection (b), such person shall, subject to the second
> sentence of this paragraph, receive at least 15 percent but not more

---

claims.") (citing *Rille*); *United States v. Shire Regenerative Med., Inc.*, No. 8:11-CV-176-T-30MAP (lead case no.), 2017 WL 6816615, at *6 (M.D. Fla. Nov. 20, 2017) (adopting analysis in *Rille*).

[21] *See* ECF 346 at 8 (noting that "a court may impose both civil penalties under the AKA, and separate civil penalties and treble damages under the FCA for the same acts") (citing *Morse Diesel Int'l, Inc. v. United States*, 79 Fed. Cl. 116 (2007)); ECF 368 at 4 (reinstating the Government's contract claims to allow pursuit alongside its FCA claims); *cf. United States ex rel. Mayman v. Martin Marietta Corp.*, 894 F. Supp. 218, 225-26 (D. Md. 1995) (holding that contract claims are not alternate remedies and that relators cannot pursue "additional [contract] counts raised by the Government as part of an action in the same forum in which the [FCA] counts are brought").

than 25 percent of *the proceeds of <u>the</u> action <u>or</u> settlement of the claim*, depending upon the extent to which the person substantially contributed to the prosecution of the action.

(emphasis added).  Relator misinterprets this provision as a guarantee that he will receive 15 to 25 percent of all settlement proceeds in any lawsuit that contains any intervened claim.  But this is not what Section 3730(d)(1) says.  Relator's misreading of Section 3730(d)(1) is two-fold.  *See* ECF 462 at 9-14.  He first misreads the phrase "the proceeds of the action" to refer to the proceeds of the *Government*'s action (rather than his own *qui tam* action).  He then ignores that the provision is stated in the disjunctive, by treating the second phrase ("the proceeds of the … settlement of the claim") as redundant with the first ("the proceeds of the action").

a.        **Relator Misreads "[t]he [P]roceeds of the [A]ction"**

When Section 3730(d)(1) refers to "the proceeds of the action," it is referring to a *relator*'s *qui tam* action.  *See Rille*, 803 F.3d at 372-73 (noting that "the phrase 'proceeds of the action' refers back to 'an action brought by [the relator]'"); *cf. SFA Sys., LLC v. 1-800-Flowers.com, Inc.*, 940 F. Supp. 2d 433, 447 (E.D. Tex. 2013) ("the general rule is that the first mention of a noun is preceded by *a* or *an* and subsequent references to the same noun are preceded by *the* or *said*"); *MacMillan Dictionary Online*, https://www.macmillandictionary.com/us/dictionary/american/the (noting that "the" is "used when … referring to a particular thing or person that has already been mentioned").  It is *not* referring to "the action as developed after intervention by the government." *Rille*, 803 F.3d at 373.  This distinction is important, because, as the FCA makes clear, the Government is not required to intervene in every claim in a relator's *qui tam* action; it may instead "clarify … *the claims* in which [it] is intervening," and then "add *any additional claims* with respect to which the Government contends it is entitled to relief."  31 U.S.C. § 3731(c) (emphasis

18

added).  Because the action the Government ultimately files may be different than Relator's *qui tam* action, the proceeds of the Government's action may be different as well.

In this case, there cannot be *any* proceeds of Relator's *qui tam* action because, after the Government settled the "Covered Conduct," which did not include any of "the claims" in which the Government intervened, Relator dismissed his *qui tam* action without resolution or compensation.  *See* Ex. 15 at 7-10, ¶¶ 6, 12.  The proceeds of Relator's *qui tam* action are *zero*.

### b.      Relator Misreads "[t]he [P]roceeds of the … [S]ettlement of the [C]laim"

Just as he misreads the phrase "the proceeds of the action," Relator also misconstrues remainder of the sentence:  "or settlement of the claim."  31 U.S.C. § 3730(d)(1).  Because this phrase is separated from the phrase concerning the proceeds "of the action" with the disjunctive "or," it means that Congress intended to give it a distinct meaning.  *See, e.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-39 (1979) (noting that courts cannot "ignore the disjunctive 'or,'" and "that terms connected by a disjunctive [should] be given *separate meanings*") (citations omitted and emphasis added).  Relator, however, does not give it a separate meaning; he instead ignores Congress's use of the disjunctive and attempts to collapse the proceeds of the "settlement of the claim" into "the proceeds of the action," alleging that any distinction between the two phrases was simply "conjure[d] up" by the Government.[22]  *See* ECF 462 at 14 ("The Government appears to be trying to conjure up *some kind of distinction* … between [the two phrases].") (emphasis added).

Relator argues, in other words, that "the proceeds of the … settlement of the claim" *are* "the proceeds of the action," implying that the Court can simply disregard the former phrase.  *Id.* ("payments under the settlement agreement qualify as *both*").  But if that was true, then "the proceeds of the … settlement of the claim" language would be superfluous, and Congress would

---

[22] Relator does this, somewhat ironically, while accusing the Government of rewriting the FCA with "'invisible ink.'" ECF 462 at 13.

not have needed to include it.  It would have been enough that Congress had provided for "the proceeds of the action," which would always and inevitably include the proceeds of any settled claim(s).  It is well-established that courts have an obligation not to interpret statutes to create these sorts of superfluities.  *See, e.g.*, *Fowler v. Gen. Ins. Co. of Am.*, No. 3:14-CV-2596-G, 2014 WL 5879490, at *3 (N.D. Tex. Nov. 13, 2014) ("Ascribing the same meaning to the [different] phrases … would also conflict with the rule against surplusage, which encourages courts to give meaning to every word and phrase, avoiding any construction that would make a provision superfluous.") (citing *Tesfamichael v. Gonzalez*, 411 F.3d 169, 175 (5th Cir. 2005), which notes: "[i]t is axiomatic that courts should strive to give operative meaning to every word in a statute")).

Relator's violation of the rule against surplusage, however, is not the only way in which his interpretation of Section 3730(d)(1) runs afoul of basic principles of statutory construction.  As noted in Part A.1 above, for example, Relator's position would render Section 3730(d)(1) inconsistent with the FCA's various claim-centric provisions, which would violate the cardinal principle that "each part or section of a statute should be construed in connection with every other part or section to produce a harmonious whole."  *Williams*, 400 F.3d at 281 n.2.  In addition, by expanding Relator's entitlement to claims on which he did not (or could not) blow the whistle, Relator's position would be "inconsistent with the purposes of the [FCA]" and would "create unwarranted disparities in recovery depending on how the government pursues a new claim" (*i.e.*, whether through a lawsuit containing intervened claims or through a separate suit containing no intervened claims).  *Rille*, 803 F.3d at 373.  This, in turn, would violate the axiom that courts should avoid interpreting statutes in ways that produce absurd results.  *See, e.g.*, *Holy Trinity Church v. United States*, 143 U.S. 457, 460 (1892) ("the act must be so construed as to avoid the absurdity"); *Krzalic v. Republic Title Co.*, 314 F.3d 875, 880 (7th Cir. 2002) (Posner, J.) (courts

20

do not "insult the legislature by attributing absurdities to it").  Put simply, the only analysis that makes sense under Section 3730(d)(1) is the claim-centric analysis that is reflected within the plain language of the statute.  *Compare* 31 U.S.C. § 3731(c) ("the Government may … clarify … *the claims* in which the Government is intervening") (emphasis added), *with id.* at § 3730(d)(1) (relators receive "the proceeds of the … settlement of the *claim*") (emphasis added).

In this case, the Government did not settle all claims that were originally included within its complaint, much less in Relator's *qui tam* action.  Instead, the Government only settled claims for the Covered Conduct described in the Settlement Agreement.  Because Relator chose to dismiss his *qui tam* action, there was no further resolution of claims beyond the Government's settlement. As such, the only issues before the Court now are (1) whether the Government settled claims for different fraud schemes than Relator alleged, and (2) only if the Government settled the same fraud schemes that Relator alleged, whether the FCA's public disclosure and alternate remedy provisions foreclose Relator from obtaining the relief he seeks.

**B.      Relator is Not Entitled to Any Share Because the Government Settled Claims Involving Different Fraud Schemes Than Relator Alleged**

The only documents that the Court needs to render a decision on Relator's motion are the Settlement Agreement (Ex. 15) and Relator's complaints (Exs. 10, 11).  By comparing these documents side-by-side, the Court can confirm that the Government did not settle claims for any of the fraud schemes that Relator alleged.  To wit, as reflected in the Covered Conduct to the Settlement Agreement, the Government settled claims related to:

- Seamans' bid-rigging of a cleaning services subcontract for a kickback from Hijazi;
- Mazon's bid-rigging of a fuel storage subcontract for a kickback from Hijazi;
- Martin's bid-rigging of two transportation subcontracts for kickbacks from Al-Absi;
- KBR's modification of Subcontract 167 to conceal an overpayment for returned equipment; and
- KBR's payment for returned equipment under Subcontract 190, which the Government pursued as a contract claim (*see* ECF 440 at 15-16).

21

*See* Ex. 15 at 2-5, ¶ D.  As reflected in Relator's complaints, Exs. 10 and 11, Relator did not allege any of this conduct.  He instead alleged fraud schemes involving prostitutes, morgue reefers, and kickbacks to operational personnel Willie Dawson and Rob Nuble to accept delivery of bad equipment or say that deliveries arrived when they did not.  These are different fraud schemes that involve different personnel (procurement vs. operational) at a different stage in the process (award/modification vs. delivery).  Notwithstanding that he has moved the Court for a share of the Government's settled claims, Relator does not meaningfully argue otherwise, much less explain with particularity how the Covered Conduct overlaps with the conduct he alleged.  Relator fails to do this even after conceding that the Government's lawsuit contained "additional claims"—a recognition that not all the Government's claims were the same as his own.  *See* ECF 462 at 4-5.

Instead, relying on precedent that supports the Government's position,[23] Relator offers a smattering of incorrect arguments about why he should receive a share without having to prove that he alleged the same schemes the Government settled.  For example, Relator incorrectly claims that the Government's position is based on only one case.  ECF 462 at 15; *but see supra* n.20 & Argument, Part A.  He then attempts to undermine that case (*Rille*), an Eighth Circuit *en banc* decision from 2015, by citing a 2-1 *panel* decision from 2013 (*Roberts v. Accenture, LLP*, 707 F.3d 1011 (8th Cir. 2013)) that *Rille* discarded and which is inconsistent with the claim-by-claim approach adopted in *Rockwell*, *Merena*, and a court within this District.[24]  ECF 462 at 15.  He suggests that courts' characterization of a relator's share as a "bounty" or "finder's fee" means that

---

[23] *See, e.g.*, ECF 462 at 15 (citing *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp 3d 1010, 1076 (N.D. Cal. 2020), which expressly adopts *Merena*'s claim-by-claim analysis).

[24] Judge Colloton, who wrote the dissent in *Accenture*, subsequently wrote the *en banc* majority opinion in *Rille*, through which the Eighth Circuit adopted the analysis from Judge Colloton's earlier dissent in place of the panel's analysis in *Accenture*.  And, regardless, the catalyst theory employed in *Accenture* does not fit here—given that the Government was already investigating the relevant conduct before Relator filed suit.

relators are entitled to such a bounty or fee even for claims that are not settled and for which there are no proceeds—a *non sequitur* that neither the FCA's text nor its precedent supports. *Id.* at 11, 15. He touts the credentials of his counsel. *See, e.g.*, *id.* at 7. And he makes confused statements that confirm his lack of familiarity with the claims the Government settled. *See, e.g.*, *supra* ¶ 14.

Even when Relator gets around to discussing factual overlap, he focuses on the wrong things. First, he attempts to establish a factual overlap by arguing that the Government's *complaint* contained certain of Relator's claims. *See* ECF 462 at 16-17. But this is irrelevant, because the Government did not settle all the claims included within its complaint (or which were described in its accompanying press release). The Covered Conduct in the Settlement Agreement comprises a subset of the claims in the complaint. The other claims were dismissed without resolution. Relator's claims were not among those that the Government settled.

Second, relying exclusively on *United States ex rel. Mustafa v. Najjar*, an out-of-circuit decision that no court ever appears to have cited, Relator argues that "[t]he case law supports" a factual overlap. ECF 462 at 17. But Relator misreads this case. It did not hold, as Relator contends, that a relator's mere allegations of fraud in the abstract, stripped of any specific details that make the allegations meaningful, is sufficient to support the relator's entitlement to a share of any fraud claims that are settled. Quite the opposite, actually. In *Najjar*, the relator alleged the exact conspiracy at issue, and the Government recovered from one of the co-conspirators that the relator had identified but not named as a defendant. The court held that, because the relator had identified the conspiracy with such specificity, he was entitled to share in claims settled with the non-defendant co-conspirator. 120 F. Supp. 3d 1322, 1324-27 (M.D. Fla. 2015). *Najjar* hardly stands for the proposition that when a relator alleges one fraud scheme, he can share in recoveries for other fraud schemes. To state the obvious, this is because not all frauds are part of the same

23

scheme—even if they occur in the same geographic region or could be labeled, at an exceedingly high level of abstraction, using the same generic terms (*e.g.*, "kickback"). Otherwise, the allegation of any one fraud would be sufficient to plead all others (a notion at odds with Fed. R. Civ. P. 9(b)), and the settlement of any one fraud would be sufficient to release liability for all others.

## C.   Even If Relator Alleged the Same Schemes, He Cannot Obtain the Relief He Seeks

Even if Relator could establish a sufficient factual overlap between his claims and the settled claims, which he cannot, Relator *still* cannot obtain the affirmative relief he seeks.  This is because Relator has moved the Court for relief—15 to 25 percent of *all settlement proceeds*—that, for at least two additional reasons, the law precludes him from recovering.

**First**, the FCA bars Relator from recovering for any claim based on "allegations or transactions" that were publicly disclosed before Relator filed suit, 31 U.S.C. § 3730(e)(4)(A), even if Relator did not personally rely on the public disclosures.[25]  The FCA, in other words, requires nothing more than a public disclosure of the same "allegations or transactions" before Relator's *qui tam* action was filed.  Here, to the extent that Relator actually alleged the schemes for which the Government settled claims, there is no question that many of the "allegations or transactions" providing the basis for the settled claims were public before Relator ever filed his complaint, and Relator does not even attempt to argue otherwise.[26]  *Compare, e.g.*, *supra* ¶¶ 3-7, *with* Ex. 15 at 2-5, ¶ D (Covered Conduct).  Indeed, the Government had charged, convicted, or obtained confessions from each of the three KBR employees who entered into the kickback

---

[25] *See, e.g.*, *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011) ("[F]or the public-disclosure bar to apply, the publicly disclosed allegations or transactions need only be as broad and as detailed as those in the relator's complaint, because that is all that is needed for the action to be 'based on' the public[ly] disclosed allegations."); *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1044 (10th Cir. 2004) ("A relator need not have learned of the basis for the *qui tam* action from the public disclosure for [the bar to apply].").

[26] Other allegations were revealed, for the first time, in the civil complaint, triggering 31 U.S.C. § 3730(e)(3).

arrangements at issue—and was actively investigating the subcontracts at issue—before Relator's complaint.  *Id.*  This dooms Relator's argument.  In the Settlement Agreement that Relator signed, the Government expressly preserved its rights to contest share under the FCA's public disclosure provisions, *see* Ex. 15 at 7, ¶ 5, and the law makes clear that it may do so, even for intervened claims, *see supra* Argument, Part A.1 at 17.

**Second**, the Government's recovery includes certain non-FCA claims, *i.e.*, AKA and contract claims.[27]  As noted above, these are not "alternate" remedies in which relators are entitled to share; they are separate claims pursued alongside FCA remedies.  *See supra* Argument, Part A.1 at 17; *cf. Novo A/S*, 5 F.4th at 54 ("After all, an 'alternate' remedy must be in place of something else.  That is, there must be a default choice for which the alternate remedy is a different option.").  In his brief, Relator, again, does not even attempt to argue otherwise.

In sum, because there is no dispute that the Covered Conduct resolves allegations and transactions that were publicly disclosed before Relator filed his complaint, and because the Government's settlement proceeds include proceeds for claims that are not alternate remedies to the FCA, Relator cannot possibly obtain the relief he seeks—15 to 25 percent of everything.[28]  As the only "state[ment] of relief sought" is something that Relator cannot have, Fed. R. Civ. P. 7(b)(1)(C), his motion must be denied as lacking appropriate support.

## CONCLUSION

For the foregoing reasons, this Court should *deny* Relator's Motion for a share of the United States' settlement of additional (non-intervened) claims with KBR.  As a matter of law, Relator is not entitled to "the proceeds of the … settlement of th[ose] claim[s]."  31 U.S.C. § 3730(d)(1).

---

[27] The Court found KBR liable on multiple AKA claims on summary judgment.  *See* ECF 346 at 10-13.

[28] For this reason, the Government need not divulge *how* it allocated the settlement proceeds among its various FCA and non-FCA claims (which is non-public information) at this time.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JENNIFER LOWERY
United States Attorney
Southern District of Texas

DANIEL D. HU
Assistant United States Attorney
Southern District of Texas
Texas Bar # 10131415
SDTX ID: 7959

*/s/ David W. Tyler*
JAMIE ANN YAVELBERG
MICHAL TINGLE
ASHLEY N. BAILEY
ELSPETH A. ENGLAND
JEFFREY A. MCSORLEY
DAVID W. TYLER
Attorneys, Civil Division
Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C.  20044
Telephone: 202.305.3988
david.w.tyler2@usdoj.gov

Dated:  October 25, 2022                    *Attorneys for the United States of America*

26

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on October 25, 2022, a copy of the foregoing was served on the attorneys of record in this case via the Court's electronic filing system.

*/s/ David W. Tyler*